# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


VALERIE HOWARD,                    )
                                   )
             Plaintiff,            )
                                   )
      vs.                          )CASE:
                                   )3:12-CV-4880-CRB
                                   )
CUMULUS MEDIA, INC.,               )
SUSQUEHANNA RADIO CORP. AND DOES   )
ONE THROUGH FIFTY, INCLUSIVE,      )
                                   )
             Defendant(s).         )
                                   )
                                   )


DEPOSITION OF VALERIE HOWARD

SAN FRANCISCO, CALIFORNIA

TUESDAY, FEBRUARY 26, 2013


Reported By:

Ora B. Kohn

CSR 11933

1

Valerie Howard

```
 1        A.   I would not typically send him an invite
 2   either.  I would maintain my own calendar.
 3        Q.   How would you find out about -- I'm not
 4   talking about one specific period.  Doesn't have to be
 5   always found out, but generally how would you find out
 6   about manager's meetings, for example?
 7        A.   It was an ongoing meeting that happened at
 8   4 o'clock every Monday or 4:30 every Monday.  And it
 9   was verbal.  It might at one point have been sent out
10   in e-mail, but it was kind of verbal after that.
11        Q.   So it was basically a standing meeting?
12        A.   Um-hm.
13        Q.   Yes?
14        A.   Yeah.
15        Q.   So then I know that the employees changed over
16   time that you were there, but typically who would be
17   included in a Manager's meeting more in terms of title?
18   Or you can use examples of people.
19        A.   Those employees didn't change when I was
20   there.  They were the same.
21        Q.   Okay.
22        A.   It would have included Judi Ratto and Daniel
23   Erman on the KNBR side, and it would have included
24   Omari Patterson from KFOG and Michael Segerhi from
25   KSAN.  I'm not sure if the National the first time
```

12

Valerie Howard

1    around had been included or not.  I don't know

2    whether --

3        Q.   The National Sales Manager?

4        A.   The first go-around, that was a job that was

5    eliminated I think in '08.  I don't know.  And then

6    it -- but the Managers' meetings typically would have

7    had Peter.

8        Q.   Who was the NSM?  I believe you were just

9    referring to until '08.  Was there a particular person

10   in that role?

11       A.   Yes.  I don't remember her name.

12       Q.   Maybe this is a good time.  I just want to

13   make sure we have enough background so that you're not

14   sitting here having to guess at things.  I don't want

15   you to guess at things in documents, so I'm going to

16   enter an exhibit.  We just do that so we know what

17   we're referring to when we look back at this document

18   one day.

19            [Whereupon, Deposition Exhibit 1, a

20            Cumulus San Francisco Sales Organization

21            Chart (11th Floor) 8/9/2010 was marked

22            for identification.]

23            This Exhibit 1 is something that I'm going to

24   represent to you that we produced to your attorney in

25   the course of litigation.  That's what those little

13

Valerie Howard

1   numbers on the bottom left mean.  And at least it says

2   that it's the Sales organization chart.  It's the

3   organization chart for Sales, and it has the date

4   August 9, 2010.  My question is whether you would

5   review this and tell me whether it's accurate to the

6   best of what you recall.

7        A.   (DOCUMENT REVIEW.) The only part that would

8   seem to be off was Daniel Erman at that time was a half

9   Manager, half seller.

10       Q.   Okay, so he would be under Judi Ratto?

11       A.   He would be under, Judi but he would be sort

12   of halfway below Michael Segerhi and Maura, and above

13   Chris Young.  It was a custom role they had created for

14   him.

15       Q.   So when you say that Daniel Erman also did

16   Sales, what do you mean by that?

17       A.   He had been a manager just like Maura and

18   Michael.  And then it was determined by Judi, as I

19   understand it, and Peter, that he was not effective in

20   that role, and so they created a custom role for him

21   where he would do sports Sales, lead the 49er efforts

22   and be a half AE.

23       Q.   So he was focusing more than on Sales to that

24   49ers franchise?

25       A.   He would handle -- he would lead and manage

14

Valerie Howard

1    the 49ers Sales effort, and then have regular accounts

2    the rest of the year.

3        Q.    Because the ball season isn't all year round.

4        A.    And he wasn't an effective LSM, but they felt

5    he had great skills and wanted to employ him in a

6    different manner.

7        Q.    Well, looking at the general structure, it

8    looks like obviously Peter Schwartz is Director of

9    Sales.  So is it fair to say at that time he was

10   overseeing all Sales in the San Francisco market of

11   Cumulus?

12       A.    Yes.

13       Q.    Then I see, just focusing on the Sales part of

14   it, you as FM General Sales Manager, and then it looks

15   like Judi Ratto is your peer on the AM side?

16       A.    Uh-huh.

17       Q.    Could you explain a little bit about the

18   difference between the FM side of the house and AM side

19   of the house at the station?

20       A.    The FM side of the house handled Sales for

21   music properties.  Two different brands.  Two very

22   different approaches, very different Sales teams.  KFOG

23   was much better funded than KSAN, where we had a much

24   smaller commission line, and Sales talent was not as

25   strong.  The AM side of the house was, as I understood,

15

**Valerie Howard**

1    an expensive operation to run.  It made a lot of money

2    because you had big brands.  And during my tenure

3    there, they won the World Series, the Giants did, so

4    there were some great opportunities for Sales.  And

5    they had a single team in a sort of simple Sales

6    process.

7        Q.    So when you're -- let's focus on the music

8    properties that you mentioned.  Would that be The Bone

9    in KFOG?

10       A.    Uh-huh.  Yes.

11       Q.    I'm not sure what call letters are for The

12   Bone.

13       A.    K-S-A-N.

14       Q.    That's what you were just saying.  If we're

15   looking at going down this chart, looks like Maura

16   Donahue was handling KFOG, and Michael Segerhi was

17   handling KSAN.  Was that accurate?

18       A.    Depends on what you mean by "handling."

19       Q.    Well, tell me what Maura's role was.

20       A.    Maura was a Local Sales Manager.  And at the

21   time she came onboard, she concentrated her energies

22   with a couple of the sellers directly, spent time with

23   Adrienne, Brian Benson.  I don't actually recall.  I

24   think that might be somebody else, Matt Alighieri.  And

25   I typically would work with John and Victoria and

16

Valerie Howard

1    Tiffany.  Before Maura joined, I also worked a lot with

2    Matthew.  So this makes it appear as though I would

3    have no direct contact with the sellers, and that

4    wasn't true at all.

5         Q.   I see.  So what would -- I mean, just for

6    people that aren't familiar with the terms of art, a

7    Local Sales Manager, does that have a common meaning in

8    the radio industry, or is that something that would

9    change from station to station or company to company?

10        A.   It would change in terms of what their direct

11   responsibilities were, but usually you would have --

12   you have revenue that is generated locally in a market,

13   and you have revenue generated nationally in a market

14   that comes from Chicago or New York or LA or DC.  A

15   Local Manager would deal with the revenue that's

16   generated here within the radius, the nine Bay Area

17   counties.

18        Q.   And then National Sales, would that have a

19   different --

20        A.   They would do --

21        Q.   -- base?

22        A.   They would deal with all customers that are

23   not in the nine Bay Area counties.  Decision making is

24   made outside of the Bay Area.

25        Q.   What would be an example of that type of --

17

Valerie Howard

1       A.   United Airlines has an agency in Chicago, and

2   the buy is made in Chicago.  And we would work with a

3   separate firm that has their own dedicated Sales Team,

4   and they would call in and order a National order, and

5   say, hey, I got four weeks for United Airlines.  And it

6   would be funneled through a dedicated National Sales

7   Manager or Natalie Pensabene.

8       Q.   Natalie?  Where is she?

9       A.   Secretary for Peter.

10      Q.   I see, okay.  So when we're looking at this

11  organization chart and we're looking at what's

12  underneath you and Judi Ratto, those would be

13  non-National?  Would that be accurate?

14      A.   There were times early on where it would have

15  been a different structure, but at this point

16  absolutely, non-National.

17      Q.   In terms of National work, are you saying that

18  it was more with agencies?  Was there more work with

19  advertising agencies versus the local side?

20      A.   Local would have included agencies, just

21  different agencies.  National is dealing with agencies

22  outside the nine Bay Area counties.  I think there's an

23  official contract that says everything outside of a

24  specific geography is the domain of the National rec

25  firm, so we would not be able to go after it.

18

Valerie Howard

1    org chart, tell me a little bit about what a General

2    Sales Manager does versus a Local Sales Manager.

3         A.   A General Sales Manager would set the Sales

4    direction and approach; how the station is going to be

5    positioned in the market to most effectively capture

6    revenue.  And in my case, how we were going to make

7    sure that we go after a similar target with KSAN and

8    KFOG, not cannibalize one another.

9         Q.   So you're not --

10        A.   So if we both reach a male 25 to 54, how we

11   position KFOG to be sort of that person that would buy

12   a high-end beer, and you would position KSAN as a

13   property that would somehow capitalize in a different

14   direction, because we didn't want to be competing

15   against one another.

16        So you would do -- you would recruit and

17   train.  A lot of recruiting, a lot of training, both

18   Local Sales Managers as well as individual reps.  You

19   would conduct Sales meetings.  You would be the face on

20   important appointments.  You would set all rates,

21   handle inventory.  You would deal with the Traffic and

22   Continuity people that over here are kind of managed by

23   Karen.  That's maybe not a hundred percent accurate how

24   that would have gone, in terms of how things were

25   scheduled.  And you would try to grow and improve the

21

1     talent of your Sales Team.  And achieve the goals.

2          Q.   That's always one of the problems with org

3     charts.  It makes everything look like a separate

4     bucket.  We all know reality is you have to coordinate

5     and take on sometimes jobs that are just not being

6     filled.

7               Tell me a little bit -- you had mentioned a

8     little bit about the difference between KFOG and KSAN.

9     Tell me a little bit more about how those properties

10    differed.  Of course I want to know about it generally

11    in the market, but more specifically in terms of how

12    you managed those two different properties.

13          A.   We managed them similar in many respects.  We

14    had weekly sales meetings.  We went on sales calls.  We

15    tried to recruit the best people we could get.  We

16    tried to make them have a sense of pride about the

17    property.

18               The areas that were different were that KSAN

19    had a smaller commission line and Sales Team, more

20    junior and less professional.  It was a harder sell.

21    We probably did more effort on training in that

22    situation.  It had blue product.  They had to be sort

23    of gutsy to out and sell.  KSAN was more about

24    negotiating and being able to hold rate and push your

25    strength.  That changed over the years because the

                                                          22

Valerie Howard

1    station obviously diminished in terms of ratings.  But

2    it tended to be a station that people wanted to buy.

3            KSAN tended to be a station that people did

4    not want to buy until you changed their mind.  And the

5    management talent, local management talent, was very

6    different.  Omara was a different Manager than Michael.

7    Omari managed for three or four years.  Michael was

8    brand new.

9        Q.    Omari Patterson would have been in Michael

10   Segerhi's role before him?

11       A.    He would have been in the Maura position.

12       Q.    In what?

13       A.    Maura Donahue position.

14       Q.    I see.  I need to keep those straight.  So

15   let's say if you were interviewing for a KFOG Manager

16   versus KSAN Manager, who -- to the extent the qualities

17   of those Managers would differ, what would you be

18   looking for in a KFOG Manager versus KSAN Manager?

19            MS. LAWLESS:  Objection as to time.  Overly

20   broad.

21            MS. MOSER:  Q.  If it helps, we can speak

22   specifically, like when you were filling Maura

23   Donahue's position what you were looking for the KFOG

24   role, what would be the qualities of a Sales Manager

25   that would fit well with the KFOG product.

Valerie Howard

1    a job with Hispanic radio for two months and then

2    joined KSAN.  I did not recruit Michael.  He was there.

3         Q.   So -- but you did recruit Maura, I understand?

4         A.   Um-hm.

5         Q.   And why was she the best candidate, from your

6    perspective?

7              MS. LAWLESS:  Objection.  Assumes facts not in

8    evidence.  You can answer.

9              THE WITNESS:  She was a good candidate.

10             MS. MOSER:  Q.  Okay.

11        A.   Peter wanted her very, very strongly.  And she

12   was a capable woman.  The most capable?  We never

13   really got to that point.

14        Q.   Did you object to Maura being hired?

15        A.   I objected to Peter about the fact that he

16   wouldn't look at the other candidates seriously.

17        Q.   And when -- strike that.

18             Tell me a little bit more about that

19   conversation, that communication with Peter regarding

20   the KFOG Sales Manager position.

21        A.   We very much -- it was an important role,

22   important station.  Omari had left, had been a solid

23   job in the market.  And we wanted to make sure that --

24   based on how many people were available that we took a

25   good look at everyone in consideration.  And so I met

25

1    And I said something to the effect, good news.  I guess

2    that means Cumulus is doing better.  And he said yes.

3         Q.   Did he tell you anything about his

4    communications with Atlanta on that subject?

5         A.   No, he did not talk about it.  I assumed that

6    he had spoken to Atlanta.

7         Q.   Was there anything else in that conversation,

8    that communication with Peter?

9         A.   About filling the position?

10        Q.   Um-hm.

11        A.   No.

12        Q.   Why did you ask Peter about whether you would

13   assume the role of the responsibilities of the KFOG

14   Sales Manager?

15        A.   Because the company the prior year had asked

16   everyone to take one week furlough, and we weren't

17   doing well economically, so they claimed, and it just

18   seemed logical that because KFOG's ratings were doing

19   so poorly, that they might want to economize and not

20   fill that role for a period of time.  And because my

21   background is all local Sales, I was doing half of it

22   anyway.

23        Q.   Are you aware of what Maura made as the KFOG

24   Sales Manager, what her compensation was?

25        A.   Yes.  I was at the time.

36

Valerie Howard

1     Q.   We can look at documents, I guess, to see

2  that, but it would be fair to say that she was paid

3  less than you were, for example?

4     A.   Right.

5     Q.   Were you aware of any other instances where

6  that had happened?  And when I say "that," I mean the

7  idea of not filling a role in having a more senior

8  Manager take on those responsibilities.

9     A.   Yeah.  When they got rid of National the first

10  time in '08, Peter took on National.  When they got

11  consolidated on the FM Manager side, the stronger of

12  the FM Managers took on the role, Benson.

13     Q.   Benson?

14     A.   Was the name of the PD for KFOG.

15     Q.   Okay, on the Programming side?

16     A.   Um-hm.  When they further consolidated, they

17  combined AM and FM.  They did that under Lee Hammer who

18  had more tenure.  When they consolidated on early

19  versions of Traffic and Continuity, the Manager took

20  over for some of the underlings.

21     Q.   Were you a part of any of the meetings about

22  those consolidations?  You mentioned some specific

23  instances.  I didn't know if you were part of the

24  meetings where that decision was made.

25     A.   Only the Traffic and Continuity one.  And the

37

**Valerie Howard**

1    of them.

2         Q.   Which ones?

3         A.   For John Freitas, Victoria Mann.  Not for

4    Tiffany.  I was for Mindy.  That isn't included here.

5         Q.   Mindy Phillips?

6         A.   Yeah.  Denise David, I would have been for

7    part of the time.  I was for Matt Alighieri for part of

8    the time.  And then when Maura came in, I think she

9    became Matt's direct, and Maura worked directly with

10   Adrienne.  And I was direct for Josh, but I don't see

11   his name here.

12            And then on the KSAN side I would have worked

13   definitely with Seth and with Rick.  And trying to

14   think of these others.  Did I work with Matt?  I know I

15   worked with Demetrius.

16        Q.   Did you work with John and Victoria and Seth

17   before they were Key Account Managers or --

18        A.   Yes.

19        Q.   How did you guys divide up who worked with

20   which salesperson?

21        A.   Two ways.  One a little bit fit, meaning who

22   was going to be who was going to be able to get the

23   most performance out.  And the other was to try take a

24   look from a revenue standpoint where there was some

25   equal weight.

                                                            41

Case 3:12-cv-04880-CRB   Document 45-2   Filed 07/19/13   Page 17 of 129

**Valerie Howard**

1      Q.    You had mentioned that Daniel Erman did some

2   Sales.  Did you do any Sales?  I guess when I say that,

3   I mean not going through a salesperson, but --

4      A.    Directly --

5      Q.    -- personally?

6      A.    No.

7      Q.    Do you know if Judi Ratto did that?

8      A.    No.

9      Q.    She did not have any of --

10     A.    No.

11     Q.    -- of her own accounts?

12     A.    No.

13     Q.    All right.  So it sounds like KFOG and KSAN --

14   well, let me ask instead of telling you.  In terms of

15   size, I see that KFOG and KSAN are grouped together,

16   and KNBR is its own organization.

17     A.    Uh-huh.

18     Q.    Do you know why that was a division, why it

19   wasn't, you know, KFOG and KNBR or KSAN and KNBR?

20     A.    I would assume that it would be because

21   there's some similarity among music Sales and the

22   approach and the limited inventory versus the AM, but I

23   don't know why it was set up that way.

24     Q.    How was -- you had started mentioning why KFOG

25   was different from KSAN.  I guess for people that

42

**US Legal Support**
**888-575-3376**

1    aren't in the Bay Area, could you describe the

2    formatting of KFOG versus KSAN?

3         A.   KFOG is targeting probably 40 to 55-year-olds.

4    Sort of an upscale audience.  KSAN is more a classic

5    rock station, a little younger, 25 to 49.  Very, very

6    male.

7         Q.   You're referring to the demographics?

8         A.   Demographics.

9         Q.   My understanding is that the demographics of

10   the station has an impact on the type of client that

11   would advertise on that station.  Is that accurate?

12        A.   Um-hm.

13        Q.   So then we have on the KNBR side Judi Ratto as

14   well.  Was she your peer?  Did she do the same role at

15   KNBR as what you did on FM?

16        A.   Um-hm.

17        Q.   She did?

18        A.   Yeah.

19        Q.   And my understanding is that there's a second

20   station.  I'm sorry.  There was a second station

21   associated with KNBR.  That was KTCT?

22        A.   Right.

23        Q.   Is it fair to say that they were essentially

24   operated as one?

25        A.   Yes.  So you had just one brand there.

                                                          43

Valerie Howard

1        Q.    Right.  Do you know anything about -- well, my

2    understanding is they were both sports, right?

3        A.    Um-hm.

4        Q.    Do you know anything about how KNBR slash The

5    Ticket, how the Programming worked on those?  Just from

6    a Sales perspective, how the Programming worked on

7    those two stations?

8        A.    You mean from a product standpoint?

9        Q.    Yes, that's a better way of the asking it.

10       A.    It's a sports talk show.  So as opposed to

11   playing music, you had different programs.

12       Q.    You had mentioned on KFOG and KSAN that you

13   were working to make sure that there was not

14   competition for clients between KFOG and KSAN?  Have we

15   said that?

16       A.    Yeah.

17       Q.    In terms of how that worked on the AM side,

18   was there that same concern about KNBR versus The

19   Ticket, or was it selling to --

20       A.    It was mostly a forced buy.

21       Q.    A what now?

22       A.    Forced buy.

23       Q.    What is that?

24       A.    That you really didn't have the option to buy

25   one or the other; you just said here it is, combined.

44

1     Q.   And when you say "here it is," it would be

2   here's the package of --

3     A.   KNBR ticket.

4     Q.   And the package of spots or something?

5     A.   Um-hm.

6     Q.   And I don't know how it worked in your market,

7   so I'll just ask.  My understanding of that's what a

8   package is that I think of it like, you know, when

9   you're in the store and they have those mini cereal

10  boxes and you have to buy some of the Raisin Bran to

11  get the Froot Loops.  Is that kind of -- you buy

12  some -- they have to buy some less desirable spots if

13  they are going to buy the desirable spots?  Is that

14  what a package would have?

15    A.   I don't think quite the same way.  Most of the

16  Programming was the same.  Whether you tuned in to The

17  Ticket or you tuned in to KNBR, you were going to hear

18  the same show.  You were going to come in at two

19  different frequencies.  If there was a 49er game on,

20  they would have to have different Programming on The

21  Ticket for that three-hour period, but most of the time

22  it was the same.

23    Q.   What about within the same product, the type

24  of package that a client would be offered?  So in terms

25  of -- I understand there's some spots that might be

45

1    during a more popular time when more people are

2    listening, and some would be -- I imagine 5:00 a.m. is

3    different, for example, than morning drive?

4        A.   Right.

5        Q.   Tell me a little bit about how those would be

6    packaged.

7        A.   I'm not sure I understand completely what

8    you're asking.

9        Q.   I guess the thing -- could you give me an

10   example of a package that would be offered to a client?

11            MS. LAWLESS:  With KNBR?

12            MS. MOSER:  Q.  With either.  Just use an

13   example, whatever your personal knowledge is.

14       A.   Twelve times on the KNBR and The Ticket.

15       Q.   Would they specify what time of day?

16       A.   They would use day parts.

17       Q.   Day parts?

18       A.   Morning drive, midday, afternoon drive,

19   nighttime, overnight.

20       Q.   You had mentioned, I believe, some sports

21   franchises.  When you were there, do you know what the

22   sports franchises were that were on KNBR?  Which ones?

23   You mentioned the Giants?

24       A.   The Giants and the 49ers, the Warriors.  They

25   had a prize package which is National Football League.

                                                        46

Valerie Howard

1   It seems like most of the energy went into the Giants.

2          MS. LAWLESS:  The Sharks?

3          THE WITNESS:  Hm-hm.

4          MS. LAWLESS:  Sorry.

5          MS. MOSER:  Q.  No problem.  I was actually

6   just disappointed that all the energy went into the

7   '9ers and not the Giants, as a Giants fan.

8          You had mentioned earlier that was an

9   expensive side to operate.  Are you referring to, like,

10  the franchise fees that they have to pay to these

11  organizations?

12      A.   Typically stations that carry sports

13  Programming, yeah.

14      Q.   So how would that work?  They pay obviously a

15  certain amount of money to these sports organizations.

16  How would they make money then?

17      A.   And they -- I don't know how much was paid

18  because I was never a part of that, but they would be

19  able to sell certain in-game commercials.  And they

20  would make money from the premium and the bigger

21  audience that might be listening to a particular show

22  or might become a sponsor.

23      Q.   What would be the demographic of -- I'll just

24  call it KNBR.  I won't say The Ticket.  What would be

25  the demographic of KNBR?

                                                    47

Valerie Howard

1   as appealing and they are a little bit more direct,

2   yeah.

3        A.   In some ways they got a little bit more

4   commercials from business to business type advertising.

5        Q.   What would that be like?

6        A.   Sometimes you would get a sponsor who wants to

7   use the merchandising that came with the sponsor to

8   entertain clients in a suite.

9        Q.   When you were -- I believe you mentioned that

10  there would be an effort to make sure that the FM and

11  AM side of the Sales were not cannibalizing each other.

12  How did that -- I understand when it was for KFOG and

13  KSAN, those are both under you, so you need to

14  coordinate to make sure that you're not competing with

15  yourself?

16       A.   Right.

17       Q.   How did the process work to make sure FM was

18  not competing with AM for Sales?

19       A.   There were a couple of situations where on a

20  particular buy we would share rates and know what one

21  another was quoting.

22       Q.   Who would you coordinate with on that?

23       A.   Judi, or Daniel at the time because he was

24  still a Manager.

25       Q.   Tell me a little bit about Judi Ratto.  You

49

1    had mentioned some external characteristics of you and

2    Maura.  How would Judi's profile compare in terms of

3    gender and age?

4         A.   I don't know how old Judi was.  She was very

5    aggressive and forceful, not as analytical, more of

6    driver.  She definitely liked to jump in and sell side

7    by side with her team.

8         Q.   Do you know anything about how her

9    compensation compared to your compensation, for

10   example?

11        A.   Hm-hm.

12        Q.   Do you know who hired Judi?

13        A.   Tony Salvadore.

14        Q.   And he would have been the Market Manager?

15        A.   Um-hm.  Actually, would he have hired her?

16   She was there for maybe eight years before she got into

17   management.  Tony would have been there.  I'm not sure

18   Tony would have been the person who did it.  I'm not

19   sure who would have done it.  Maybe Dwight Walker.

20        Q.   So I know you worked for Cumulus, but my

21   understanding was that that was -- Cumulus purchased

22   the Susquehanna company property?

23        A.   Um-hm.  Right.

24        Q.   Was it -- Tony part of that Susquehanna --

25        A.   Um-hm.

                                                          50

Valerie Howard

1    Q.   -- management?

2    A.   Yes.

3    Q.   And then at some point Peter Schwartz joined

4    the organization?

5    A.   Right.  I think that Peter had -- Tony had

6    disclosed he wanted to retire within the next couple of

7    years, and at that point I suppose he told Corporate,

8    and that's when the decision was made to hire a DOS,

9    which was kind of a Tony-in-training.

10   Q.   Director of Sales?

11   A.   Um-hm.

12   Q.   Do you know anything about who interviewed for

13   Peter's position?

14   A.   Judi and I did.  And there might have been

15   four or five other people in the market.

16   Q.   Who interviewed you?

17   A.   Jon Pinch and Tony.

18   Q.   Were there any other internal candidates that

19   you're aware of?

20   A.   I don't think so, but I don't know.

21   Q.   Tell me a little bit about -- well, how did

22   you express your interest in that position?

23   A.   I think both Judi and I said we'd be

24   interested in interviewing.  I don't think there was

25   anything subtle about it.

51

1    a typical DOS sort of position."

2        Q.   Tell me a little about your position of what

3    your understanding of a -- what a Market Manager would

4    do and why that would be a desirable job for you.

5        A.   I think, from my perspective, the desirable

6    job was to train with Tony.

7        Q.   I understand he had a lot of respect.

8        A.   Yeah.  A Market Manager would be the person in

9    charge of overseeing Sales and product.

10       Q.   So both the Sales and Programming aspect?

11       A.   Yeah.  I don't know if that's really how it's

12   organized now, but back then it was.

13       Q.   Under Tony it was?

14       A.   Um-hm.  Um-hm.

15       Q.   Tell me a bit about managing Programming,

16   because I understand Sales is one creature and

17   Programming is another creature.  Is that right?

18       A.   Yes.

19       Q.   Tell me bit about managing Programming, why

20   that would be desirable for you.

21       A.   I had managed Programming when I was a General

22   Manager before and had a couple of stations.  It's

23   interesting because it is a creative and ever-changing

24   job as you try to position your particular brand in the

25   marketplace through research, through program

53

1  directors, through promotion and see trends, and

2  understanding what the competitors are doing in order

3  be able to create a popular product.

4      Q.   When you worked with Programming previously,

5  what sort of properties were those?  What type of

6  stations?

7      A.   One was a classical.  One was a rock station,

8  maybe more similar to KSAN.  And one was a country

9  station.

10      Q.   So music?

11      A.   Um-hm.

12      Q.   So how did you learn that you were not getting

13  the Director of Sales position?

14      A.   I think Tony just told us we weren't getting

15  it.

16      Q.   When did you first learn about Peter Schwartz?

17      A.   I think Judi had some -- found some way to

18  sneak the information.  I don't remember how.

19      Q.   That's how business is operated?

20      A.   She knew.

21      Q.   And did she tell you anything about what she

22  had heard?

23      A.   No.  I don't remember the details.  I'm not

24  big on gossip.

25      Q.   Smart.  What about when Peter started?  What

54

Valerie Howard

```
 1        Q.   My understanding is that Peter never filled

 2   that Market Manager position; is that correct, or --

 3        A.   It was always kind of murky.  As I understood

 4   it, they didn't wait for Tony to retire.  They laid him

 5   off.

 6        Q.   Right.

 7        A.   And then they weren't able to put Peter into

 8   the role even though he sat in the office and filled

 9   the role.

10        Q.   I see.  So -- so he would be an acting Market

11   Manager.  Would that be fair?

12        A.   For a period, yeah.

13        Q.   So he would have managed both Sales and

14   Programming?

15        A.   Um-hm.

16        Q.   Do you know much about how involved Atlanta

17   was on the Programming side while he was -- let's call

18   it acting Market Manager?

19        A.   It seemed as though they were stepping up

20   their involvement and contact with the PDs.

21        Q.   At some point -- I'm sorry.  So when Tony

22   left, was there anything -- like Peter Schwartz is now

23   the Market Manager.  Was there any statement that he

24   was in that role?

25        A.   What did they say?  They came in and they had
```

56

Valerie Howard

1    a meeting.  I don't recall what they said.

2        Q.   Was it your understanding that he had been

3    elevated to the Market Manager position as sounds like

4    was the goal of the Director of Sales position?

5        A.   It seemed as though he would assume that role

6    because there was -- he was certainly the highest

7    ranking person in San Francisco.  And so for many folks

8    that would be enough that they would be considering him

9    in that position, whether he had the title or not.  If

10   you have the perks and the office --

11       Q.   Do you know what title he went by during that

12   time after Tony left?

13       A.   I thought it stayed as DOS.

14       Q.   At what point did it become apparent that

15   Peter was not the Market Manager, as it sounds like the

16   original plan was?  At some point it's like Peter was

17   being groomed for that position, but he's not doing it.

18       A.   I don't -- I don't know if I really saw that.

19   That might have been after my time.

20       Q.   Was --

21       A.   Seemed like after the six months had passed,

22   he didn't get promoted, but I don't really see a point

23   where I felt he wasn't the person.

24       Q.   Did you know anything about whether Peter had

25   any connections with people in the Cumulus organization

                                                        57

1    before he started working there?

2        A.   Maybe that was one of the things that Judi had

3    mentioned; that he had known somebody during his time

4    in Las Vegas, but I'm not really --

5        Q.   It does seem like a small industry in terms of

6    a lot of people see each other again throughout their

7    careers.  Did you ever express an interest in the

8    Market Manager position after it became apparent that

9    Peter wasn't going to fill that role?

10       A.   No.

11       Q.   So I guess Bill Bungroth came in after your

12   departure?

13       A.   Yes.

14       Q.   And do you have any understanding as to what

15   his role was?

16       A.   I thought he was more a Market Manager.

17       Q.   So I believe you said you joined the company

18   in 2007.

19       A.   Yes.

20       Q.   2000 to 2010, that actually sounds like it was

21   a pretty interesting time in the industry in terms of

22   at least the outside a bit unprecedented in dealing

23   with the economy tanking.  Is that fair to say?  Did

24   radio change with the downturn in the economy, is a

25   better way of asking it?

                                                          58

Valerie Howard

1          MS. LAWLESS:   Objection.   Calls for

2     speculation.   You can answer.

3          MS. MOSER:   Q.   Just in your opinion.

4     A.    Ownership changed.

5     Q.    What does that mean?

6     A.    Probably more than the economy.

7     Q.    So the ownership changed when -- tell me what

8     that means.

9     A.    There were a lot of new owners with new ideas.

10    Q.    So was Cumulus one of them?

11    A.    Um-hm.   Different ideas of how to operate.

12    But I think it depends on where you were working at the

13    time.   I think if you were with CBS, you would say

14    there wasn't much change going on.   If you were at

15    Cumulus, you probably felt there was a lot of change.

16    Q.    Well, I believe you said earlier that the

17    company, meaning your employer, that it changed from

18    your hire in 2007 through your departure.   Is that

19    fair?   Is that what you said earlier?

20    A.    It felt like there were different priorities

21    and projects, yeah.

22    Q.    Tell me a little bit about how it changed from

23    2007 on.

24    A.    I think in 2007 it was more locally

25    controlled, meaning Tony was in charge, and it was his

59

Valerie Howard

 1    organization.  And by the time I was terminated, it

 2    seemed that it was more a Sales Manager that was sort

 3    of top dog in San Francisco.  But a lot of things were

 4    coming -- were centralized out of Corporate.

 5         Q.   Did that affect the way you did your job, that

 6    change?

 7         A.   No.  I think I went about doing my job the

 8    same way.  You did have different -- different things

 9    that they wanted to look at.

10         Q.   Like what?

11         A.   Different reports, different charts, different

12    types of ways of analyzing, evaluating your team.

13         Q.   What are some examples of those tools?

14         A.   They wanted to look at how effective you were

15    at closing streaming revenue, which before nobody

16    thought about looking at.  And they wanted reports on

17    Elephant accounts, how you were growing big accounts

18    with your team members.  They wanted you to do regular

19    reporting every time you went on a Sales call with a

20    rep.  They had different things they wanted to look at.

21         Q.   When you say "streaming," what are you

22    referring to?

23         A.   Streaming is when you listen to music over the

24    computer, and you might have a pre-role at the

25    beginning, or between songs you might have little

                                                          60

1    and AM, how did they compare when you were there?

2         A.   We never really got a good sense of that.

3    It's different on the AM because you run twice as many

4    commercials.  On the FM, you always run half as many

5    commercials.

6         Q.   Do you know how the rates compared?

7         A.   There were times that the rates for, say, a

8    7:00 a.m. commercial might have been comparable among

9    the stations.  There were other times, based on demand,

10   they would be widely different because it's a supply

11   and demand business.  And Judi and the AMs had twice as

12   many commercials.  You didn't have to be as aggressive

13   to generate a revenue.

14        Q.   Right.  So you have more inventory to sell?

15        A.   Right.

16        Q.   I guess I always thought there was a limited

17   amount of inventory, but I never focused on the fact

18   that AM has more inventory than FM.  That makes sense

19   as a listener.  So the actual rates charged, let's just

20   say for a similar time slot, were the FM higher, lower

21   than the AM?

22        A.   Again, KFOG at one point would have been quite

23   a bit higher, but because the ratings had gone down,

24   down, down during my tenure at the end, I can't imagine

25   that KFOG had higher rates.

65

**Valerie Howard**

1     Judi, and myself.

2          Q.    Did --

3          A.    And Peter.

4          Q.    Was there ever a threshold where you needed to

5     go up in the organization for approval, threshold of

6     Sales numbers or that you just couldn't approve it

7     without someone from above?

8          A.    No.  And they say at one point it seemed like

9     they were in the process of implementing.  Or perhaps

10    it was too big of a rate discrepancy, that it would be

11    flagged and someone would, you know, call you on a

12    special red phone, but I don't remember.  I don't

13    remember that happening.

14              MS. LAWLESS:  Good time to take a rest room

15    break?

16              MS. MOSER:  Absolutely.

17                  (Brief recess.)

18              MS. MOSER:  Back on the record.

19         Q.    I believe you mentioned that the company

20    changed from when you started to when you left.  Do you

21    feel as if the company became more or less cost

22    conscious over time?

23         A.    I think they were always cost conscious.  I

24    don't think that changed.

25         Q.    You mentioned that things changed at some

69

1    point so much that you felt like they might not replace

2    Omari.

3         A.   I did not think they were going to replace

4    Omari.

5         Q.   So --

6         A.   That was just simply because the prior year

7    had been such a bad year, and they had all Managers

8    take furloughs.  And they had changed the AE

9    commissions with the Key Account Manager system.  So

10   they had tightened things.  Wasn't change; it was just

11   tightening.

12        Q.   So let's start -- you know, obviously when you

13   start with a company -- at what point did that

14   tightening process start?

15        A.   I think that they had always been extremely

16   cost conscious.  Tony perhaps hid some of it when he

17   was in the position and when he moved out.  Perhaps

18   Peter simply disclosed.

19        Q.   Do you know why Tony was laid off?

20        A.   I guess I assumed it was because they wanted

21   to save money and he was going to be retiring in a

22   little while anyway.  But -- you know, they did not ask

23   or tell me.

24        Q.   Maybe a better way to talk about it is; I

25   think you mentioned that there was a change in the

70

**Valerie Howard**

1   ratings at some point during your employment.  When was

2   that, and what were you talking about?

3        A.   Well, there's obviously many different radio

4   stations.  KFOG's ratings -- I have to look at the

5   chart, but seemingly they had started, but it was quite

6   painful after PPM came in, different rating sometime.

7        Q.   PPM?

8        A.   Is the portable meter reader.

9        Q.   How was that different than the previous

10   system?

11        A.   It was a Diary method.

12        Q.   So what was the system for?  Was that part

13   where the consumer was reporting what they were

14   listening to versus a tracking?

15        A.   Yeah.

16        Q.   So when did that PPM system start being a

17   factor?

18        A.   Trying to remember.  It started in July.

19        Q.   Of?

20        A.   '08, '09.  Somewhere in there.

21        Q.   So was it that there were less people

22   listening, or that it was measuring and less people

23   were listening, in your opinion?

24        A.   Does it matter?

25        Q.   Yeah, it does.

71

1    A.   If there are less, there are less.

2    Q.   I'm trying to understand if there was some

3    overall market condition that caused it or just how you

4    were measuring it that caused the downturn in the

5    ratings.

6    A.   I think that KFOG had already seen erosion.  I

7    don't remember when the PD had been let go.  They

8    didn't put much money into marketing.  They didn't do

9    much product research, and the audience grew older.

10   That's just what audiences do.

11   Q.   And that would be around?

12   A.   That would have been with Arbitron Diary.  And

13   then on top of it, of all of those things, then PPM

14   came in.

15   Q.   I understand it kind of revolutionized the way

16   people looked at ratings.  Is that --

17   A.   It was designed to get more credibility in the

18   buying community.  And another --

19   Q.   Is that the -- is that the standard used in

20   the industry now to measure -- when they say "ratings,"

21   is that what they are referring to?

22   A.   I think so, but I'm not in the industry, so --

23   Q.   Fair enough.  So when PPM started in '08, '09,

24   was it your understanding that -- were you using that

25   to replace Arbitron, or were people in the industry

72

**Valerie Howard**

1      Q.   What --

2      A.   Some for markets benefitted.  The KNBR side

3   benefitted.

4      Q.   So I believe you were just talking about KFOG

5   and the ratings there.  Was there any change in KSAN in

6   ratings from when you started to when you left?

7      A.   KSAN had been sort of the middle of the pack.

8   And then with PPM it had Yo-Yo ratings; a good year, a

9   bad year, a good year, a bad year.

10      Q.   So I believe you were saying you knew

11   something about the KNBR side and the ratings.  Tell me

12   a bit more about that.

13      A.   When the first book or quarterly came out,

14   Arbitron came in and did a big presentation.  And I

15   remember them talking about how the sports format was

16   doing better than they had thought.  And I believe they

17   said it was across the country.

18      Q.   So do -- does ratings -- do ratings have

19   anything to do with the rates charged for advertising?

20      A.   Absolutely.

21      Q.   And what impact do they have?

22      A.   Pretty significant because most of the revenue

23   from that station is being bought by a professional

24   negotiator.  And this information from Arbitron is

25   given almost free to agencies, and they use the ratings

74

Valerie Howard

1    to determine if they want to buy your station or not.

2    And they use it to negotiate one station versus

3    another.

4        Q.   Would it be fair to say higher ratings means

5    you're going to collect more?  I'm sorry.  Does higher

6    ratings mean that you're going to be able to charge

7    more for the same spots?

8        A.   In some cases yes.

9        Q.   What other factors would go into what you can

10   charge for your inventory, your product?

11       A.   How unique your product is.  The age range of

12   your demographic.  The commercial environment that the

13   advertiser spot would run in.

14       Q.   Did those factors apply to KFOG and KSAN when

15   you were there?

16       A.   The uniqueness of the KFOG format allowed us

17   to hold on to revenue a little more effectively.  And

18   on the KSAN side it was harder because it was less

19   unique.  The audience didn't have as great an income,

20   and so and it wasn't as consistent a station.

21       Q.   And KFOG is a pretty longstanding franchise,

22   isn't it?

23       A.   Um-hm.

24       Q.   We've been discussing how on the AM side

25   Judi would have these sports franchises as part of her

75

Valerie Howard

1   world music or something, but they were very

2   unimportant day parts.

3       Q.    You mentioned that at some point there was a

4   furlough, a one-week furlough?

5       A.    Yes.

6       Q.    What was your understanding as to who was

7   required to take that furlough?

8       A.    I think they asked Managers, but not sellers.

9   But that's quite a few years ago, so I don't recall the

10  details.

11      Q.    Do you remember roughly when that happened?

12      A.    I thought it was in '08 or '09.

13      Q.    Was there any reason provided for the

14  furlough?

15      A.    There probably was.

16      Q.    Did you have an understanding as to why there

17  was a furlough?

18      A.    I think the general feeling was that the

19  company told us they weren't doing well.

20      Q.    What about outside of what the company is

21  telling employees?  My understanding is that there are

22  trade magazines that comment on various radio

23  companies.  Did you ever look to the outside for

24  example what Radio Inc said about how Cumulus was

25  doing?

                                                          77

Valerie Howard

1      A.   Cost cut.

2      Q.   At any point when you worked at Cumulus, did

3  you look for a job elsewhere?

4      A.   I had applied at one job with Clear Channel

5  that had come up maybe, I don't know, online.  That's

6  it.

7      Q.   What kind of job was that?

8      A.   It was a DOS position.

9      Q.   So did you apply for it because it was a type

10  of progression in your career; it would be a promotion,

11  or just because you wanted to work at Clear Channel?

12      A.   They had had some layoffs at -- it was the

13  first layoff at Cumulus, and I thought, oh, I should

14  get my name out.

15      Q.   When were there layoffs at the company?

16      A.   Just in '08.

17      Q.   There were no other layoffs after that that

18  you're aware of?

19      A.   Seams like there was maybe a person in

20  Continuity at one point.  And -- but the one in '08,

21  that was the one I remember.

22      Q.   And other than the Clear Channel job, were

23  there any other jobs that you looked at but didn't

24  apply for?

25      A.   Not that I recall.

                                                          80

**Valerie Howard**

1      Q.    So my understanding of your case, and correct

2   me if I'm wrong, is that you feel as if you were

3   discriminated against based on your medical condition

4   of having cancer.  Is that correct?

5      A.    When I disclosed that I needed time off for a

6   serious medical condition, as it was worded on the FMLA

7   paperwork, yeah, that they treated me differently.

8      Q.    So I guess a better way of putting it is, of a

9   medical condition which in your case was cancer?

10      A.    (NO AUDIBLE RESPONSE)

11            (WITNESS MOVES HEAD UP AND DOWN)

12      Q.    Did you ever have any concerns or problems in

13   getting leave for your medical condition?

14      A.    I don't know what it should have felt like.

15      Q.    You didn't have --

16      A.    But it seemed as though I had asked for time

17   off, and I got it.

18      Q.    So your lawsuit is not saying you handled my

19   leave poorly and I was damaged, for example?

20      A.    No.  It was how I was treated after I asked

21   for the leave.

22      Q.    My understanding is also -- we'll definitely

23   talk about that, but there's nothing like that you were

24   discriminated against because of your age or gender;

25   your suit is about your medical condition?

                                                        81

**Valerie Howard**

1   reason that changed over time.

2           THE WITNESS:  Was --

3           MS. LAWLESS:  You can answer.  Calls for

4   speculation.

5           THE WITNESS:  I think that she's an honest

6   person.  I don't know, but I think so.

7           MS. MOSER:  Q.  I'm just asking what you

8   think.  Jon Pinch.  You mentioned his name.  How does

9   he fit into this lawsuit?

10      A.   How does he fit in?  He was the COO, I

11  believe.

12      Q.   Are you saying that he discriminated against

13  you?

14      A.   Yes.

15      Q.   You mentioned Maura Donahue and Michael

16  Segerhi.  You're not saying that either of them

17  discriminated against you, are you?

18          MS. LAWLESS:  Same objection.  Calls for

19  speculation.

20          THE WITNESS:  Not to my knowledge.

21          MS. MOSER:  Q.  Omari Patterson and Tony

22  Salvadore.  Are you alleging that either of them

23  discriminated against you?

24      A.   Not to my knowledge.  Tony was gone by then.

25      Q.   What about Karen Gooseff?  How does she fit

83

1    into this lawsuit?

2        A.    She is the Business Manager and sent me an

3    e-mail saying I was being terminated.

4        Q.    Are you saying that she was one of the people

5    that discriminated against you?

6            MS. LAWLESS:  Same objection.  Calls for

7    speculation.

8            THE WITNESS:  I don't know.  She wasn't nice

9    about sending the e-mail.

10           MS. MOSER:  Q.  Basically I mean, there's no

11   tricks here.  I just want to figure out who you said

12   discriminated against you and how they did it and how

13   it affected you.  There's no magic to it.  So when I'm

14   saying did this person discriminate or did this person

15   not discriminate, it's not that I'm implying anything

16   about your case; I just want to make sure I'm asking

17   about the right people.

18           MS. LAWLESS:  I think the record -- the point

19   is that oftentimes we as attorneys know what it means

20   to be discriminated against.  When you have lay people

21   responding to questions about whether or not so-and-so

22   discriminated, because of the law and circumstantial

23   evidence, I think that might be where we're --

24   sometimes those are more in contention interrogatory

25   information, but I'm letting her answer as well as she

84

Valerie Howard

1      Q.   Did you discuss that comment by John Dickey

2   with anyone after you left that meeting?

3      A.   I don't recall.

4      Q.   Did you say anything to John Dickey about the

5   fact that you didn't feel comfortable with his comment?

6      A.   No.  I do not remember saying anything to him.

7      Q.   So let's start first with Peter.  How are you

8   saying that he discriminated against you?  How was that

9   evidenced?

10      MS. LAWLESS:  Objection.  Overly broad.  More

11   properly asked in a contention interrogatory.  But you

12   can answer.

13      MS. MOSER:  Q.  What did Peter do that you

14   feel was discriminatory, based on your definition?

15      A.   After I took time off, he became aloof and had

16   very little communication with me.  Very limited.

17   Occasional e-mail.  He didn't allow me to participate

18   in decisions with regard to my team members.  He did

19   things without my involvement behind my back.  He set

20   up meetings with Pinch and my subordinates that I was

21   not a part of.  He denied me a raise, and other people

22   were given raises.  He shunned me generally and went

23   and talked in the offices of other Managers but not me.

24      He, I feel, misled me entirely about

25   recruiting a KFOG LSM because 90 to 120 days later we

88

Valerie Howard

1   were suddenly out of money and my job was going to be

2   the one that was to be eliminated.  He didn't allow me

3   to participate in -- with Omari in the salvaging of

4   Omari before he left.  He didn't give me assignments

5   that he gave other people.  He took away the

6   opportunity to manage the Bridge To Bridge Run which I

7   had managed the prior year.  He wanted me to back away.

8           When I asked for accommodation for Maura --

9   she had a desk that was ripping her nylons -- he did

10  nothing for two months, and then at the end of it moved

11  her clear across the building.  When I got the e-mail

12  saying I was going to be terminated, and I went to talk

13  to him, and I said, "Peter, I understand you're going

14  to get rid of me on Friday," he lied, "Oh, no.  No.

15  Where did you hear that?  No, no."  I said, "I got the

16  e-mail, Peter."  "Oh, yeah, we are."  I asked him why I

17  wouldn't be considered for some of the other jobs, and

18  he said that I wasn't qualified.

19      Q.   Okay.  That's quite a list, but have we

20  covered all the bases generally?

21      A.   There's probably more, but those are the ones

22  I'm thinking right now.

23      Q.   What about with regards to the termination of

24  your employment?  Are you saying that he was -- he

25  discriminated against you and was involved in the

89

Valerie Howard

1    termination of your employment?

2        A.    Yes.

3        Q.    And then Jon Pinch.   How are you saying he

4    discriminated against you?

5        A.    It's hard to know exactly where Jon Pinch ends

6    and Peter begins, but I would assume that Jon Pinch

7    would dictate, you know, a lot to Peter in terms of

8    structure.   He would have played a role, what kind of

9    structure they wanted.   When he came out to talk about

10   rates and area, that clearly is something I was

11   involved in, and didn't allow me to participate in the

12   meeting and met alone with Michael Segerhi.

13            They had Managers' meetings in Atlanta.   And I

14   do remember going up to him and talking about one of

15   our newer sellers.   And he was incredibly cold.

16   Incredibly cold.   But I did not have daily interaction

17   with him.

18            I know that there were things with regard to

19   Michael's pay raise and Omari's pay change that were

20   communications between Pinch and Schwartz that I was

21   not a part of.  So I feel that, you know, again, he did

22   not communicate.  He did not allow me to get involved

23   in things that would typically have been -- I would

24   have been an integral part of that.

25       Q.   When was that Atlanta meeting?

90

Valerie Howard

1     A.   I think it was April.

2     Q.   2010?

3     A.   Yes.

4     Q.   Did you ever tell Peter that you felt as if he

5     was treating you unfairly?

6     A.   No, because I did not think he was plotting

7     and scheming to terminate me.

8     Q.   But --

9     A.   I think I'm being a flexible employee, you

10    know, who's worked through chemo and radiation, and

11    that by showing that I'm there with them during that

12    part, as opposed to backing away and not doing it, that

13    they would have seen I want to be a part of the company

14    and that I'm working.  So not looking for reasons until

15    you get to the end of it and you add all these pieces

16    up and you say, hm, I feel discriminated against.  I

17    feel that he changed.

18    Q.   When was the first time that you felt that,

19    that he changed, that he was discriminating against

20    you?

21    A.   When I got back, he was incredibly cool.  So

22    that would have been in February.

23    Q.   Did you ever say to Peter that you felt as if

24    he was discriminating against you?

25    A.   No.

91

Valerie Howard

```
 1        Q.    Just asking.   What about Jon Pinch?   Did you

 2     ever say to him that you felt as if the company was

 3     discriminating against you?

 4        A.    No.   I didn't have -- other than the one lobby

 5     interaction, I did not have any direct interaction with

 6     Pinch.   He met with other people, but not with me.

 7        Q.    And Stacey Haysler, I understand she handled

 8     HR functions there.   Did you ever complain to her about

 9     discrimination?

10        A.    I may have said something to her after I had

11     gotten the e-mail about being terminated.   And I went

12     downstairs and asked her if she was familiar with it,

13     and she claimed she had just heard that morning.

14        Q.    And you say that in a way that you doubt that

15     she had heard that morning.

16        A.    I don't know.   She said she had not heard

17     until that morning.

18        Q.    I see what you're saying.   What about when you

19     spoke with Peter?   Did he say when the decision was

20     made?

21        A.    No.

22        Q.    Had anyone ever communicated to you from the

23     company that your job was in jeopardy before you were

24     terminated obviously?

25        A.    No.
```

92

Valerie Howard

1        Q.    I definitely want to go through your leave,

2   but since we're talking about the termination of your

3   employment, let's go ahead and go through that.

4             So you said that you found out that your

5   employment was being terminated through an e-mail?

6        A.    Yes.

7        Q.    Tell me a little bit more about that.

8        A.    Karen sent an e-mail that was intended for Jon

9   Pinch that said here's Valerie's final check,

10  basically, sign off on it.

11       Q.    And where were you when you received that

12  e-mail?

13       A.    In my office.  It was two hours after where

14  they had just announced they were hiring a National

15  Sales Manager.

16       Q.    And was that your last day of employment?

17       A.    Yes.

18       Q.    The day --

19       A.    Wasn't the last day of employment; was the

20  last day I was physically there.

21       Q.    So you get the e-mail.  What's the first thing

22  you do?

23       A.    Feels like a pit in your stomach, like getting

24  a diagnosis of cancer just it lingers a lot longer.

25  You think, oh my God, did I miss a clue?  You get a

                                                           93

1    cold sweat.  And you immediately think how can I turn

2    back the dial?  How can I salvage it?  Is there any way

3    of fixing it before it becomes public and you have to

4    face the embarrassment and call people.  And I did not

5    even call my husband.  And I went down to talk to

6    Stacey to see if there was a way of resolving it.

7         Q.    So you went to Stacey's office?

8         A.    Um-hm.

9         Q.  Did you have a conversation in her office?

10        A.    I sent her an e-mail.  I said, "Are you here

11   today?"  Because she didn't work every day.  And she

12   said, "Yeah, come on down."

13        Q.    So you're speaking with Stacey.  I know you

14   referenced the conversation, but just to make sure I

15   have a complete picture, tell me a little bit about

16   that conversation.

17        A.    I think I said, "I just got an e-mail saying

18   that they are going to terminate me on Friday.  Is this

19   true?"  Something along that line.

20        Q.    And then I believe you said she said that she

21   had just learned that your employment was being

22   terminated that morning?

23        A.    That's what she said.

24        Q.    Anything else in that conversation?

25        A.    Not that I recall.  After something like this

94

1    happens, you're in such shock and pain, you don't think

2    back that clearly.

3         Q.    At some point you went to see Peter?

4         A.    Yes.

5         Q.    Tell me about that conversation.

6         A.    I walked into his office, and that's when I

7    said, "Hey, I understand you're going to terminate me

8    on Friday."  And he said, "No.  No.  No.  Not going to

9    do that."  And that's when I said, "I got the e-mail,

10   Peter."  "Oh, yeah, yeah."  He recanted and said,

11   Yeah, we're going to terminate you on Friday.

12        Q.    Anything else to the conversation?

13        A.    Yeah.  Then I said, "Why did you have me hire

14   Maura?  You know, 90 days ago you had me hire Maura and

15   suddenly -- well, it's not because of cause.  We're

16   just out of money.  Something along that fact.  And I

17   said, "You couldn't tell that, you know, 60 days ago."

18   "No."  I said, "Well, then what about the Joe position,

19   the National you just announced two hours ago?"

20   "That's been filled."  I said, "If I had known mine was

21   going to be gone, I would have applied for it.  What

22   about the open KNBR position?"  They had created a

23   custom role for Daniel, the failed Manager.  "And what

24   about the open job that they were interviewing for?"

25   And he said, "No, no.  You're not qualified for that."

95

**Valerie Howard**

1    And I said, "So that's how it's going to go?"  And he

2    said, "Yep."  And I walked out, after saying that I had

3    my colonoscopy the next day and it probably didn't make

4    sense for me to come in.  Just call in sick and return

5    on Friday.

6        Q.  Did you return on Friday?

7        A.  Hm-hm.

8        Q.  So did Peter say why he didn't -- did Peter

9    say anything to you other than the fact he didn't think

10   you were qualified for the AM position?

11       A.  Hm-hm.

12       Q.  Did he say why?

13       A.  Hm-hm. No.

14       Q.  Who do you know who ultimately filled that

15   position?

16       A.  I think it's a David Drew.  I saw it

17   somewhere.

18       Q.  So was it your understanding that they

19   would -- they posted for the position that Daniel was

20   just doing, I guess, part time?

21       A.  Yeah.  They probably had posted for the job.

22       Q.  Did he say -- you mentioned the National Sales

23   Manager job.  Did he say anything about your

24   qualifications specifically for that job?

25       A.  No.  He just said it was filled.  I think I

96

Valerie Howard

1    might have added that I had done National before; that

2    I had managed Joe at one point.

3        Q.   Oh, really?  When was that?

4        A.   KYUU.

5        Q.   How long before was that?

6        A.   15 years.

7        Q.   Did you know anything at the time about

8    basically what Joe was doing before he came to Cumulus?

9        A.   Yes.

10       Q.   What was he doing?

11       A.   He had called me about the opening.  He was

12   doing National at KGO and KSFO.

13       Q.   When you say he called you about the opening,

14   when was that?

15       A.   I don't know when the job was posted exactly,

16   but he called and said, hey you know, thinking of

17   leaving where I am.  Pay is not very good.  Looking for

18   something else.  I'm not sure if Citadel was in

19   bankruptcy then or not.

20       Q.   So that would have been after you left?  No?

21       A.   No.

22       Q.   I'm just trying to figure out when that phone

23   call was in relation to --

24       A.   Before he applied for the National job.

25       Q.   And that would be how in relation to Maura's

97

Valerie Howard

1      A.   Generally lesser.  But again, this role had

2   been Cumulus San Francisco with some responsibilities

3   in their Oxnard market.

4      Q.   Would you have thought of that Sales Manager

5   job as a promotion?

6      A.   No.  A lot of -- different kind of job.

7      Q.   With that, National Sales Manager position, is

8   based on the clients.  Seems like that would be not be

9   a job you would be out in the field.  When you were

10  General Sales Manager I understand you were going out

11  in the field with your people.

12     A.   Right.

13     Q.   National Sales Manager job, did it have that

14  component?

15     A.   Yeah.  You make market trips.

16     Q.   Okay.

17     A.   And visit people.  You would simply fly to

18  different places.  And in your home market you would

19  find the local contact for United Airlines came out of

20  Chicago, and there was the regional Pubah of marketing,

21  you would relate to that individual in your home

22  market.

23     Q.   Was it generally the same kind of pool of

24  advertisers that you were competing for with other

25  stations for the National work?  Was there just kind of

102

1    that had job shared for ten plus years.

2        Q.    And were they FM or AM?

3        A.    AM.

4        Q.    Do you know whether they were leaving

5    voluntarily or were asked to leave?

6        A.    Voluntarily.

7        Q.    Then it says, "We found that some good sellers

8    from LA are afraid of the sports element on KNBR."  I'm

9    not sure what that means.  Do you have any idea?  Is

10   there anything in the industry that says sports are

11   different?

12       A.    Sounds to me like Judi called some people from

13   LA and is reporting back with the reason they are not

14   interested; that she can't persuade them to sell is

15   because of sports, which may or may not be the case,

16   but that's what she's passed on to Peter.

17       Q.    What about your personal impression of selling

18   sports versus music?

19       A.    Same.  Just selling.

20       Q.    So you disagree with her -- sorry.  You

21   disagree with the statement in this e-mail that --

22       A.    Sports is a big deal?  Yeah, I disagree with

23   it.

24       Q.    So when I'm looking at this e-mail, it

25   suggests that "save a hundred grand," was it your --

                                                      112

1      would you have taken a job that paid a hundred grand

2      less than what you were making?

3          A.   Of course.  I did it at last my job.

4          Q.   How so?

5          A.   You go with jobs available at the time.  They

6      consolidated.  They were in a situation where I was a

7      General Manager, and my boss was a General Manager.

8      Been with the company for 30 years.  And across the

9      company they consolidated.  And they said, look, we'd

10     love to keep you.  Are you willing to be DOS?  And I

11     said sure.

12         Q.   When and where was that?

13         A.   Right before Cumulus.

14         Q.   That was Intercom?

15         A.   Bonneville.

16         Q.   Bonneville, sorry.

17         A.   Yeah.  Fairly common that people take the job

18     that's available.

19         Q.   How about at Cumulus?  Are you aware of

20     another instance where that actually happened?

21         A.   There hadn't been any movement in the general,

22     local during my tenure.  The general mantra was to keep

23     the strongest player.  That was the pattern.

24         Q.   So I think some people say -- have said over

25     the years that radio is, I guess, becoming less and

113

Valerie Howard

1    money.  Ask Jeeves or something.  Went and kind of

2    bounced around.  There were so few jobs, that I found

3    that I had to look you know in digital and in radio.

4        Q.   When did you start your job search?

5        A.   Right after I was let go.

6        Q.   The same day, the same week?

7        A.   Probably -- I had my colonoscopy, and then I

8    had a couple of days.  I may have started on the -- I

9    probably didn't disclose anything until the week after,

10   only because we weren't -- it wasn't going to be

11   public.  But as soon as it was public, I started to

12   look.

13       Q.   You mentioned that the day you received Karen

14   Gooseff's e-mail was your last day in the office.

15       A.   Yes.

16       Q.   Was that the last day that you did any work?

17       A.   Yes.

18       Q.   Did you work with anyone at the station, for

19   example, if they had questions about something that you

20   would know about?

21       A.   (NO AUDIBLE RESPONSE)

22            (WITNESS MOVES HEAD SIDE TO SIDE)

23       Q.   No work interaction after you left?

24       A.   No.  It was treated like a firing, not really

25   a layoff.

                                                          116

**Valerie Howard**

1     Q.   Well, how would those be different?

2     A.   They weren't calling me for advice and

3   perspective.

4     Q.   So are you aware of a different process in the

5   layoff?

6     A.   Well, those other jobs they filled later on,

7   they didn't call me.

8     Q.   I guess I'm just talking about -- you were

9   saying layoff is different.

10     A.   Peter's insistence on turning off my e-mail

11   kind of makes it feel more like a firing.

12     Q.   When did that happen?

13     A.   The next day.  Before my final day.

14     Q.   Your final day was?

15     A.   I think it ended up being the 21st or 22nd.

16     Q.   But when you say "final day," you're talking

17   about, I guess -- you were taking sick days?

18     A.   Right.

19     Q.   Is there anyone that was laid off -- are you

20   aware of anyone that was laid off that was treated

21   differently than you?

22     A.   I wasn't aware of how other people were

23   treated.  I do think that they chose not to renew Dave

24   Benson's contract, and he was there for a month, couple

25   weeks.

117

1        Q.    I just want to figure out where you get the

2    understanding that the terminations were treated

3    differently than the layoffs.  I understand what you're

4    saying very much, but --

5        A.    Layoffs, you know, you get recalled.

6        Q.    You get recalled.  At Cumulus you do?

7        A.    Well, yeah.  They rehired Peter.

8        Q.    Do you know what role they rehired him in?

9        A.    National.

10        Q.    National Sales Manager?

11        A.    Um-hm.

12        Q.    So that would be a demotion, though?

13        A.    Yeah.  So he was DOS, and then when they

14    bought the Citadel stations, they decided to give the

15    job to Deidra and not Peter, so he was let go.  And a

16    few weeks later they called him back to do National, so

17    it was some other change.

18        Q.    Is there anyone else that you are saying at

19    Cumulus was recalled?

20        A.    I know that they had a very serious

21    conversation with the PD of KSAN who had been let go in

22    '08 about coming back, but they couldn't come to terms

23    on price, salary.  I don't know if there were others.

24        Q.    When was that?  KSAN -- you heard about it at

25    some point, but when was your understanding as to when

118

Valerie Howard

```
 1                    AFTERNOON SESSION

 2                       ---oOo---

 3            MS. MOSER:  Q.   I believe you said you were

 4    working with Bonneville before Cumulus.

 5         A.    Yes.

 6         Q.    That is the job you say you received a pay cut

 7    as part of a restructure?

 8         A.    Yeah.

 9         Q.    Tell me a little bit about that.

10         A.    The company changed their structure and --

11    trying to think.  So my boss was over at KOIT, and I

12    was over at two other stations.  And throughout the

13    company they were consolidating in DC and in Chicago

14    and in San Francisco.  So the choice was to either, you

15    know, go out and look for work or to become a DOS over

16    this newly-structured company.  And so I said, yeah,

17    I'd be -- I'd like to do that.  Never done that.  Still

18    get to work with the same people.

19         Q.    How did the compensation differ between the

20    two jobs?

21         A.    Well, when I was a GM, I made more money, and

22    you had a big bonus attached that was an achievable

23    bonus, where with the other it ended up being -- seems

24    like it was a different salary, and there was just not

25    the up side.  It was just, you know, going to be
```

                                                          120

Valerie Howard

1    package -- you consider that package, including the

2    job, a stepping stone to other things?

3         A.   Did I consider taking that -- no.  In some

4    ways I felt that it -- the positive is that there were

5    certainly more Sales management opportunities.  If

6    you're a GM, there's even fewer jobs.  So while it's

7    sad to be demoted, the flip is you're still employed

8    and ultimately it gives you more moveability.

9         Q.   When did that occur when you had the new job,

10   the Sales Manager job?

11        A.   I was in the Sales Manager job for a little

12   over two years before the company decided to sell.

13        Q.   So --

14        A.   I did this lesser job for two full years.

15        Q.   So in the restructuring you're talking about?

16        A.   Yes.

17        Q.   When did that happen?

18        A.   I had been with the company, I believe,

19   18 years or so, and so it would have happened 15,

20   16 years into it.  I had many different jobs over the

21   course of the years.  They were all going up.  This one

22   was not.

23        Q.   So other than the GSM job and the Sales

24   Manager job, did you have any other jobs at Bonneville?

25   I'm just going to focus on the last five years you were

122

1    that the --

2         A.   That would have happened at the end of 2005

3    because I did that role for the year of 2006 and 2007.

4         Q.   Other than what we've just discussed, is there

5    anything on this resumé that, you know, you think is

6    wrong now looking at it, or this is a fair

7    representation?

8         A.   No, it's pretty fair.  When I had been an

9    Account Executive with KYUU at the beginning and, you

10   know, and when I left to join KOIT, it -- you know, I

11   started as an AE again.  So again, it was another

12   backwards step.  Just how it is in broadcasting.

13        Q.   So let's talk about Cumulus.  Was this the

14   first time you ever applied for a job at Cumulus?

15        A.   Yes.

16        Q.   What about Susquehanna?

17        A.   Yeah.  No, I never applied to Susquehanna.

18        Q.   Why did you -- why did you -- how did you know

19   there was an opening?

20        A.   Because this company had -- Bonneville had

21   sold -- they wanted to get out of market -- to

22   Intercom.  And Intercom hired Dwight, who had been

23   Tony's number two for 15 years and the Sales Manager

24   over at KSAN and KFOG.  So those people went over

25   there, so that meant I didn't have a job over there,

                                                          125

1    but there was an opening at Cumulus.

2        Q.   I see.  And then what job opening was it?  I

3    know there's a lot of different titles floating around.

4        A.   It was a General Sales Manager job for KSAN

5    and KFOG.

6        Q.   So it wasn't exactly the two jobs that were

7    vacated?  It wasn't Dwight left and this other person

8    left and those particular jobs were what you were

9    applying for?

10       A.   So Dwight left as -- I don't know what he was

11   actually at Cumulus.  He went over as General Manager

12   to the now Intercom company, and he took the person who

13   had been General Sales Manager of KSAN and KFOG and

14   made that person, I don't know, Sales Manager or DOS or

15   whatever over there.  And so then Tony had an opening

16   obviously.  So people just flopped, and there was great

17   anger and drama in the market.

18       Q.   Like your industry.  So then you're looking at

19   Cumulus.  And is there a particular position you're

20   looking at, you're asking to be considered for?

21       A.   Yeah, because Tony has an opening because two

22   people just left him.

23       Q.   Which one of those is what I'm asking?

24       A.   Over -- the Dwight job was going away.  He

25   thought he was going to be canned anyway, so that's why

Valerie Howard

1    he was looking to make a move.  The other fellow wanted

2    to go with Intercom.  So I was looking for the Sales

3    Managers job because Tony wasn't going to refill the

4    other job.

5        Q.   So how did you express your interest in the

6    job?  Who did you talk to?

7        A.   I was told I wasn't going to be retained at

8    Intercom, and the next day I picked up the phone and I

9    called Tony and said, we've never had anything in

10   common, but I'm out of work and you have an opening, so

11   let's meet.  And we did.

12       Q.   And so he was the person that hired you then?

13       A.   Yes.

14       Q.   Did he -- did you have the impression that he

15   was the final decisionmaker on that or he needed to go

16   to Atlanta?

17       A.   There was another man in the loop then.  I

18   don't remember his name.  It wasn't Pinch.  Fellow out

19   of New York.  He was in town, and I do remember

20   interviewing with him as well.  I guess I believed it

21   was Tony's call, but there was input from this other

22   individual.

23       Q.   Do you remember whether that individual was

24   Sales, Programming?

25       A.   Yeah, it was a Sales kind of individual.  I

127

Valerie Howard

1    to KNBR?

2        A.   Yes, because Judi was at KNBR.

3        Q.   Was there anything on KSAN, KFOG other than

4    Programming that someone else was in charge of?

5        A.   Yeah.  There was the people in HR and people

6    in Accounting and yeah, Engineering.  I didn't have

7    anything -- I just handled the sellers, the

8    administrative assistant that went with the Sales Team

9    in sort of a dotted line relationship with the Traffic

10   and Continuity people, but that was it.  So all

11   Engineer, all HR, all Finance, all Promotions, all

12   Product were Tony's.

13       Q.   As a General Sales Manager, I assume you think

14   that a General Sales Manager has an impact on Sales.

15   In what way?  How?

16       A.   You provide the leadership and management of

17   the team.  You set expectations.  You hold people

18   accountable for realistic goals.  You position the

19   station from a sales standpoint so that it is

20   appropriately situated to collect revenue and you can

21   be the face in the public, certainly with the major

22   media shops.

23       Q.   So is it fair to say that you were responsible

24   for the revenue side, generating revenue for KSAN and

25   KFOG?

                                                        129

1      A.   Yes, I was responsible for working with the

2  sellers to generate revenue.

3      Q.   Is there any other way that the company would

4  make money for KSAN and KFOG other than advertising

5  sales?  I mean, whether it's on air, streaming or

6  anything like that, was there any other way to make

7  money?

8      A.   At the time they would occasionally sell our

9  Web inventory.  We would get some kind of an order or

10 simply use the inventory and not put any revenue on.

11 So there were, once in a while, an account or two that

12 would come from Corporate.

13     Q.   But there wasn't some other way that, you

14 know, the company would be making money that you

15 weren't part of?  You know, I'm just trying to think.

16 I mean outside the industry, it's like is there

17 anything other than selling ads?  Wherever the ads are,

18 is there anything other than selling ads that could

19 help you make money at a station?

20     A.   Not on the music side.  The deals are

21 structured different on the AM.

22     Q.   How are they structured differently?

23     A.   Having not been on the AM, I don't know, but

24 the 49er deal and the Giants deal and some other people

25 sell your inventory.

                                                      130

Valerie Howard

1      Q.   So let me give you your offer letter, so

2   that -- Exhibit 8 and this appears to be an e-mail.

3   And is this a fair description of what your

4   compensation was when you started with Cumulus?

5           [Whereupon, Deposition Exhibit 8, an

6           E-mail from Tony Salvadore to Valerie

7           Howard dated March 14, 2007 was marked

8           for identification.]

9      A.   Yes, I think so.

10     Q.   How did how -- if it at all -- did it change

11   over time, your compensation?

12     A.   It there was a small increase, I think at the

13   end of -- the beginning of 2008, but it didn't really

14   change.

15     Q.   Do you -- you had mentioned, I believe, that

16   you feel it was discriminatory that you did not receive

17   a salary increase.  Is that right?

18     A.   The conversation had come up because Peter

19   called me in the afternoon, walked in and said, "Hey,

20   great news.  We have a raise for Michael.  We're going

21   to give him another 15,000."  And I said, "Okay, great.

22   When might I get a raise?  You know, it's been a couple

23   years.  I've taken furloughs.  I worked through chemo

24   and radiation.  One would think, you know, I've done a

25   decent job.  He has only done what he's done in tandem

131

**Valerie Howard**

1       Q.   This appears to be a summary of your

2   compensation for 2008.  Is this something that you

3   received?

4            [Whereupon, Deposition Exhibit 9, a

5            Letter to Valerie Howard from Tony

6            Salvadore dated January 3, 2008 was

7            marked for identification.]

8       A.   Yes.

9       Q.   Does it accurately describe your compensation?

10      A.   I think it does.

11      Q.   Let's fast forward a year, January 2009.  Did

12   you receive a pay increase then?

13      A.   No, nor did any of the other management people

14   on the FM side.

15      Q.   Are you aware of the raises that were done in

16   2008, January 2008?

17      A.   Yes.

18      Q.   Other than yourself?

19      A.   Yes.

20      Q.   And who do you know about?

21      A.   Well, I don't think that Omari got one at the

22   same time because he had gotten an increase in June.  I

23   believe Michael did.  But I think because Omari had --

24   we had salvaged him in June, then maybe we didn't do

25   anything this date.  But that's a long time back, and

135

**Valerie Howard**

1    Q.   Do any of these policies look familiar?

2    A.   No.

3    Q.   Do you think you read them before signing the

4    acknowledgement?

5    A.   I may have read them very quickly, but I don't

6    remember.

7    Q.   And then Exhibit 13 is that one right there.

8    It says that you completed a training course.  Do you

9    recall doing that course?

10   A.   What kind of training?

11   Q.   It says "Supervisor's Supplement 2007."

12   A.   I remember some type of harassment training,

13   but I don't know -- didn't seem like that was '08.  I

14   don't know what the class was.

15   Q.   Do you recall any training about how you

16   should bring concerns of harassment or discrimination

17   to the attention of HR or --

18   A.   I remember some sexual harassment training.

19   Q.   What was your understanding of what you should

20   do if an any employee came and complained to you of

21   harassment, for example?

22   A.   Speak to HR.

23   Q.   What about discrimination, if someone

24   complained to you of discrimination?

25   A.   I would typically go to HR.

142

Valerie Howard

```
1        Q.   Mark that one.

2             [Whereupon, Deposition Exhibit 14, a

3             Code of Business Conduct and Ethics was

4             marked for identification.]

5              And that one too, please.

6             [Whereupon, Deposition Exhibit 15, an

7             Acknowledgement of Receipt of and

8             Adherence to Policies of Cumulus Media

9             Partners, LLC was marked for

10            identification.]

11             So Exhibit 14 looks like on the first page it

12        it's a "Code Of Business Conduct And Ethics."  If you

13        turn to the last page, not really sure why it's that

14        size, but is that your signature on that

15        acknowledgement?

16        A.   Yes, looks like it.

17        Q.   Looks like it's '09.  Is it possible that they

18        distributed them again to be signed?

19        A.   Don't know.

20        Q.   Do you have any reason to doubt that

21        December 20th something '09 date that's on there?

22        A.   No.

23        Q.   Exhibit 15.  Acknowledgement.  This document

24        looks like the other one that you -- well, first of

25        all, is that your signature on Exhibit 15?
```

143

Valerie Howard

1    A.    Yes, I believe so.

2    Q.    And do you have any reason to doubt that

3    May 12th, 2010 date?

4    A.    No.

5    Q.    Do you recall doing this Acknowledgement, a

6    second Acknowledgement in 2010?

7    A.    I remember -- I remember some of these pay

8    all, plug all policies.  Those were kind of the routine

9    things they would have us sign every now and again.  I

10   remember talking about the cell phone.  That became an

11   issue.

12   Q.    What about the whistleblower hotline?

13   A.    No, I don't remember anybody emphasizing that

14   with us.

15   Q.    Did you know there was one?

16   A.    I may have.

17   Q.    Let's look at the one that the Bates number

18   starts 378.  And let's go to 386.  Did you understand

19   Cumulus to have a policy that prohibited discrimination

20   and harassment?

21   A.    Um-hm.

22   Q.    Yes?

23   A.    (NO AUDIBLE RESPONSE)

24        (WITNESS MOVES HEAD UP AND DOWN)

25   Q.    So were you aware of this policy -- strike

144

Valerie Howard

1   off time for doctor appointments or anything?

2       A.   Not to my recollection, no.

3       Q.   Okay, so going to the day when you tell Peter

4   and Stacey.  Who did you inform first?

5       A.   Peter.

6       Q.   And tell me about that meeting.

7       A.   I recall going into his office and saying that

8   I was going to have some surgery and would be off for a

9   couple of weeks and -- I must have had the date that I

10  shared with him when I would start.  I told him I

11  wasn't going to share with Michael or Omari.  Rather

12  not have anybody gossiping.  And I would tell them the

13  date before I left.

14      Q.   Did you tell Peter the medical condition at

15  that time?

16      A.   No.

17      Q.   Did he respect your privacy?  Did he ask you

18  about details?

19      A.   He said, "I hope it's not serious."

20      Q.   So that day that you talked to him -- where

21  was your office in relation to Peter's?

22      A.   I believe at that time I might have been two

23  doors down, one door down.

24      Q.   Would you just drop in from time to time to

25  talk to him, or would you schedule meetings?

                                                      151

Valerie Howard

```
1        A.   Yeah, drop in, try to find him when he was not

2   on the phone.

3        Q.   So then in terms of the day that you spoke

4   with him, did you catch him -- what time did you catch

5   him?  Can you remember?

6        A.   I thought it was in the afternoon, but it may

7   have been the morning.  I don't remember.

8        Q.   What about Stacey?  Do you remember --

9        A.   I thought after I spoke with him that I went

10  right down and talked to Stacey, but it may have been a

11  day later because again, Stacey was only working half

12  time.  But I thought I might have simply gone from his

13  office down to hers.

14       Q.   Again, just trying to make sure I have the

15  chronology and dates.  Exhibit 18, is that an e-mail

16  that you sent?

17       A.   Yes.

18            [Whereupon, Deposition Exhibit 18, an

19            E-mail from Valerie Howard to Karen

20            Gooseff, cc Stacey Haysler dated 9/9/09

21            was marked for identification.]

22       Q.   Do you recall when in relation to your

23  conversations --

24       A.   This happened --

25       Q.   -- this happened?
```

152

Valerie Howard

1      Q.   Did -- sorry.   And I believe you said you had

2   no problems with getting time off during that time

3   period when you had to be out for surgery and

4   everything.

5      A.   No.

6      Q.   And then at some point you returned to work,

7   well at least partially?

8      A.   I -- I don't know the dates, but I think it's

9   in there somewhere.  As soon as I sort of knew what the

10  agenda was, and I had the signoff that you were okay to

11  go back, from the surgeon, and had started chemo, I

12  think right around then is when I went to work

13  remotely.

14     Q.   This is Exhibit 19.

15          [Whereupon, Deposition Exhibit 19, an

16          E-mail from Valerie Howard to Stacey

17          Haysler dated 10/7/09 was marked for

18          identification.]

19           Is this an e-mail that you sent to Stacey with

20  your --

21     A.   It looks like, uh-huh.

22     Q.   The second page has an e-mail from -- I'm

23  sorry, has an e-mail from Stacey.  "Dear Valerie.

24  Thank you for the information.  I will prepare the FMLA

25  documents and let Peter know that you have given us

155

1    whenever Peter got off the phone.  I was not included

2    with those.  There was things that happened with

3    regards to pay packages with Omari that I was not

4    included.  It was as though working remotely, in

5    Peter's eyes, was not working.  And I remember

6    producing one document about a competitor to KFOG, and

7    he being -- one of the few e-mails that he might have

8    sent during that period, and it was critical.  It was

9    just no information.  Nothing.

10       Q.  So what about your job was different while you

11   were basically working from home when you were on this

12   intermittent leave?  What was different than your job

13   before?

14       A.   I did not go on calls with AEs.  I did not

15   participate in those Monday meetings or information

16   from Corporate.  I got e-mails from the Bonneville COO

17   saying how are you doing.  I didn't get anything from

18   Cumulus.  But other than that, the job remained the

19   same.  I had my same one-on-ones. I talked to Michael

20   and Omari.  I set pricing.  I signed orders.  I did the

21   job.  I produced the material for the Sales meetings.

22   I was conferenced in.

23       Q.  So you were conferenced in Sales meetings.

24   What type of meetings are those?  How do they differ

25   from the Managers meetings?

162

1       A.   It was actually an agenda that was

2  accomplished.  They were the same meetings we had

3  always had.  Typically Omari or Michael might do a bit

4  of the talking because it helped on being clear as

5  opposed to being on a speaker.  But it was the normal

6  goals, you know, in terms of educate, motivate the

7  team, update them on what's going on.  I probably

8  produced more literature and analytical pieces simply

9  because I was sitting in font of a computer all day, or

10  I didn't deliver so much in terms of in front of

11  client.  I could offset it in that way.  That was how

12  the meetings went.

13       Q.   Who would be included in these Monday

14  afternoon Managers meetings?

15       A.   Daniel, Judi, Omari, Michael and myself.

16       Q.   So at some point you would not be attending

17  those because you were completely out of work -- you

18  were completely out of the office not doing any work?

19       MS. LAWLESS:  You mean before she was working

20  intermittently?

21       THE WITNESS:  For the three weeks recovery.

22  For those three weeks, right.

23       MS. MOSER:  Q.  So you weren't part of the

24  meetings or anything --

25       A.   Nothing.

                                                        163

Valerie Howard

```
1        Q.   -- at that point?
2        A.   Yeah.
3        Q.   When you come back to work February 2010, tell
4   me how you're saying you were excluded from the
5   Managers meetings?
6        A.   What time are you guys going to meet?  Before
7   you tried to call.  He's on the phone.  Now they are
8   meeting in the conference room.  Oh, let me get the
9   conference room number.  Oh, no, they went back to his
10  office.  Or the meeting was blown off entirely that
11  week.  Okay, maybe next week.  So then you try and
12  just -- it's not like, I'm going to call Valerie and
13  put her on the speaker phone.
14       Q.   Doesn't sound like they were the most
15  organized meetings; is that fair to say?
16       A.   Right.
17       Q.   So who did you talk to about being conferenced
18  in to those meetings?
19       A.   I remember talking to Michael.  I may have
20  talked to Omari too.
21       Q.   And tell me about those communications.
22       A.   I said, "I'm not being conferenced in."  I
23  think their smart ass remark was, "You're not missing
24  anything."  But still I felt the need to remain a part.
25  I was working through chemotherapy, when other people
```

164

Valerie Howard

1    would just bail, in the hopes of genuinely showing that

2    I was engaged, was productive, wanted to be a part of

3    the company, not just faking it and saying, wow, I'm

4    going to suck six months out of it and do nothing.

5    That wasn't my goal.  I was productive.  I was looking

6    to be fully integrated as opposed to having a bunch of

7    health excuses.

8        Q.   So then did you ever discuss with Peter being

9    conferenced in those Managers meetings?

10       A.   I think on one occasion I did have a

11   conversation, but we had very limited conversations.

12       Q.   And what did you communicate with him about

13   the --

14       A.   I think at one point I might have sent a memo

15   saying this is what I'm doing.  I've got this and this

16   and this and this, showing them that much of my

17   schedule was exactly the same and unchanged and that I

18   wanted to continue to participate.  I tried to be

19   businesslike about communicating when I was ill because

20   I didn't want to make it a big drama thing where for

21   ten weeks everybody is weepy and sad about the disease.

22   I sort of tell him and Stacey, try to keep this inside,

23   and then when the news comes out in the afternoon, I

24   tell Michael and Omari, hey, I got to have surgery, see

25   you in a few weeks.  It doesn't end up that I see them

165

Valerie Howard

 1    like when you were in the office, Peter was on the

 2    phone quite a bit, so you would just have to try catch

 3    him between calls, right?

 4         A.    And he was an informal Manager.  He didn't

 5    have as many scheduled activities, so he would bounce

 6    from office to office and be social that way.  During

 7    my time off, I would talk to Michael and Omari pretty

 8    frequently, often about rates or what was being signed

 9    or if they were going to be out all afternoon, with

10    what I would be covering.  And then of course we would

11    talk about the Sales meeting.

12         Q.    How do you think it should have worked with

13    Peter in terms of communicating?  Sounds like you were

14    talking on the phone to Omari and Michael, but how do

15    you think it should have worked with Peter in terms of

16    communication, just with you being physically in

17    another location?

18         A.    I would think he would have wanted to hear

19    from me how the team was doing, how the sellers were

20    performing, and how the Sales Managers were doing.  As

21    it turned out, he only wanted to talk to Omari and

22    Michael.  He didn't care about what I had to say, so he

23    had no need to contact me.  He was going to get his

24    information from them.

25         Q.    Did he -- do you recall whether he ever called

                                                        168

1   you to discuss anything?

2       A.   I know -- I remember talking with him about

3   Rick Neil, one of the sellers who at that particular

4   point in time was dissatisfied with pay.  May have

5   called me on that issue.

6       Q.   Did you call him?

7       A.   And I did put in calls, but I didn't have as

8   many calls coming in.  So he was doing National at that

9   time.

10      Q.   Peter Schwartz was doing National --

11      A.   Um-hm.

12      Q.   -- Sales in addition to Director of Sales?

13      A.   Um-hm.

14      Q.   Was there ever a time --

15      A.   Peter was not an organized person where you

16  call and you were going to necessarily get a call back.

17      Q.   At some point in time you, sounds like, came

18  to the conclusion that you were being treated

19  differently because of your medical condition?

20      A.   Um-hm.

21      Q.   At what point did you start thinking it was

22  because of your medical condition?

23      A.   You know, I don't think you put all of it

24  together until you're standing there looking at the

25  paperwork from Karen about your final paycheck.  That's

169

Valerie Howard

```
1    when you put it all together.  You might feel that

2    you're being treated differently, but at the time it's

3    happening it doesn't seem quite real because you feel,

4    I've been a good performer, and I'm working through

5    chemo.  And of course they are -- I mean, who could be

6    that cruel?  You don't suspect it, and then you begin

7    to add up all the little pieces.

8         Q.   So the first time you tied how you were being

9    treated with your medical condition would be with the

10   time of your termination?

11        A.   Yeah.  There were other things that were kind

12   of cold and sobering like Pinch's reaction to me in

13   Atlanta and being told you'd never get a raise.  But I

14   do remember seeming odd.  But again, you know, I'm

15   focused on getting the job done.

16        Q.   Did you ever say to Peter, look, I feel like

17   you're freezing me out; you're treating me differently?

18   This is during the intermittent leave time?

19        A.   No.

20        Q.   Did you ever say that to him when you came

21   back to the workplace?

22        A.   No.

23        Q.   Why not?

24        A.   Because I thought he was just scattered.  I

25   thought it was just scattered Peter.  I didn't think it
```

170

Valerie Howard

1   was so Draconian that he was plotting and scheming

2   behind my back to get rid of me.  I thought he's kind

3   of chaotic and overwhelmed, and I won't add to it.  It

4   wasn't as though I needed his insight to make me

5   successful.  But I just didn't think he was that kind

6   of a character.

7        Q.   Do you know when --

8        A.   And I tend to be a more adaptive Manager.  I

9   tend to adapt to the people around me, not say I need

10  you to be this way in order for me to be productive.

11       Q.   Do you know when Peter started discussing the

12  termination of your employment with Atlanta?

13       A.   Hm-hm.

14       Q.   So --

15            MS. LAWLESS:  Time to take another break?

16            MS. MOSER:  Yes, perfect time.

17                 (Brief recess.)

18            MS. MOSER:  This is Exhibit 22.

19            [Whereupon, Deposition Exhibit 22, a

20            String of e-mails Bates stamped SQ000653

21            to SQ000654 was marked for

22            identification.]

23            Appears to be an e-mail from Peter to the

24  Sales Managers about your birthday, and I just wanted

25  to -- take whatever time you need to read it, and I'll

                                                    171

Valerie Howard

```
1      ask you some questions about it.

2          A.    (DOCUMENT REVIEW.)

3          Q.    Did you receive this e-mail?

4          A.    Um-hm.

5          Q.    Better to say "yes" or no.

6          A.    Yes.

7          Q.    And was that your birthday, October 27th?

8          A.    Yes, it was.

9          Q.    What was your reaction when you got this

10     e-mail?

11         A.    It was just, you know, just kind of a shallow

12     pleasantry, but not a big deal.  John Freitas, one of

13     the Sales Team, had actually brought flowers over,

14     so --

15         Q.    Yeah, but there's nothing that you're reading

16     into this that's discriminatory or --

17         A.    No.  Sounds like somebody reminded him it was

18     my birthday because John was collecting money, and he

19     decided to fire off a little e-mail.

20         Q.    Are you aware of him doing that for other

21     Managers?

22         A.    Oh, yeah.  I mean, he may not have done an

23     e-mail because they were at work, but yeah, he would

24     have taken them out for lunch or do whatever.

25         Q.    Exhibit 23.
```

172

Valerie Howard

1              [Whereupon, Deposition Exhibit 23, a

2         Series of e-mails Bates stamped SQ000662

3         to SQ000663 was marked for

4         identification.]

5         Looks like it's an e-mail exchange.  Looks

6    like Peter sent you something on December 12th, and you

7    responded on December 14th.  Does this look like an

8    e-mail exchange that you had?  I guess more

9    specifically, the second page.

10        A.   This might have been the night of the KFOG

11   Christmas concert.

12        Q.   Okay, yeah, I was going to ask what it's

13   about.  So did --

14        A.   I don't know if --

15        Q.   How did you take that e-mail when you received

16   it?  What was your reaction?

17        A.   That the KFOG team would be in attendance.

18   Mike Alighieri and I had sold one of the big sponsors

19   for the event.  That's why he thought about it.  When I

20   got it, I would have thought that.  Now I'm not sure I

21   think that.

22        Q.   What do you think now?

23        A.   It was just an artful attempt to be -- act

24   like he was involved with me.  I mean, it's odd to get

25   these two e-mails all perky and not convey any business

173

**Valerie Howard**

1    in between.

2         Q.   I'm sorry, what do you mean?  The e-mail --

3    which two e-mails?

4         A.   My birthday e-mail and the concert e-mail.

5         Q.   So you're saying you had no communications

6    with him between Exhibit 23 and Exhibit 22?

7         A.   I don't think I participated in any Monday

8    meetings during this period.  Is there more?

9         Q.   Exhibit 24.

10             [Whereupon, Deposition Exhibit 24, an

11             E-mail from Peter Schwartz to

12             SFO_Sales_Managers dated 12/15/09 was

13             marked for identification.]

14             Take a look at it and let me know whether ever

15    you received that e-mail.

16         A.   (DOCUMENT REVIEW.) I may have.  I don't know.

17    Doesn't show my name on the bottom.  Does that mean --

18         Q.   I was looking at the "SFO Sales Managers."

19         A.   I don't know.

20         Q.   It says "Valerie."  You're not sure.

21         A.   (DOCUMENT REVIEW.)

22         Q.   Do you recall being invited to a lunch or

23    having a conversation about this lunch?

24         A.   Hm-hm.

25         Q.   Do you remember ever seeing this particular

174

Valerie Howard

1   e-mail?

2       A.   I don't remember it.   I may have gotten it,

3   but I don't remember it.

4       Q.   Actually don't really understand what he means

5   by this line.   Maybe you can help me.   "Valerie, I'm

6   sorry you will miss this one.   Actually the food is

7   okay and the company is not much better."   Do you know

8   what that means?

9       A.   No.

10          MS. LAWLESS:   Well, I can tell you that

11  Alioto's isn't all that great.

12          MS. MOSER:   That could be what it is.

13          MS. LAWLESS:   Don't tell them I said it.

14          MS. MOSER:   I'll keep your secret.

15      Q.   Exhibit 25.

16          [Whereupon, Deposition Exhibit 25, a

17          String of e-mails Bates stamped SQ000666

18          was marked for identification.]

19          This is another e-mail exchange between you

20  and Peter.   Did you have this exchange?   Does this look

21  like an e-mail you exchanged with him?

22      A.   Yeah.   I sent him an update on colleges.

23      Q.   Looks like he responded later that same day,

24  Christmas Eve?

25      A.   Um-hm.

175

Valerie Howard

1      Q.    His response, "It sounds very positive, and

2   considering all that you've been through, appears to be

3   a welcomed Christmas present, which reminds me of

4   something I have for you in my office.  A happy and

5   healthy holiday to you, Gene and the twins."  What was

6   your reaction when you saw that e-mail?

7      A.   I don't think anything.  Just nothing.  Just

8   an e-mail.

9      Q.   I think that what --

10      A.   I sent him an update on how I was doing health

11   wise, and he responded.

12      Q.   Did he give you a Christmas present?

13      A.   There may have been a bottle of wine.  He

14   typically bought wine for all Managers.  There may have

15   been one in my office when I arrived.

16      Q.   So I mean, obviously I'm not there, and I

17   don't know the specifics of your communications, but

18   I'm just looking at paperwork.  And I wasn't there for

19   the conversation; I wasn't present for them, so I'm

20   trying to reconcile some of these e-mails, which

21   honestly this seems like a very nice e-mail, very warm

22   e-mail.  Trying to reconcile that with --

23      A.   Someone that doesn't allow me to participate

24   in any decisions.

25      Q.   Yes, because I believe you said he was very

176

Valerie Howard

1   cold, so I'm trying to reconcile that with some of the

2   these e-mails which seem a little gushy to me, seem

3   very warm.

4        A.   Let me see here.  This one.  I'm not sure I

5   got this one about the thing.  There's something on the

6   night of the event and there's a happy birthday.

7        Q.   I guess particularly the last exhibit, the one

8   on Christmas Eve.

9        A.   So on my birthday people in the office are

10  buying flowers, and he decides to send me an e-mail.

11  Then he goes to a KFOG event where I helped to sell a

12  major sponsor, and he sends me an e-mail.  And then I

13  send him an update on my health status, and he

14  responds.

15       Q.   But you don't consider that response a warm

16  response?

17       A.   It is a -- it's a nice thing as a result of me

18  sending him an e-mail.

19       Q.   Are you saying he should have asked about your

20  medical condition?

21       A.   He should -- he's responding back when I'm

22  giving him an update.  It appears to be warm.

23       Q.   I just want to make sure that, you know, you

24  were saying that he was responding to your e-mail with

25  the schedule, and I wanted to make sure that you

177

1    Q.  Is there -- is that all you're talking about

2    John Dickey?  Did he have any other role, involvement?

3    A.  No.  I didn't have any other interaction with

4    him.

5    Q.  I guess the easiest thing to do would be to go

6    to now you're able to get back in the workplace,

7    February 2010, right?

8    A.  Yeah.

9    Q.  This would be helpful.  Just want to clear up

10   this date thing because it's driving me crazy, in terms

11   of whether it was September -- don't worry about it.

12   Strike all that.

13         So do you remember when you returned to work?

14   A.  Um-hm.

15   Q.  You said day after --

16   A.  It was the Monday after Valentine's Day, which

17   was on a Friday.

18   Q.  Tell me how your return to the office went.

19   A.  I got there at the normal time, and the AEs

20   were excited.  There was a sign up.  People were

21   curious to see how I was doing and what I looked like.

22   And it was good to see all the sellers.  And talked to

23   Omari.  Omari dropped by at one point.  But it was

24   positive.

25   Q.  Did you see Peter at all that first day back?

181

**Valerie Howard**

1    Was he in the office?

2         A.   I believe that he did come by.  I don't

3    remember what he said.  He was cordial, but there was

4    no come into my office, tell me how it's been, share.

5         Q.   So was your office still in the same place, a

6    couple doors down from his?

7         A.   Yeah.  I don't think they moved it.

8         Q.   All right.  So tell me who do you say treated

9    you unfairly when you returned?  We're still just

10   talking about Peter, right?

11        A.   Different things would unfold.  He would tell

12   me that I needed to back away from the Bridge To Bridge

13   Run.  It was an event that I had managed the prior year

14   because nobody wanted it.  He would walk right by my

15   office and go into Michael's and chat and play air

16   guitar.  He would talk tickets with Judi and Daniel.

17   He would give a big assignment to Omari before Omari

18   left.  But other than the 4 o'clock meetings, there was

19   nothing.  He wasn't coming to me for projects.  I

20   remember a couple of different things he would assign

21   to Michael to do; then Michael would come into my

22   office and say how do I do this?

23        You know, when Pinch came to town and they

24   wanted to talk rate, I wasn't invited to the meeting,

25   even though I'm the one doing rates.  Different pay

                                                         182

**Valerie Howard**

1    packages and things are offered, and I'm not a part of

2    it.

3         Q.   Pay packages meaning to?

4         A.   Salvage Omari.

5         Q.   I remember you saying that before.  Do you

6    know whether this -- the conduct you're describing,

7    whether that was going on while you were out on leave?

8         A.   I would not know.

9         Q.   What was your understanding of who was

10   handling your duties while you were completely out of

11   work?

12        A.   I would suspect nobody.  And then when I

13   jumped back in, then I picked up where I left off,

14   but --

15        Q.   So I think you were talking about the Bridge

16   To Bridge?

17        A.   Yes.

18        Q.   Tell me a little bit about that -- that --

19   your concern about how you were treated.

20        A.   It's a cluster-wide Sales event and something

21   that I took on but had to leave a little bit before.

22   It included the prior year through the surgery.  It

23   didn't come up.  I think it's an October event, and

24   they usually don't launch it until May or so.  So to be

25   told in February or March, you know, you're not needed,

                                                        183

Valerie Howard

1        Q.   Okay.

2        A.   After Peter said, yeah, we can hire a

3   replacement for Omari, I remember both Sales meetings

4   talking about how since we didn't have a lot of

5   information on the company's success, bringing that up

6   as a positive.

7        Q.   You also mentioned that you were excluded from

8   regular lunches that Michael Segerhi was having with

9   Peter; is that right?

10       A.   Um-hm.

11       Q.   Was that something that you had regular

12   lunches with Peter before you went out on leave?

13       A.   No, but Peter and Michael, after I got back,

14   had lunches, I would think weekly.

15       Q.   Do you know if those were lunches to discuss

16   business or --

17       A.   Pretty impossible to separate, but I wasn't

18   there, so I don't know.

19       Q.   So are you saying that Peter should have asked

20   you to lunch as much as he was asking Michael Segerhi?

21   That assumes lots of stuff.  Do you know if Peter was

22   asking Michael or Michael was asking Peter?

23       A.   Peter was definitely asking Michael.

24       Q.   Why do you think that?

25       A.   He wanted Michael to like him and to be loyal.

187

Valerie Howard

```
1        Q.    And where did you have that impression from?

2        A.    Because Peter was--   wanted to see Michael

3   grow and develop, and Michael was pretty open about not

4   liking the company and wanting to leave.

5        Q.    Was there anyone else that you saw Peter

6   having regular lunches with other than Michael?

7        A.    I know that he would go out with Judi and

8   Daniel.  Because of the tickets available, would attend

9   games and have more social interaction.

10       Q.    Did you want to attend games and you were

11  excluded?

12       A.    On the FM side nobody really got tickets.   A

13  few to the 49ers, but none to the other games.

14       Q.    Okay, the lunch thing.  Did you ever go to

15  lunch with Peter?

16       A.    Um-hm, one time after I got back.

17       Q.    Had you ever gone out to lunch with him before

18  you left?

19       A.    Um-hm.

20       Q.    How many times total?

21       A.    The one time -- pardon?

22       Q.    I just want to figure out how many times total

23  you had lunch with Peter to the extent you can count

24  them.

25       A.    Maybe two or three.
```

188

Valerie Howard

1      Q.    You just used the word "shunned."  Tell me

2   what you mean by that.

3      A.    I think of shunned as kind of ignored,

4   politely ignored.  I don't know if that's the

5   definition, but that's how I think of it.

6      Q.   So have we discussed the ways that you were --

7   you feel you were treated differently after you

8   returned, or are there specific instances that you

9   still want to talk about?

10          MS. LAWLESS:  Object as overly broad.

11          MS. MOSER:  Q.  Is there any other way you

12   think you were treated differently after you returned

13   from medical leave?

14      A.   I think we've covered that.  I, you know,

15   wasn't participating in activities with my

16   subordinates; that management was ignoring.  Sort of

17   obliquely cool.  Upon my return, Peter sort of misled

18   with regard to being able to recruit somebody on the

19   KFOG side.  Those are the topics I feel we've covered,

20   haven't we?

21      Q.   Yeah, I think so.  This is Exhibit 29.

22          [Whereupon, Deposition Exhibit 29, a

23          Series of e-mails Bates stamped SQ000707

24          to SQ000708 was marked for

25          identification.]

193

**Valerie Howard**

1    the poor timing given the extent of the personal mattes

2    Valerie is faced with this week." Did you ever talk to

3    Karen about that e-mail that she sent?

4        A.    Hm-hm.

5        Q.    No?

6        A.    No.

7        Q.    Do you have any information to suggest that it

8    was anything more than a mistake?

9        A.    I don't know.

10       Q.    Third paragraph.  We go to what you were

11   talking about.  I think getting some information off of

12   your Outlook calendar.  Did you receive that

13   information that you requested?

14       A.    Yes.

15       Q.    Are you aware of anyone else who received

16   information off their Outlook calendar after they've

17   been involuntarily terminated?

18       A.    I'm not aware one way or the other.  Doesn't

19   seem like it's a special request, though.

20       Q.    The last paragraph refers to a formal exit

21   interview.  Did you do a formal exit interview?

22       A.    No.

23       Q.    Why not?

24       A.    I think when all of it sunk in, it just seemed

25   like a waste of my time.

                                                          203

Valerie Howard

1   other job.   There was -- there were other lots of ways

2   to make money, clearly when I was at Bonneville, and

3   they said the pay is less; it's an easy one.   But they

4   didn't want -- they had me hire other people in the

5   case of Maura so that the job would be full; then they

6   didn't notify me that my job was going to be

7   eliminated, so I had no time to apply for a National

8   job, which I've held before and done before.   And

9   there's no performance issue, so the only thing I can

10  think of is disease.   And in spite of a few chipper

11  e-mails, it's been not including, not involving, not

12  embracing, ignoring, going around, telling me that I'm

13  not qualified for jobs that I've held in the past and

14  completely capable of holding.   I've even taken jobs

15  that made less money, embraced them and was successful.

16  It wasn't as though when I went to Bonneville and they

17  said, look, this is what was left, do you want it, I

18  was moody and looking to jump ship six months later.   I

19  was earnest about taking the job.   And I feel that I

20  had worked during chemo and radiation in an attempt to

21  show that I was earnest and had real meetings with

22  people and accomplished real things.   And then to

23  basically be misled into recruiting someone for the LSM

24  position at KFOG, and then to actually have Joe Karifi

25  contact me first about the NSM position and what was it

206

Valerie Howard

1   told they have a pay cut and leave, but I honestly

2   haven't seen a situation where someone has been told

3   they have a pay cut and things go well.  Have you seen

4   one other than you?

5       A.   I've seen people take all sorts of lesser jobs

6   in radio, in Clear Channel and over here.  Yeah.

7   There's no choice.  And the equivalent to that is to

8   get a double job with the same money.  It's the same,

9   in essence, situation.  But yes, I have.

10      Q.   Can you think of any in particular?

11      A.   Cheryl Hangartner over at Clear Channel was

12  National, and they said she had to become Sales Manager

13  of, I don't know, some little AM station, less money,

14  less prestige, but employment.

15      Q.   Are you aware of anybody at Cumulus going from

16  full-time employment with Cumulus in one job to,

17  immediately after, full-time employment in another job

18  with less pay?

19      A.   I'm not, no.  It may be, but I was not privy

20  to that information.

21      Q.   Do you know about the circumstance of Peter

22  leaving the DOS position?

23      A.   Hm-hm.

24      Q.   How about Bill Bungeroth; do you know anything

25  about the circumstances of his Market Manager tenure?

209

**Valerie Howard**

1     Q.   I'm just kind of wanting to know how your

2  thought process got from, you know, felt as if you were

3  treated unfairly to, I want to take some sort of legal

4  steps.  I'm just trying to get a feeling for that.

5     A.   I don't really know.  I'm sorry.

6     Q.   Other than your request for intermittent

7  leave, was there anything else you asked of the company

8  related to your medical condition that they didn't give

9  you?

10    A.   Not that I recall.  I've tried to be very low

11  maintenance.

12    Q.   Do you know who did your duties after you left

13  Cumulus, who took on your duties?  Do you know?

14    A.   Who took on my duties?

15    Q.   What responsibilities --

16    A.   After I departed in September?

17    Q.   2010, yeah.

18    A.   I think -- I guess Michael might have.  Maura

19  might have.  I don't know.  I wasn't there.

20    Q.   All right.  So you also have in your lawsuit

21  that -- a claim for intentional infliction of emotional

22  distress.  I'm not asking what the legal definition of

23  that is, but can you tell me what part of your

24  relationship with Cumulus was -- you think was

25  intentional infliction of emotional distress of however

219

Valerie Howard

```
1    with the Fair Employment Housing, with the California

2    agency that deals with discrimination?

3        A.   I don't remember.  Things were filed, but I

4    don't think I really knew what they were.  But there

5    were a couple of steps.  That's what I recall.

6        Q.   Did you participate in anyone else's claims of

7    discrimination or concerns, or all of your stuff has to

8    deal with your own personal experience?

9        A.   You mean other lawsuits?

10       Q.   Um-hm.

11       A.   No.  I had -- there were two lawsuits at

12   Bonneville, but not of significance.

13       Q.   Let's say 2009 and 2010, were you -- did you

14   participate in any sort of investigation of an

15   employment issue, employment concern, like one of your

16   employees complaining?  Just trying to say anything

17   outside your personal lawsuit.

18       A.   We had one seller on The Bone that had

19   attempted to -- I don't know -- they sent a letter

20   about wrongful termination or something maybe like

21   that.  Freddie Avener.

22           MS. LAWLESS:  Was it Lavener?

23           THE WITNESS:  A-v.  And I remember Tony was

24   there at the time.  A lawyer came in, and we had one

25   discussion and -- but then it went away.
```

221

Valerie Howard

1          MS. MOSER:  Q.  Anything other than that that

2     you can think of?

3          A.    Hm-hm.

4          Q.    Just trying to make sure I cover all my bases.

5     Okay, so you said that this experience with Cumulus

6     caused you emotional distress.  And just if you can

7     describe for me specific ways that you felt emotional

8     distress.  I'm not saying you haven't.  I just wanted

9     to understand the specific ways that this has been true

10    for you.

11         A.   Being a somewhat private person, any time

12    you're put in the situation your life becomes public,

13    and it's humiliating.  There's not a person that you

14    meet; aren't you in media; weren't you in media?  What

15    happened, who don't want to hear or understand what

16    happened.  And it's not comforting.  It's just

17    information on their part.  Humiliating to have to call

18    around trying to grovel for a job at a time when you

19    don't even feel that physically you're a hundred

20    percent.

21              At night you think about it, and you think

22    just how incredibly mean people are unnecessarily.  And

23    it's sad.  It's sobering.  In the daylight you put on a

24    brave face, but at night when you're all alone and

25    you're thinking, uh-oh, my future is not that bright.

222

**Valerie Howard**

1    a determination that you've sort of been sullied.  I've

2    had very few holes in my employment over the years.

3    And a part of that is your reputation and the kind of

4    job that you do.

5         But in this situation anyone would look at it

6    and say, wow, they kept all those other Managers but

7    they got rid of you.  And over allegedly 50K, which is

8    nothing.  That's nothing.  Lew would spend that on

9    airfares flying to and from.  That's a nothing amount

10   of money.  Well, no that was it.  It was all money.

11   They would have kept me.  It was just I was too

12   expensive.  It was just not believable.  So it's just

13   sad that they don't offer to the right person.

14        I think that, you know, I've gained weight.

15   I've done -- I went to see a counselor in the hopes of

16   putting a different spin, not making it as depressing.

17   But when you look at your kids, that's a tough one, you

18   know.  You do -- you live your life because you don't

19   know exactly how long you're going to be out or at a

20   reduced level of pay.  Likely to be, you know,

21   permanent because you're forced to get out of the tiny

22   industry and to go into something else.  And for me,

23   you know, I got into print not because print was hot,

24   but because it was the only one that would hire me.

25   And -- but there's no security there.  I mean, it's no

226

1  you're touching.  As I mentioned, the Bonneville

2  people, I remember getting an e-mail on the subject

3  saying how are you doing?  Some general concern as

4  opposed to saying you're going out on a serious medical

5  leave, man, let's get rid of this one as fast as we

6  can.  She might get sick or might take medical rates

7  up.  No sense of humanity.

8        But for me personally it's, you know -- it's a

9  time where you try to bear down, but it's hard to look

10 for a year and have two or three near misses.  Not a

11 lot of positive feedback.  And you curtail costs.  You

12 know, obviously you don't know how long things are

13 going to sort of dwindle.  So I'm probably chubbier and

14 wrinklier than before.  And my oncologist is the one

15 person who says how are you doing?  I say, well -- they

16 are worried about your mental outlook.  And the

17 counselor that I saw was, you know, she was

18 interesting.  She tried to sort of get me to open up

19 and look in other areas thinking it's probably futile

20 to try to find something in media; that it would

21 ultimate depress me.  I don't know if that's true.

22       Q.   How long did you see her?

23       A.   Probably two or three months.  I would have

24 stayed with her longer, but it was not covered.  And I

25 look at myself now, and I'm thinking if I'm applying at

229

**Valerie Howard**

1   say if you were the one that was singled out, then you

2   must have been lousy.  They wouldn't believe a company

3   would so petty to go with a lesser manager over 50K.

4   Nobody would believe that unless they work for Cumulus.

5   One Manager could make a single deal worth 200K, yet

6   they're going to pinch pennies over 50.  Maura was

7   cheaper.

8        Q.   But that's what happened with comparing Omari

9   and Maura, right; that e-mail that you had saying we

10  can save 50,000?  That was 50,000 was a factor at

11  least?

12       A.   I'm not recalling.

13       Q.   The part that I'm having a hard time is when

14  you say that 50,000, 100,000 that it's a nothing amount

15  because everything that I've seen is that every penny

16  is a huge deal, and perhaps that's because -- sounds

17  like --

18       A.   That's the -- the profit side versus the

19  potential of what somebody can generate.

20       Q.   Okay.  So the Miller Kaplan report --

21       A.   So you would be saying that Omari and Maura

22  performed at the same level.

23       Q.   Yeah, I don't -- honestly those are all

24  business determinations that I'm not included in.  But

25  the Miller Kaplan report, you were saying that the

                                                        231

1    stations were performing better.  In what way?  In

2    terms of are you looking at ratings, or are you looking

3    at revenue?  Are you looking profit and loss?  What are

4    you basing that on?

5        A.   That would be on revenue and an ability to

6    convert revenue on whatever the ratings are.  The

7    ratings were dwindling, but I had no control over that.

8    But the ability to convert on a power ratio would be

9    greater in 2010 than in 2011.

10       Q.   So you're saying it was not your experience

11   that Cumulus was trying to reduce overhead?

12       A.   I think they were trying to reduce overhead

13   sometimes without considering the impact.  They almost

14   saw everybody as the exact same performer.  Very little

15   ability to discern differences in performance.

16       Q.   Right.  So you have Tony Salvadore and you

17   have --

18       A.   Peter.

19       Q.   Schwartz.  And Peter Schwartz costs less than

20   Tony, and we think he can do the same job.  Is that

21   what you're saying?

22       A.   Um-hm.  But at the end of the day it's just

23   the cruelty that hits you, the scheming, the plotting.

24   You know, a couple of e-mails here and there, but

25   knowing that behind the scenes they just have their

                                                        232

Valerie Howard

1    daggers out.

2        Q.    And you're referring to specifically what you

3    talked about earlier in terms of Peter somehow being in

4    discussions about terminating your employment and also

5    making representations to you?

6        A.    Yeah.

7        Q.    Is that what --

8        A.    Happy birthday.

9        Q.    Are you aware of any efforts that Peter made

10   to -- behind the scenes, to keep you?

11       A.    I've not seen any efforts or heard any

12   efforts.  It was my knowledge that he didn't want to do

13   National anymore.  Peter had a saying in 4:00 p.m.

14   meetings, and it was to basically keep your head down

15   and say and do what you have to do.  Don't stick your

16   neck out.  He was also counseling Michael.

17       Q.    I don't understand what that means.

18       A.    Don't get pushed back to Cumulus.

19       Q.    I see.

20       A.    Put your head down and do what you have to do.

21   I'm going to feed my family.  That's what I'm going to

22   do.  I'm going to do and say what I have to do to feed

23   my family.

24       Q.    I'm not sure what that means exactly, though.

25       A.    It means I'll lie to keep my job.  I'll do

233

Valerie Howard

1    document?

2            MS. LAWLESS:  Objection.  Asked and answered.

3    You can answer again.

4            THE WITNESS:  I know it was early because I

5    had gone on vacation.  And it had to be a week out or

6    so.  And I think the surgery was around the 10th.

7    Might have been the 10th.

8            MS. MOSER:  Q.  Why do you think it was a week

9    before the surgery?

10       A.   Because I wanted to give Peter and the company

11   some time to know I was going to be out.  Even though I

12   wasn't going to try upset the team --

13       Q.   Right.

14       A.   -- I wanted him to know in advance.

15       Q.   But sounded like you said you needed to be

16   scheduled for surgery fairly quickly?

17       A.   Yes.

18       Q.   Because of your health condition?

19       A.   Yes.

20       Q.   Are you aware of any documents other than this

21   Exhibit 35 out there that reflect when you informed the

22   company about your health condition?

23       A.   I'm not aware of them.  There may be other

24   ones.

25           MS. MOSER:  Good enough.  We're done.  I don't

                                                        239

Valerie Howard

1    STATE OF CALIFORNIA      )

2                             ) SS

3    COUNTY OF CONTRA COSTA   )

4        I, ORA B. KOHN, Certified Shorthand

5    Reporter, do hereby certify:

6        That prior to being examined, the witness in the

7    foregoing proceedings was by me duly sworn to testify

8    to the truth, the whole truth, and nothing but the

9    truth.

10       That said proceedings were taken before me at

11   the time and place therein set forth and were taken

12   down by me in shorthand and thereafter transcribed into

13   typewriting under my direction and supervision.

14       I further certify that I am neither counsel

15   for, nor related to, any parties to said proceedings,

16   nor in any way interested in the outcome thereof.

17              In witness whereof, I have hereunto

18   subscribed my name.

19

20                  Dated: March 8, 2013

21

22                  _____

23                  ORA B. KOHN, CSR 11933

24

25

243

## CUMULUS
### SAN FRANCISCO
KNBR | THE BONE | KFOG

## Sales Organization Chart
### (11th Floor)
8/9/2010

Peter Schwartz
Director of Sales

Natalie Penisakne
National Sales Coordinator

Stacey Hayder
HR Manager

Karen Goodoff
Business Manager

Jimmie Aleilo - Accounts Receivable

Will Mitsukuri - Accounts Receivable

Desire DeVault - Accounts Payable

Karylonni Biasi
Traffic Supervisor

Meihara Mercier - KFOG

James Ly - KSAN

Heather Webster
Continuity Director

Judi Kahn
AM General Sales Manager

Sarah Curry
AM Sales Coordinator

Daniel Erman
KNBR 1050

Chris Young
Gabe Shapiro
Jennifer Magnone
Kerry Weidail
Loren Fraser
Mark Schuman
Niles Sedgwater
Tryan Crawford
Rade Ivanov
Sharon McGlone
Colin Kelly

Seth Whitehead - KAM
Rick Neal
Jennifer Sagenmeg
Matthew Wexler
Rafael Paniolga
Demetrius McDaniel

Valerie Howard
FM General Sales Manager

Jennifer Kim
FM Sales Coordinator

Mayra Donohue
KFOG Sales Manager

Michael Seghieri
KSAN Sales Manager

John Fretke - KAM
Victoria Mann - KAM
Tiffani Patrick
Matthew Alghbart
Brian Behsen
Adrienne Brawley

Howard v. Cumulus Media Inc., et al.

EXHIBIT
Deponent
Date          Rptr.
www.DEPOBOOK.COM

**From:** Karen Gooseff
**Sent:** Monday, September 13, 2010 4:14 PM
**To:** Valerie Howard
**Subject:** Valerie Howard Manual Payroll Check Request Form
**Attachments:** Valerie Howard Manual Payroll Check Request.pdf

Jon, Attached is Valerie Howard's manual payroll check request form.  A manual check needs to be done for her final paycheck. Her last day will be Friday, September 17th.   I will submit to DJ once you have approved, so a paycheck can be processed.  Can you please approve the attached manual payroll check request form.  Thanks, Karen

Karen Gooseff-Business Manager
Cumulus San Francisco
KFOG/KNBR/KSAN/KTCT
55 Hawthorne Street, 10th Floor
San Francisco, CA 94105
(415) 995-6872

Cumulus Media Email Policy
PLEASE NOTE: This message contains confidential information and is intended only for the individual(s) named. Employees of CMI and CMP (and their subsidiaries) are prohibited from forwarding this email or otherwise disclosing the contents of this email, or any portion thereof, to any third party, including any non-employee of the respective companies. Failure of an employee to comply with this policy will result in disciplinary action up to and including immediate termination of employment.



1



EXHIBIT 7
Deponent: Howard
Date: 2/12/0 Rptr. 0L
WWW.DEPOBOOK.COM

Howard v. Cumulus Media Inc., et al.

**VALERIE E. HOWARD**
1517 St. Alphonsus Way
Alamo, California, 94507
valeriechoward@gmail.com

M (415) 819-9520   H (925) 837-1038

**EXPERIENCE:**

**2005 – 2007**      Vice President, Director of Sales - KDFC, KMAX, KOIT, Bonneville International Corp.
- Generated cluster revenue of $44 million and oversaw a department of 30 media sales reps
- Achieved #1 FM billing status in the San Francisco market for KOIT in 2006
- Developed new business team that sold integrated programs (on-air and on-line) with annual sales volume of $5 million
- Re-purposed as Director of Sales after corporate restructuring; stations sold in February 2007

**2002 – 2005**      Vice President, General Manager - KDFC and K2BR (95.7)
- Promoted to oversee a second station and selected to debut a new format
- Conducted extensive perceptual, music and focus group research; oversaw product development
- Recruited a staff of 20+ that were responsible for handling all aspects of marketing, sales and finance

**1997 – 2002**      Vice President, General Manager - KDFC
- Created the most profitable classical radio station in the United States
- Responsible for building the brand of the radio station while working within tight budget constraints
- Oversaw sales, marketing and programming aspects of the operation

**1993 – 1997**      Vice President, General Sales Manager - KOIT
- Led a team of ten local sales reps and one national manager to exceed revenue goals
- Positioned the product and audience to clients; highlighted competitive strengths
- Handled all recruiting, training and compensation of sales team
- Promoted to General Manager

**1990 – 1993**      National Sales Manager - KOIT
- Worked with large national advertisers to secure revenue for the station
- Directed a team of 30+ sales reps located in major cities throughout the US

**1989 – 1990**      Account Executive – KYUU, NBC Radio
- Successfully developed marketing and promotional campaigns for clients

**EDUCATION:**
San Francisco State University, San Francisco, Bachelor of Music
College of San Mateo, San Mateo, Associate of Arts, Music

**TRAINING:**
NAB Georgetown Management and Leadership Training, Customer Focused Selling, Talent Focused Manager, Gallup
Leadership Seminar, Xerox Professional Sales II, Dale Carnegie Public Speaking
**AWARDS:**

SQ000376

03/15/2007   10:43   9257498381   MBE 882   PAGE   01

**Howard, Gene**

To:    valerie howard

Subject: RE: Offer of employment...

-------- Forwarded message ---------
From: Tony Salvadore <Tony.Salvadore@cumulus.com>
Date: Mar 14, 2007 6:53 PM
Subject: Offer of employment...
To: valeriechoward@gmail.com

Dear Valerie;

Please consider this email an offer of employment with Cumulus/SF, as General
Sales Manager of KFOG and KSAN (the BONE) beginning as soon as possible, but
no later than Monday March 26th, 2007.

Salary and Bonus Compensation:
*    Annual Salary $235,000, paid semi monthly.

*    $4,000p/m for achievement of FM sales, including local, national, NTR
and all other budgeted revenue's.

*    Annual recapture: If a monthly bonus is missed during the year, but the
annual budgets are achieved, then all lost monthly bonuses would be earned.

*    KaBOOM bonus: $3,000 earned upon achievement of gross NTR KaBOOM
budget.

*    49er Season Long Bonus: $3,000 earned for achievement of 49ers budget
(1.2mm)

You will be provided with a company-paid parking space in the 55 Hawthorne St
building.

Reimbursed business expenses: In accordance with company policy.

Benefits: You will be eligible for various benefits provided by Cumulus, on
the same terms and conditions as they are made available to all other
employees.

I'll call you tomorrow to answer any question you may have.

I look forward to having you join Cumulus/SF.

Sincerely;

Tony Salvadore
SR/VP Market Manger Cumulus/SF

3/15/2007

SQ000361





**CUMULUS**
SAN FRANCISCO

To:     Valerie Howard

From:   Tony Salvadore

Date:   January 3, 2008

Re:     2008 Compensation Plan

Valerie, the following outlines your compensation plan for 2008. The compensation plan is effective January 1, 2008 and will run through December 31, 2008 and is subject to change at any time. This memo outlines the method of your compensation and is not a contract or a guarantee of employment.

Effective Date:             January 1, 2008

Base Compensation:          $240,000.00 Annually

Monthly Bonus:              $4,000.00 for achievement of KFOG & KSAN (local, national, NTR) budgeted gross sales.
You will be paid 60% of the monthly bonus for exceeding same month last year, or 75% of the monthly bonus for achieving 85% of the monthly budget, or 100% for achieving monthly budgeted sales goals.

KaBoom Bonus:               $3,000.00 earned upon achievement of gross NTR KaBoom budget.
You will be paid 60% of the bonus for exceeding last year, or 75% of the bonus for achieving 85% of the budget, or 100% for achieving budgeted sales goals.

49ers Season-Long Bonus:  $3,000.00 earned for achievement of 49ers gross budget (1,115,981).
You will be paid 60% of the bonus for exceeding last year, or 75% of the bonus for achieving 85% of the budget, or 100% for achieving budgeted sales goals.

Monthly Bonus:              $665.00 earned for achievement of 25 KFOG/KSAN Streaming packages on the web per month. This goes into effective on April 1, 2008 and will run through December 31, 2008.

Parking:                    You will be provided with a company-paid parking space in the 55 Hawthorne Street building.

Reimbursed Business Expenses:  In accordance with Company policy.

Accepted: _____     Dated: _V 7 08_____
          Valerie Howard

SQ000351                                              Howard v. Cumulus Media Inc., et al.



EXHIBIT 14
Deponent Howard
Date OV Rptr. 2/07
WWW.DEPOBOOK.COM

# CODE OF BUSINESS CONDUCT AND ETHICS

## Introduction

This Code of Business Conduct and Ethics describes the basic principles of conduct that we share as officers and employees of Cumulus Media Inc (the "Company"). This Code also applies to our directors. Violation of this Code may result in disciplinary action, varying from reprimand to dismissal.

This Code is intended to provide a broad overview of basic ethical principles that guide our conduct. In some circumstances, we maintain more specific policies on the topics referred to in this Code. Should you have any questions regarding these policies, please contact the Company's General Counsel.

## Compliance with Laws, Rules and Regulations

We strive to comply with all laws, rules, and regulations of the places where we do business. It is the personal responsibility of each officer, employee and director to adhere to the standards and restrictions imposed by those laws, rules and regulations. If a law, rule, or regulation is unclear, or conflicts with a provision of this Code, you should seek advice from supervisors or our General Counsel but always seek to act in accordance with the ethical standards described in this Code.

## Conflicts of Interest

We conduct our business affairs in the best interest of our Company and should therefore avoid situations where our private interests interfere in any way with our Company's interests. We need to be especially sensitive to situations that have even the appearance of impropriety and promptly report them to a supervisor, or if appropriate, a more senior manager. If you believe that a transaction, relationship or other circumstance creates or may create a conflict of interest, you should promptly report this concern.

A "conflict of interest" can occur when an officer's, employee's or director's personal interest interferes in any way with -- or may appear to interfere with -- the interests of the Company as a whole. Personal interests may include commercial, industrial, banking, consulting, legal, accounting, charitable or financial relationships, among others. Conflicts of interest may also arise when an officer, employee or director, or a member of his or her immediate family, receives personal benefits outside of the compensation or reimbursement programs approved by the Board.

It is our policy that circumstances that pose a conflict of interest for our employees who are not executive officers or directors are prohibited unless a waiver is obtained from the Company's General Counsel. Any waiver of this conflict of interest policy for a director or executive officer may only be made by our Board of Directors (the "Board"), and any such waiver will be promptly disclosed to the public.

Howard v. Cumulus Media Inc., et al.

## Record-Keeping

We require honest and accurate recording and reporting of information in order to make responsible business decisions. We document and record our business expenses accurately. Questionable expenses should be discussed with the appropriate personnel in our accounting department.

All of our books, records, accounts, and financial statements are maintained in reasonable detail, appropriately reflect our transactions, and conform both to applicable legal requirements and to our system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained unless permitted by applicable law or regulation.

We avoid exaggeration, derogatory remarks, guesswork, or inappropriate characterizations of people and companies in our business records and communications. We maintain our records according to our record retention policies. In accordance with those policies, in the event of litigation or governmental investigation, please consult the Company's General Counsel.

## Public Reporting

We are a public company and as a result file reports and other documents with the Securities and Exchange Commission (the "SEC") and the securities markets on which our securities trade. In addition, we issue press releases and make other public statements that include financial and other information about our business, financial condition and results of operations. We endeavor to make full, fair, accurate, timely and understandable disclosure in reports and documents we file with, or submit to, the SEC and in our press releases and public communications.

We require cooperation and open communication with our internal and outside auditors. It is illegal to take any action to fraudulently influence, coerce, manipulate, or mislead any internal or external auditor engaged in the performance of an audit of our financial statements.

The laws and regulations applicable to filings made with the SEC, including those applicable to accounting matters, are complex. While the ultimate responsibility for the information included in these reports rests with senior management, numerous other employees participate in the preparation of these reports or provide information included in these reports. We maintain disclosure controls and procedures to ensure that the information included in the reports that we file or submit to the SEC is collected and communicated to senior management in order to permit timely disclosure of the required information.

If you are requested to provide, review or certify information in connection with our disclosure controls and procedures, you must provide the requested information or otherwise respond in a full, accurate and timely manner. Moreover, even in the absence of a specific request, you should report to the appropriate Company employee or officer any information that you believe should be considered for disclosure in our reports to the SEC.

If you have questions or are uncertain as to how our disclosure controls and procedures may apply in a specific circumstance, promptly contact your supervisor or a more senior

manager. We want you to ask questions and seek advice. Additional information regarding how to report your questions or concerns (including on a confidential, anonymous basis) is included below in this Code under the heading "Reporting Illegal or Unethical Behavior."

## Insider Trading

We do not trade in Company stock on the basis of material, non-public information concerning the Company, nor do we "tip" others who may trade in Company securities.

## Corporate Opportunities

We do not personally take opportunities that are discovered through the use of Company property, information or position without the prior consent of our Board. Our directors, officers, and employees are also prohibited from competing with the Company.

## Competition and Fair Dealing

We outperform our competition fairly and honestly. We do not engage in unethical or illegal business practices such as stealing proprietary information, possessing trade secret information that was obtained without the owner's consent, or inducing disclosure of this type of information by past or present employees of other companies.

## Business Entertainment and Gifts

We recognize that business entertainment and gifts are meant to create good will and sound working relationships, not to gain unfair advantage with customers or suppliers. Neither we nor our family members offer, give, or accept any gift or entertainment unless it:  (a) is not a cash gift, (b) is consistent with customary business practices, (c) is not excessive in value, (d) cannot be construed as a bribe or payoff, and (e) does not violate any laws or regulations. Any questionable gift or invitation should be discussed with a supervisor, or, if appropriate, a more senior manager.

## Discrimination and Harassment

The diversity of our employees is a tremendous asset. We provide equal opportunity in all aspects of employment and will not tolerate discrimination or harassment of any kind. Derogatory comments based on racial or ethnic characteristics, unwelcome sexual advances and similar behavior are prohibited.

## Health and Safety

We strive to provide a safe and healthful work environment. We ensure a safe and healthy work environment by following safety and health rules and practices and promptly reporting accidents, injuries and unsafe equipment, practices, or conditions to a supervisor or more senior manager.

We do not permit violence or threatening behavior in our workplaces. We report to work in condition to perform our duties at our best, free from the influence of illegal drugs or alcohol. We do not tolerate the use of illegal drugs in the workplace

**Confidentiality**

We protect confidential information. Confidential information includes proprietary information such as our trade secrets, trademarks, copyrights, business, marketing plans, sales forecasts, designs, databases, records, salary information, and unpublished financial data and reports, as well as any non-public information that might be of use to competitors or harmful to us or our customers if disclosed. It also includes information that suppliers and customers have entrusted to us on a confidential basis. Our personal obligation not to disclose confidential information continues even after employment ends

**Protection and Proper Use of Company Assets**

Theft, carelessness, and waste of Company assets have a direct impact on our profitability and should be avoided. Any suspected incident of fraud or theft should be immediately reported to a supervisor or, if appropriate, a more senior manager for investigation. We carefully safeguard our confidential information. Unauthorized use or distribution of confidential information is prohibited and could also be illegal, resulting in civil or even criminal penalties.

**Payments to Government Personnel**

In compliance with the United States Foreign Corrupt Practices Act we do not give anything of value, directly or indirectly, to officials of foreign governments or foreign political candidates in order to obtain or retain business. We do not promise, offer, or deliver to any foreign or domestic government employee or official any gift, favor, or other gratuity that would be illegal. Our General Counsel can provide guidance in this area.

The laws or customs of other countries in which we operate may be less clear. It is our policy to comply with those laws or customs; however, if a local law or custom seems to contradict the principles described in this Code, contact a supervisor or our General Counsel for guidance.

**Waivers**

Consistent with NASDAQ listing requirements, only our Board may waive a provision of this Code for our executive officers or directors, and any waiver should be promptly disclosed to the public. Waivers of this Code for any other employee may be made only by the General Counsel, and then only under special circumstances.

**Reporting Illegal or Unethical Behavior**

In order to encourage good faith reports of illegal or unethical behavior (including violations of this Code), we keep all reports confidential and do not allow retaliation for reports

of misconduct by others  It is also our duty to cooperate in internal investigations of alleged misconduct.

We must all work to ensure prompt and consistent action against unethical or illegal behavior.  Oftentimes a violation of this Code will be easy to recognize and should be promptly reported to a supervisor or, if appropriate, a more senior manager  However, in some situations it is difficult to know right from wrong.  Since none of us can anticipate every situation that will arise, it is important that we have a way to approach a new or sensitive question or concern  Here are some questions that can be asked:

1.  *What do I need to know?*  In order to reach the right solutions, we must be as fully informed as possible

2.  *What specifically am I being asked to do?  Does it seem unethical or improper?*  This will focus the inquiry on the specific action in question, and the available alternatives.  Use judgment and common sense; if something seems unethical or improper, it probably is

3.  *What is my responsibility?*  In most situations, there is shared responsibility  Should colleagues be informed?  It may help to get others involved and discuss the issue

4.  *Have I discussed the issue with a supervisor?*  This is the basic guidance for all situations.  In many cases, a supervisor will be more knowledgeable about the question and will appreciate being brought into the decision-making process.  Remember that it is the supervisor's responsibility to help solve problems.

5.  *Should I seek help from Company management?*  In the case which it may not be appropriate to discuss an issue with a supervisor, or where you would not be comfortable approaching a supervisor with your question, discuss it with your office manager or the human resources manager.  If for some reason you do not believe that your concerns have been appropriately addressed, you should seek advice from our General Counsel  Alternatively, you may make confidential, anonymous submissions of concerns regarding alleged violations of this Code, including concerns with respect to questionable accounting or auditing matters, through procedures established and published by the Company from time to time

Conclusion

The Company's good name and reputation depend, to a very large extent, upon you taking personal responsibility for maintaining and adhering to the policies and guidelines set forth in this Code  Your business conduct on behalf of the Company must be guided by the policies and guidelines set forth in this Code.

Standards.

[illegible paragraph]

Section 8

February 18, 2009

* * * * *

Valerie Howard
_____
Print your name

I hereby acknowledge that I have read the Code of Business Conduct and Ethics for Cumulus Media and that I understand the conduct expected of me. I further understand that violation of this policy may result in disciplinary action up to and including immediate termination of my employment.

Valerie Howard
_____
Signature

9/4/09
_____
Date

Howard v. Cumulus Media Inc., et al.





# CUMULUS

## ACKNOWLEDGEMENT OF RECEIPT OF AND ADHERENCE TO POLICIES OF CUMULUS MEDIA PARTNERS LLC

✓    Cell Phone & Handheld Device Use Policy

✓    Code of Business Conduct and Ethics

✓    Dress Code: Guide to Business Casual Dressing

✓    Information Security Policy and Record Retention Schedule (Exhibit A)

✓    Motor Vehicle Policy

✓    Alcohol Policy

✓    Payola-Plugola Policy

✓    Policy Prohibiting Unlawful Discrimination, Harassment and Retaliation

✓    Substance-Abuse Prevention Policy

✓    Whistleblower Hotline

\* \* \* \* \* \*

**EMPLOYEE'S STATEMENT:**

By my initials above, I acknowledge that I have received a copy of each of the employment policies listed above. I have reviewed the policies, and by signing below, agree to adhere to the terms of such policies. I understand that a failure to follow the employment policies may lead to disciplinary action, up to and including immediate termination of employment.

_Valerie Howard_             _5/12/10_

Employee's signature                 Date

Rev. 9/2009

| | |
|---|---|
| **From:** | Valerie Howard |
| **Sent:** | Tuesday, September 08, 2009 1:48 PM |
| **To:** | Karen Gooseff |
| **Cc:** | Stacey Haysler |
| **Subject:** | Request |

I will be out for medical reasons starting Thursday 9/10/09 for approximately 3-5 weeks.  Please use my accrued vacation/sick days to 'top off' my state disability payments.

Thank you.

-Valerie
h 925-837-1038
m 925-705-5746

Cumulus Media Email Policy
PLEASE NOTE: This message contains confidential information and is intended only for the individual(s) named. Employees of CMI and CMP (and their subsidiaries) are prohibited from forwarding this email or otherwise disclosing the contents of this email, or any portion thereof, to any third party, including any non-employee of the respective companies. Failure of an employee to comply with this policy will result in disciplinary action up to and including immediate termination of employment.



1

Howard v. Cumulus Media Inc., et al.

**From:** Valerie Howard
**Sent:** Wednesday, October 07, 2009 4:14 PM
**To:** Stacey Haysler
**Subject:** FMLA Intermitant Schedule

My schedules will look like this:

10/7,8,9 - FMLA
10/12 - Back to work, full days/full week, remotely

10/26,27/28 - FMLA
10/29 - Back to work, full days/full week, remotely

11/16,17,18 - FMLA
11/19 - Back to work, full days/full week, remotely

12/7,8,9 - FMLA
12/10 - Back to work, full days/full week, remotely

12/28-2/2 - Back to work, full days/full week, but one hour of each day will be flex time, remotely

2/3 - Back to work, full days/full week, (combination in office and remote depending on Doctor signoff.)

Obviously, dates could slide around somewhat, but this appears to be 'the plan' that all doctors have agree to.

Let me know if you need more specifics.  I'll wait to hear the final answer from you before talking with Peter.

Thank you for all of your help on this project.

-Valerie
m 925-705-5746
h 925-837-1038

Cumulus Media Email Policy
PLEASE NOTE: This message contains confidential information and is intended only for the individual(s) named. Employees of CMI and CMP (and their subsidiaries) are prohibited from forwarding this email or otherwise disclosing the contents of this email, or any portion thereof, to any third party, including any non-employee of the respective companies. Failure of an employee to comply with this policy will result in disciplinary action up to and including immediate termination of employment.



EXHIBIT 19
Deponent Howard
Date 2/22 Rptr. OK
WWW.DEPOBOOK.COM

1

SQ000436

Howard v. Cumulus Media Inc., et al.

| | |
|---|---|
| From: | Stacey Haysler |
| Sent: | Wednesday, October 07, 2009 4:39 PM |
| To: | Valerie Howard |
| Subject: | RE: FMLA Intermitant Schedule |

Dear Valerie - Thank you for the information.  I will prepare the FMLA documents and let
Peter know that you've given us proper notification for intermittent leave.

Stacey

From: Valerie Howard
Sent: Wednesday, October 07, 2009 5:13 PM
To: Stacey Haysler
Subject: FMLA Intermitant Schedule

My schedules will look like this:

10/7,8,9 - FMLA
10/12 - Back to work, full days/full week, remotely

10/26,27/28 - FMLA
10/29 - Back to work, full days/full week, remotely

11/16,17,18 - FMLA
11/19 - Back to work, full days/full week, remotely

12/7,8,9 - FMLA
12/10 - Back to work, full days/full week, remotely

12/28-2/2 - Back to work, full days/full week, but one hour of each day will be flex time,
remotely

2/3 - Back to work, full days/full week, (combination in office and remote depending on
Doctor signoff.)

Obviously, dates could slide around somewhat, but this appears to be 'the plan' that all
doctors have agree to.

Let me know if you need more specifics.  I'll wait to hear the final answer from you before
talking with Peter.

Thank you for all of your help on this project.

-Valerie
m 925-705-5746
h 925-837-1038

Cumulus Media Email Policy
PLEASE NOTE: This message contains confidential information and is intended only for the
individual(s) named. Employees of CMI and CMP (and their subsidiaries) are prohibited from
forwarding this email or otherwise disclosing the contents of this email, or any portion
thereof, to any third party, including any non-employee of the respective companies. Failure

1

Howard v. Cumulus Media Inc., et al.

| From: | Peter Schwartz |
| Sent: | Tuesday, October 27, 2009 5:00 PM |
| To: | Valerie Howard |
| Cc: | SFO_Sales_Managers |
| Subject: | Happy Birthday! |

| Tracking: | Recipient | Read |
| --- | --- | --- |
| | Valerie Howard | |
| | SFO_Sales_Managers | |
| | Omari Patterson | Read: 10/27/2009 5:03 PM |
| | Michael Seghieri | Read: 10/27/2009 5:06 PM |
| | Judi Ratto | Read: 10/27/2009 5:20 PM |

We were all going to come by tonight for dinner but thought better of that idea. Michael thought he would wear his elephant costume early for Halloween while Judi would bring her dog to slobber all over you after a day in the dog park. Omari was going to bring his children that were touching every wall and desk at their school today. Daniel was the only one actually bringing hand sanitizer. As for me, only one of my daughters has a cough so I didn't think you'd mind if I brought them both over.

We'll save it for next year's birthday. Until then, stay off the tables and keep the lamp shades where they belong.

*Peter Schwartz*
*VP/ Director of Sales*
*Cumulus*
*KNBR/KFOG/KSAN (The BONE), Cumulusjobs.com*
*Giants, Niners, Warriors*
*55 Hawthorne Street - 10th Floor*
*San Francisco, CA 94105*
*p (415) 995-6814*
*peter.schwartz@cumulus.com*

*Ask me how Cumulus can help with your recruitment effort.*

 Please consider the environment before printing this e-mail.



SQ000653                                    Howard v. Cumulus Media Inc., et al.

**From:** Peter Schwartz
**Sent:** Tuesday, October 27, 2009 5:29 PM
**To:** Valerie Howard
**Subject:** FW: Happy Birthday!

**From:** Peter Schwartz
**Sent:** Tuesday, October 27, 2009 3:00 PM
**To:** Valerie Howard
**Cc:** SFO_Sales_Managers
**Subject:** Happy Birthday!

We were all going to come by tonight for dinner but thought better of that idea. Michael thought he would wear his elephant costume early for Halloween while Judi would bring her dog to slobber all over you after a day in the dog park. Omari was going to bring his children that were touching every wall and desk at their school today. Daniel was the only one actually bringing hand sanitizer. As for me, only one of my daughters has a cough so I didn't think you'd mind if I brought them both over.

We'll save it for next year's birthday. Until then, stay off the tables and keep the lamp shades where they belong.

*Peter Schwartz*
*VP/ Director of Sales*
*Cumulus*
*KNBR/KFOG/KSAN (The BONE), Cumulusjobs.com*
*Giants, Niners, Warriors*
*55 Hawthorne Street - 10th Floor*
*San Francisco, CA 94105*
*p (415) 995-6814*
*peter.schwartz@cumulus.com*

*Ask me how Cumulus can help with your recruitment effort.*

Please consider the environment before printing this e-mail.

1

**From:**     Peter Schwartz
**Sent:**     Saturday, December 12, 2009 6:00 PM
**To:**       Valerie Howard
**Subject:**  You'll Be Missed Tonight


Sent from my iPhone



SQ000662                                    Howard v. Cumulus Media Inc., et al.

From:           Valerie Howard
Sent:           Monday, December 14, 2009 10:32 AM
To:             Peter Schwartz
Subject:        RE: You'll Be Missed Tonight


Thank you and visa versa...in spite of the weather!

-Valerie

_____

From: Peter Schwartz
Sent: Saturday, December 12, 2009 3:59 PM
To: Valerie Howard
Subject: You'll Be Missed Tonight

Sent from my iPhone

Cumulus Media Email Policy
PLEASE NOTE:  This message contains confidential information and is intended only for the
individual(s) named.  Employees of CMI and CMP (and their subsidiaries) are prohibited from
forwarding this email or otherwise disclosing the contents of this email, or any portion
thereof, to any third party, including any non-employee of the respective companies.  Failure
of an employee to comply with this policy will result in disciplinary action up to and
including immediate termination of employment.

1

| From: | Peter Schwartz |
|---|---|
| Sent: | Tuesday, December 15, 2009 8:15 PM |
| To: | SFO_Sales_Managers |
| Subject: | Lunch on Thursday |

| Tracking: | Recipient | Read |
|---|---|---|
| | SFO_Sales_Managers | |
| | Peter Schwartz | Read: 12/15/2009 8:27 PM |
| | Michael Seghieri | Read: 12/15/2009 8:35 PM |
| | Judi Ratto | Read: 12/15/2009 9:46 PM |
| | Omari Patterson | Read: 12/16/2009 10:48 AM |
| | Daniel Erman | Read: 12/16/2009 12:16 PM |

Clear your schedules for a pre-Star Party lunch at Aliotto's.

Valerie, I'm sorry you will miss this one (actually, the food is ok and the company is not much better).

*Peter Schwartz*
*VP/ Director of Sales*
*Cumulus*
*KNBR/KFOG/KSAN (The BONE), Cumulusjobs.com*
*Giants, Niners, Warriors*
*55 Hawthorne Street - 10th Floor*
*San Francisco, CA 94105*
*p (415) 995-6814*
*peter.schwartz@cumulus.com*

*Ask me how Cumulus can help with your recruitment effort.*

Please consider the environment before printing this e-mail.



1

Howard v. Cumulus Media Inc., et al.

**From:** Peter Schwartz
**Sent:** Thursday, December 24, 2009 3:31 PM
**To:** Valerie Howard
**Subject:** Re: Schedule Update

It sounds very positive and considering all that you have been through, appears to be a welcomed Christmas Present (which reminds me that I have something for you in my office). A happy and HEALTHY holiday to you, Gene and the twins!

Sent from my iPhone

On Dec 24, 2009, at 11:33 AM, "Valerie Howard" <Valerie.Howard@cumulus.com> wrote:

Happy Holidays!

I met with my oncologist yesterday and updated Stacy on my status this morning (yes it's positive.) She asked me to e-mail you and cc: Karen.

My oncologist approved me to start daily radiation on 12/28/09 (yeah!), but due to 1) my current anemia 2) level of recovery from chemo and 3) fatigue that will accompany radiation, has advised me not to return to the office for a few more weeks. However, she will allow me to go into the office for a few hours on a specific day to attend an important meeting(s).

My radiation schedule ends on 2/12/10. I asked if there would be any further delays/changes/setbacks/stalls (they avoid committing to anything) and she said most patients return to work immediately, but some keep a shorter day schedule for the first couple of weeks (until the fatigue subsides.)

Based on that information I should be back at work - consistently on 2/15/10 (Monday) or sooner if there are meetings or events I should attend!

I will be starting one medication that requires an infusion (one hour a month for 3.5 years - this medical stuff is weird!). The first cycle I will take during radiation, but the rest will be scheduled late afternoon or early morning.

I am excited to see this chapter of my ordeal coming to an end! Please call me if you have any questions.

-Valerie
m 925-705-5746
h 925-837-1038

Cumulus Media Email Policy
PLEASE NOTE: This message contains confidential information and is intended only for the individual(s) named. Employees of CMI and CMP (and their subsidiaries) are prohibited from forwarding this email or otherwise disclosing the contents of this email, or any portion thereof, to any third party, including any non-employee of the respective companies. Failure of an employee to comply with this policy will result in disciplinary action up to and including immediate termination of employment.



SQ000666                                        Howard v. Cumulus Media Inc., et al.