# EXHIBIT B

PETER SCHWARTZ - February 27, 2013

```
 1                UNITED STATES DISTRICT COURT
 2       IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3   VALERIE HOWARD,                )
                                    )
 4               Plaintiff,         )
                                    ) No. C 12-4880 CRB
 5     vs.                          )
                                    )
 6   CUMULUS MEDIA INC.,            )
     SUSQUEHANNA RADIO CORP, and    )
 7   DOES ONE through FIFTY,        )
     inclusive,                     )
 8                                  )
                 Defendants.        )
 9                                  )
     ----------------------------//
10
11
12
                            Deposition of
13
                           PETER SCHWARTZ
14
                        FEBRUARY 27, 2013
15
16
17
18
19
20   REPORTER:
21   WENDY L. VAN MEERBEKE, CSR NO. 3676
22
23                      TOOKER & ANTZ
              COURT REPORTING & VIDEO SERVICES
24            350 SANSOME STREET, SUITE 700
              SAN FRANCISCO, CALIFORNIA 94104
25                   (415) 392-0650
```

1    called SFX Broadcasting.

2         Q.  You worked at SFX Broadcasting for how long?

3         A.  Well, it became ten-plus years because it

4    went through a lot of machinations of purchases and

5    sales.

6         Q.  Were you a general sales manager the entire

7    time?

8         A.  No.  Actually, I was the general sales

9    manager for one radio station, then became the general

10   sales manager for the bigger of the two radio stations.

11        Q.  Which was?

12        A.  KYXY.  And then in '95 -- I'm sorry -- 2005,

13   I was elevated to market manager for the two stations.

14   That was all under CBS.

15        Q.  And the two stations were KYXY?

16        A.  And KPLN.

17        Q.  And how long were you market manager?

18        A.  I was there for three years.

19        Q.  Until 2008?

20        A.  Yeah.  Until, like, June of 2008.  I was

21   promoted in June of 2005 and then left in June of 2008.

22        Q.  And why did you leave in June of 2008?

23        A.  To come up here to work for Cumulus.

24        Q.  Were you recruited for the job at Cumulus?

25        A.  Yes.

15

PETER SCHWARTZ - February 27, 2013

1    Q.  That was by Jon Pinch?

2    A.  Yes.

3    Q.  And what job was Jon Pinch recruiting you

4    for?

5    A.  Vice president of sales.

6    Q.  Did you consider that to be a promotion for

7    you after your job as market manager?

8    A.  Yes.  I mean, it's moving from what would be

9    considered the 17th market in the country to the number

10   four market in the country, elevating from about 25

11   million in annual sales to about 75 million in annual

12   sales.

13   Q.  Did Mr. Pinch tell you why he was recruiting

14   for a position of V.P. of sales?

15   A.  Because they lost that position.  It had been

16   vacant for a while.  They felt it was a position they

17   wanted to fill.

18   Q.  Do you know why it had been vacant for a

19   while?

20   A.  Because the person who was in that job had

21   gone across the street to Entercom, E-n-t-e-r-c-o-m,

22   who had bought Boneville.

23   Q.  Do you know who the person was that had gone

24   across the street to Entercom?

25   A.  Yeah.  Dwight.

1      Q.  Last name?

2      A.  Dwight Walker.

3      Q.  And so what was the first day in -- was it

4   June of 2008 that you started at Cumulus?

5      A.  Yeah.  It was, like, the end of June.  Like,

6   mid to end of June.

7      Q.  And when you first commenced employment at

8   Cumulus, to whom -- in your V.P. of sales position, to

9   whom did you report?

10     A.  Tony Salvador.

11     Q.  What was Tony's position at that time?

12     A.  He was the market manager.

13     Q.  And what were your job duties when you

14   originally arrived in June of 2008 at Cumulus?

15     A.  I had to oversee the sales department which

16   at the time included six managers and about maybe,

17   like, 27 or 28 sellers, account executives.

18     Q.  And were there particular radio stations that

19   they were selling for?

20     A.  Yes.

21     Q.  And what were those?

22     A.  KFOG, KSAN, KNBR AM and KTCT AM.

23     Q.  And when you first took on that role as the

24   market manager, were you at that time supervising

25   Valerie Howard?

PETER SCHWARTZ - February 27, 2013

1      A.   Yes.

2      Q.   Had you previously known Ms. Howard?

3      A.   No.

4      Q.   Had you previously worked at all with Tony

5  Salvador?

6      A.   No.

7      Q.   And had you previously worked with Jon Pinch

8  at all?

9      A.   No.

10     Q.   I want to ask you a little bit about your

11  role during the time period when you were at Cumulus.

12  So originally, you started as V.P. of sales in June of

13  2008, reporting to Tony Salvador.  Did that change at

14  all, your job title, at any point in time during your

15  tenure at Cumulus?

16     A.   During what time period?

17     Q.   The whole time.

18     A.   My job title -- my official job title, no.

19     Q.   Did your duties change at all?

20     A.   Yes.

21     Q.   When was the first time you recall your job

22  duties changing after you arrived at Cumulus?

23     A.   September of '09.  I'm sorry.  September of

24  '08.

25     Q.   Just a few months after you started?

18

PETER SCHWARTZ - February 27, 2013

1           A.  If you remember that time, the world fell

2    apart.  September of '08 was when the financial crisis

3    occurred.

4           Q.  Began.

5           A.  Yeah.

6           Q.  So you arrived in June.  How did your job

7    duties change in September of '08?

8           A.  I had to take on the additional

9    responsibilities of national sales manager.

10          Q.  And had there been a national sales manager

11   when you arrived?

12          A.  There was.

13          Q.  Who was that?

14          A.  Jill Ducey.

15          Q.  And what became of Ms. Ducey?

16          A.  Jill now -- if I remember correct, she's

17   still over at Comcast.

18          Q.  She's at Comcast now?

19          A.  She's at Comcast.

20          Q.  Was she terminated from her position, if you

21   know?

22          A.  She was.

23          Q.  Did you terminate her?

24          A.  No.  Tony actually did.  But I was aware of

25   it.

19

PETER SCHWARTZ - February 27, 2013

1     Q.  You took on her job duties as national sales

2  manager?

3     A.  I did.

4     Q.  Did your job change at any other time during

5  your tenure at Cumulus?

6     A.  Yes.

7     Q.  When was the next time that it changed?

8     A.  I think it was June of '11.  I had to take on

9  additional responsibilities to sales manage KSAN.

10     Q.  Did your job duties change at any other time?

11     A.  No.

12     Q.  During your tenure -- when you first started

13  at the company, you were working for Mr. Salvador.  Did

14  that change at any point in time?  In other words, to

15  whom you had a direct report.

16     A.  Yes.

17     Q.  When did that change?

18     A.  That changed, I believe, in July of '09.

19     Q.  How did that change?

20     A.  Tony was terminated.

21     Q.  Prior to his termination, do you recall Tony

22  announcing that he was planning on retiring?

23     A.  Probably at some time I did.  We had

24  conversations about it.  Tony had been there for a long

25  time.  But he had not dedicated a specific date for his

 1    termination.

 2         Q.  Were you involved in the decision to

 3    terminate Tony Salvador's employment?

 4         A.  No.

 5         Q.  Do you know who was?

 6         A.  I assume it was Jon Pinch.

 7         Q.  When Tony was terminated in July of 2009, how

 8    did you learn about it?

 9         A.  Jon was in the building and called me in and

10    told me.

11         Q.  Did he tell you why Mr. Salvador was being

12    terminated?

13         A.  I don't remember.  I think it was -- I think

14    in the end it was a cost issue.

15         Q.  Had you had a good working relationship with

16    Mr. Salvador?

17         A.  Yes.

18         Q.  And during the time period when you were

19    working with him, did you consider him to be an honest,

20    forthright person?

21         A.  I had no other reason to believe otherwise.

22         Q.  Had you heard about him prior to working for

23    him?

24         A.  Yeah, I did.

25         Q.  Sort of well known in the industry?

                                                            21

PETER SCHWARTZ - February 27, 2013

```
 1          A.  Pretty legendary.  Yeah.
 2          Q.  When Mr. Pinch informed you that Tony was no
 3     longer going to be employed at the company as market
 4     manager, did you and Mr. Pinch discuss who, if anyone,
 5     would be taking over the market manager job duties?
 6          A.  We did.
 7          Q.  And what did you discuss?
 8          A.  Is there anybody going to be identified in
 9     that specific role.  And Jon said not at that time.
10     And I had always had made it very clear to Jon that I
11     wanted that role.
12          Q.  Did you make it clear to him then?
13          A.  Absolutely.
14          Q.  What did you --
15          A.  And both he and John Dickey were there.
16          Q.  John Dickey was present as well?
17          A.  Yes.
18          Q.  Did they tell you who you would be reporting
19     to?
20          A.  I'd be reporting to Jon Pinch.  But I would
21     help run the building with Lee Hammer, who was the
22     operations manager for the AM stations KNBR and KTCT.
23     So the two of us together would help run the building,
24     reporting right back to Jon.
25          Q.  So as of July of 2009, you're still in your
```

22

1    your tenure at the -- at Cumulus?  In other words, that

2    the KFOG and KSAN were doing relatively well.

3         A.   No.

4         Q.   And when did you believe that things started

5    to get worse for them?

6         A.   I think it's directly related to the PPM,

7    which was implemented fully in September of 2008.

8              Ultimately, Dave Benson, who was released as

9    program director in April of 2009 -- he was the

10   nine-year program director for KFOG.  I think -- but it

11   really occurred when PPM was implemented.  And then I

12   think the -- it just was a continuous struggle from

13   that point.

14        Q.   After Mr. Bungeroth became the market manager

15   in March of 2011, did you report directly to him?

16        A.   I did.

17        Q.   And then you remained with the company for

18   how much longer?

19        A.   Until September of 2011.

20        Q.   What happened in September of 2011?

21        A.   I was terminated.

22        Q.   Who terminated you?

23        A.   Bill.

24        Q.   Did he tell you why you were being

25   terminated?

26

PETER SCHWARTZ - February 27, 2013

1        A.   It was a -- overlapping positions.   We were

2   merging with -- not merging.   We were purchasing two

3   stations from Citadel.

4             As I always knew, I was the highest-paid

5   person in that position without a contract.

6        Q.   And when Mr. Bungeroth terminated you, did

7   you sign any type of severance agreement with the

8   company?

9        A.   Ultimately, I did.   Yeah.

10       Q.   In the severance agreement, did you agree to

11  cooperate with them with respect to any future

12  litigation?

13       A.   I don't recall.   I don't know what that

14  document identifies.

15       Q.   Did you negotiate the severance?

16       A.   I did.

17       Q.   And how much severance were you given?

18       A.   I want to say eight weeks, but I can't be

19  absolutely sure.

20       Q.   I know you told me earlier.   When did you

21  start at the new company?

22       A.   In March.

23       Q.   Of 20111?

24       A.   2012.

25       Q.   Okay.   I'm sorry.   I'm glad we cleared that

27

PETER SCHWARTZ - February 27, 2013

```
1    up.
2              After you were terminated, you then looked
3    for employment and then found employment which
4    commenced in March of 2012?
5         A.   No.   I was hired back by Cumulus four weeks
6    later.   National sales manager of San Francisco and
7    Los Angeles.
8         Q.   How did you get hired back, if you know?   You
9    got terminated by Bill in September of 2011.
10        A.   Right.
11        Q.   And then how many weeks later did you say?
12        A.   Four and a half weeks later.
13        Q.   Had you signed your severance agreement
14   already?
15        A.   Yes, I did.
16        Q.   And they gave you the severance?
17        A.   Not all of it.   No.   I only got severance up
18   until when I came back.   They paid the difference of my
19   severance versus my new salary.
20        Q.   So you started back at a new salary?
21        A.   Which was less than what my old salary was.
22        Q.   But you were willing to take that; correct?
23        A.   After being out of work four and a half weeks
24   and I looked at my options and wanted to keep my family
25   in town, so I did.
```

28

1      Q.   How did you find out about that national
2   sales manager job that you got soon after you were
3   terminated?
4      A.   Jon called me.
5      Q.   Jon Pinch?
6      A.   Yeah.   We were in conversation about my
7   severance and he asked me if I was interested in doing
8   something like that.   There was a lot of movement.
9   There's so much fluidity going on because you're
10  merging stations.   It's basically -- they're cost
11  cutting everywhere.
12     Q.   Cumulus was cost cutting everywhere?
13     A.   Sure.   They were trying to find efficiencies.
14  I was part of that.   You know, I was -- I was the
15  by-product of those efficiency dealings.
16     Q.   And this was in 2011?
17     A.   September of 2011.
18     Q.   Did you ever see any reports in 2011 showing
19  what the Pinches were making in their positions?
20     A.   They're public.
21     Q.   Right.
22     A.   I never hunted and searched for them.   I know
23  they make millions of dollars on the stock.   I get it.
24  I don't know what they do actually make, though.   I
25  think the last thing I was maybe in -- before I left --

29

PETER SCHWARTZ - February 27, 2013

1       doing the training?

2            A.   There should be, but I don't know that for

3       sure.

4            Q.   During the time period when you were working

5       in the San Francisco office, was there a human

6       resources representative?

7            A.   Yes.

8            Q.   Who was that when you were there?

9            A.   Stacey Haysler.

10           Q.   H-a-y-s-l-e-r.  Was Ms. Haysler a full-time

11      employee?

12           A.   For the first part of my tenure at Cumulus.

13      And then she became part time.

14           Q.   Do you know if that was voluntary?

15           A.   I don't know.  I can't remember if she chose

16      to do that or it was -- I just don't remember.  I think

17      it was a little of both.  But Stacey will be able to

18      shed light on that.

19           Q.   Did she provide human resource services for

20      any other office other than San Francisco, to your

21      knowledge?

22           A.   Within Cumulus?

23           Q.   Yes.

24           A.   No, I don't know that.

25           Q.   How many employees were at the San Francisco

PETER SCHWARTZ - February 27, 2013

1    office when you first started at Cumulus?

2         A.  I think when I first started, there were 100.

3         Q.  When you left after your position there when

4    you returned --

5         A.  I couldn't tell you.  It was less.

6         Q.  Do you know how much less?

7         A.  It's not apples to oranges because we took on

8    two more radio stations.

9         Q.  Understood.  I'm just curious as to what the

10   body count was.

11        A.  I don't know.  The body count could have gone

12   up.  But as a percentage against radio stations, it

13   could be way low.  You can't compare the two.

14        Q.  I was actually looking at it more from a

15   human resources perspective than anything else.  I was

16   curious if you knew if there was a substantial decrease

17   in the number of employees.

18        A.  We had cut many positions since I had started

19   there.  It had been a pretty consistent campaign to

20   reduce costs.  That's part of the efficiencies of

21   buying a radio group.

22             That was prior even to the financial crisis

23   of 2008.

24        Q.  And there was also two more radio stations

25   that had been acquired?

36

PETER SCHWARTZ - February 27, 2013

1          A.  Yes.  That came on, like, in September --

2     they finally rolled into the group in maybe July of

3     2011.  And then they finally moved into the offices in

4     October of 2012.

5          Q.  And were you gone by then?

6          A.  I was.  Yeah, I was.  I was terminated

7     somewhere, like, September 22nd or 23rd of 2011.

8               I'm sorry.  They moved into the building I

9     think in September of 2011, not 2012.  I was terminated

10    in September of 2011.  They moved in, like, probably

11    ten days after.  And then I arrived four weeks later

12    back to the building.

13         Q.  And then you arrived back and you were the

14    national sales manager of San Francisco and LA?

15         A.  Yes.

16         Q.  You were working at a reduced salary from

17    what you had previously had?

18         A.  That's correct.

19         Q.  And then at some point in time, you left

20    again?

21         A.  That's correct.

22         Q.  And you left voluntarily?

23         A.  I did.

24         Q.  And why did you decide to go voluntarily?

25         A.  Opportunity, the ability to make more money.

1          Q.  You weren't required to sign off on it or

2     anything like that?

3          A.  I may have signed off on it, but I didn't

4     handle it.

5          Q.  It's something that you deferred to

6     Ms. Haysler?

7          A.  Stacey would have handled it.  I believe

8     Valerie worked directly with Stacey on it.  I don't

9     believe Valerie came to me and asked me to do any

10    paperwork for it.

11         Q.  Do you recall having any conversations with

12    Mr. Pinch in the early September 2009 period about the

13    fact that Ms. Howard needed to take some time for a

14    medical procedure?

15         A.  Yes.

16         Q.  When was it that you recall?  Did you inform

17    him that she would be doing that?

18         A.  Probably early September.

19         Q.  What do you recall discussing with Mr. Pinch

20    in that regard?

21         A.  I don't recall, actually, the conversation

22    other than Valerie is taking off.

23         Q.  And do you recall Mr. Pinch making any

24    comments on the fact that she would be taking some time

25    off?

50

PETER SCHWARTZ - February 27, 2013

1      A.  Yeah.  There was conversation, you know,

2   about that job and the potential elimination of that

3   position.  There may have been conversation that said,

4   "This is not something we can do right now."

5      Q.  When do you recall there being conversation

6   about the elimination -- you're talking about the

7   elimination of Ms. Howard's job?

8      A.  Right.

9      Q.  When do you recall having those

10  conversations?

11     A.  They probably started sometime -- I want to

12  say, like, in maybe July of that year.

13     Q.  Of 2009?

14     A.  Yeah.

15     Q.  And with whom did you have such

16  conversations?

17     A.  Jon Pinch.

18     Q.  How many such conversations did you have?

19     A.  No idea.

20     Q.  And did you inform Ms. Howard that you were

21  having those conversations?

22     A.  No.

23     Q.  And did you ever have any e-mail

24  communications with Mr. Pinch regarding the possibility

25  of eliminating Ms. Howard's job?

51

1      Q.   And then you believe you had some
2   conversations with Mr. Pinch about the fact that now
3   that she's going out, we can't eliminate her job?  Is
4   that fair?
5      A.   I think that's fair to say.
6      Q.   So you had been talking about the
7   possibility, but then it was decided it would not
8   occur?
9      A.   Yes.  That's correct.  Because I think we
10  were talking about -- we hadn't decided on a specific
11  date, but we were getting to that point where we were
12  going to probably eliminate it by the end of September.
13     Q.   But then you heard about her condition and
14  the decision was made you won't do it?
15     A.   Right.
16     Q.   Do you know if there's any documentation of
17  any of those discussions between July and September of
18  2009 about the possibility of eliminating her job?
19     A.   I don't know.
20     Q.   And when you were doing the restructuring
21  with respect to the account executives, there was a lot
22  of back and forth with people on e-mail; correct?
23     A.   Presumably.  Yes.
24     Q.   When you communicated with Mr. Pinch -- I've
25  seen some of the communications that came from your

PETER SCHWARTZ - February 27, 2013

1    recollection regarding item two of any discussions you

2    had with respect to those points with either Stacey or

3    Mr. Pinch?

4         A.   No recall.

5         Q.   How about item three; do you have any

6    recollection of having any discussions with Stacey or

7    Mr. Pinch regarding item three?

8         A.   No recall.

9         Q.   Do you recall learning at some point in time

10   that Valerie Howard's immune system would be suppressed

11   from the chemo and/or radiation so she could work, but

12   she would have to do it at home?

13        A.   Vaguely remember that.

14        Q.   And then you wrote down, "Right now she is

15   currently doing the following."  And then you have five

16   bullet points.

17        A.   Yes.

18        Q.   Where did you get that information as to what

19   she was doing at the time?

20        A.   I don't recall.

21        Q.   Do you recall ever asking Ms. Howard at the

22   time as to what she was actually doing?

23        A.   I don't recall.

24        Q.   And then you wrote a comment.  "Most of the

25   meat of the job is still left on the bone."  What did

65

1    you mean by that?

2          A.   That probably refers to the fact there's

3    still a ton more of the responsibilities at the job

4    that are required.

5          Q.   And did you ever tell Ms. Howard at that time

6    that you felt there was a lot more that needed to be

7    done?

8          A.   I don't recall.

9          Q.   Do you recall at any point in time reaching

10   out to her and asking if she could do more work

11   remotely than what she was doing?

12         A.   No.   I don't recall doing that.

13         Q.   As of October 22nd, 2009, were you

14   dissatisfied with the amount of work that she was

15   doing?

16         A.   I wouldn't say dissatisfied.

17         Q.   What would you say?

18         A.   It was what it was.   She was sick.   I wasn't

19   going to push her.

20         Q.   And then you say here, "We are waiting to

21   speak with Richard."   Who is Richard?

22         A.   Richard is general counsel for Cumulus.

23         Q.   And I'm not entitled to know your

24   conversations with him.   Was there a reason you were

25   telling Mr. Pinch that you were waiting to speak with

PETER SCHWARTZ - February 27, 2013

1    September 28.  Is that right?

2            A.  That's what the e-mail says.

3            Q.  You state, "As we agreed, we'll keep her

4    salary as is unless we discuss otherwise."

5                Had you been having conversations with

6    Mr. Pinch about changing Valerie's salary as of

7    November 2009?

8            A.  It looks like it's in regards to, I

9    believe -- no, no.  I think the question was whether or

10   not if she's going to be working part time or full time

11   that we, I'm assuming, move forward with any of this to

12   try to reduce her salary.  That's what this looks like.

13           Q.  Just so I understand -- and correct me if I'm

14   wrong -- the conversation wasn't about necessarily

15   reducing her salary overall, but it was with her

16   working perhaps not full time.

17           A.  Right.

18           Q.  You had discussions about whether or not you

19   could reduce her salary?  Is that fair to say?

20           A.  I remember that vaguely with Jon.  This more

21   prompts my memory a little bit.  I don't recall all

22   these e-mails with Richard and Stacey and everything.

23   But there was a -- obviously, this was all leading to

24   one thing, which was should we be paying Valerie her

25   full compensation.

69

1          No, it wasn't in regards to reducing her

2     salary generally.

3          Q.  Was this a conversation that was initiated by

4     Mr. Pinch or was it something that you had initiated?

5          A.  I don't recall.

6          Q.  And did you -- I take it that you had sought

7     Stacey's advice as the human resources consultant;

8     correct?

9          A.  Probably.  As my human resources director.

10          MS. LAWLESS:  I'm going to have the court

11     reporter mark a one-page document, Bates stamped SQ

12     661.

13          (A document was marked as Exhibit 14 for

14     identification.)

15          MS. LAWLESS:

16          Q.  Do you recall receiving this e-mail from

17     Mindy Phillips with the trail below it in or about late

18     November of 2009?

19          A.  I don't recall.

20          Q.  Okay.  I don't want you to speculate.  Do you

21     have any reason as to -- do you have any understanding

22     as to why Mindy would send you this e-mail chain?

23          A.  Yes.  I remember meeting with Mindy because

24     she wanted to receive more accounts.  She was talking

25     about her compensation as it pertained to her billing

PETER SCHWARTZ - February 27, 2013

1    front of you, it appears that you sent Mr. Pinch an

2    e-mail on January 5, 2010.  At the bottom you state,

3    "Thanks for your guidance on this one as well as the

4    Valerie situation."

5         Earlier, on December 28, you had sent him

6    Ms. Howard's e-mail of December 24.

7         A.  Yes.

8         Q.  Looking at this document, Exhibit 17, does it

9    refresh your recollection at all as to what guidance,

10   if any, Mr. Pinch provided you with respect to the,

11   quote, Valerie situation, end of quote?

12        A.  No recall.

13        Q.  At this point in time, did you have any

14   discussions with Mr. Pinch as of the end of December of

15   2009 about eliminating her job?

16        A.  No specifics.  No.

17        Q.  Anything general?

18        A.  I think it had always been on the table, but

19   we had always put it aside because of Valerie's

20   condition and that it was, I believe, be inappropriate.

21   But I don't recall any specifics.  I think that just

22   dates all the way back to when we had begun considering

23   the elimination of the position in July of '09.

24        Q.  When you say you put it on the table, is it

25   fair for me to conclude that when you said to Mr. Pinch

74

PETER SCHWARTZ - February 27, 2013

 1     in the January 5, 2010, "Thanks for your guidance on

 2     this one as well as the Valerie situation," that you're

 3     not referring to the job elimination?

 4          A.  No.  I wouldn't say that's fair.  It could

 5     have been referenced at one time and it could not be

 6     applied to that.  It could be just in general to say

 7     thanks and Valerie is coming back.  Just in general.

 8          Q.  You don't know one way or the other?

 9          A.  No.

10          MS. LAWLESS:  I'm going to have the court

11     reporter mark as the next exhibit a two-page document,

12     SQ 336 through 337.

13              (A document was marked as Exhibit 18 for

14     identification.)

15          MS. LAWLESS:

16          Q.  And looking at Exhibit 18, this appears again

17     to be -- well, the first one at the bottom appears to

18     be an e-mail from yourself to Mr. Pinch and then

19     another one to Jon Pinch and then another one to Karen

20     Gooseff.  Do you see that?

21          A.  Yes.

22          Q.  The one dated at the bottom of the first page

23     of Exhibit 18 is dated January 22.  It talks about

24     sales managers bonus structure; is that right?

25          A.  Yes.

PETER SCHWARTZ - February 27, 2013

1     Q.  Again, the document has been redacted.  On

2  the second page, it has information relating to Valerie

3  Howard; is that correct?

4     A.  That's correct.

5     Q.  What is the information that relates to

6  Valerie Howard?  Can you just tell us what that is for

7  the record?

8     A.  Bonus pool.

9     Q.  Is the 240K her annual salary?

10    A.  Correct.

11    Q.  As of February 4, 2010, you anticipated that

12  she would continue to receive 240K and then whatever

13  her bonus pool was?

14    A.  That's correct.

15    Q.  Do you recall in or about the February 2010

16  time period making any increases in any particular

17  sales manager's bonus pools?

18    A.  Yes.  I think I did.

19    Q.  To whom do you recall increasing the bonus

20  pools?

21    A.  I think across the board for everybody.

22    Q.  Did that include Valerie as well?

23    A.  I think so.  Yeah.  I believe that.

24    Q.  And why were you doing that?

25    A.  Because they were my people.  I wanted to see

PETER SCHWARTZ - February 27, 2013

1    them compensated.  We were talking to Jon and we were

2    discussing what was a fair compensation.  I think a lot

3    of things had changed in the business, and I wanted to

4    have a fair -- presumably fair bonus structure in

5    place.

6              The problem is that, you know, there were

7    some heavy numbers to hit.  But we had to also align it

8    so that everybody was working together in order to hit

9    a bonus.  There was a cluster budget put together

10   achieving -- you know, a lot of the bonus they wanted

11   to have tied to exceeding the number.  And I wanted to

12   at least get some of that bonus tied to achieving it.

13             MS. LAWLESS:  I'm going to have the court

14   reporter mark as the next document, Bates stamped SQ

15   483.

16             (A document was marked as Exhibit 19 for

17   identification.)

18             MS. LAWLESS:  We'll mark SQ 486.  That will

19   be 20.

20             (A document was marked as Exhibit 20 for

21   identification.)

22             MS. LAWLESS:

23        Q.  If we look at Exhibit 19, this appears to be

24   an e-mail that came from Natalie Pensabene.

25        A.  Yeah.

PETER SCHWARTZ - February 27, 2013

```
 1    discussions with Ms. Haysler?
 2         A.  No recall.
 3         Q.  Do you recall including Ms. Haysler in any
 4    discussions in or about July or August of 2009
 5    regarding terminating Ms. Howard?
 6         A.  I'm sorry.  Say that again.
 7         Q.  Did you have any conversations with
 8    Ms. Haysler in or about July or August of 2009
 9    regarding possibly terminating Ms. Howard?
10         A.  I don't recall.
11         Q.  And after you received this information from
12    Ms. Haysler set forth on Exhibit 21, did you share the
13    information with anyone?
14         A.  Possibly Jon Pinch, but I don't recall.
15         Q.  Do you recall you and Mr. Pinch making any
16    decisions that you would not be terminating Ms. Howard?
17         A.  Yeah.  I do remember conversations that would
18    have taken place that said, "This is not the right
19    time.  Let's not do this."
20         Q.  Why wasn't it the right time and "Let's not
21    do this"?
22         A.  I think it was Valerie just arriving back
23    into the office.  It just wasn't appropriate.
24         Q.  And it wasn't appropriate because she had
25    just taken a leave?
```

81

PETER SCHWARTZ - February 27, 2013

1          A.  I think just because she had just come back

2     from being on absent -- leave for being sick.

3          Q.  Were there any other reasons you decided it

4     was not an appropriate time?

5          A.  Not that I can recall.

6          Q.  To your knowledge at the time, was this a

7     call that you were making or is it a call Mr. Pinch was

8     making?

9          A.  "Call," meaning a decision?

10         Q.  Yeah.  Decision.  Sorry.

11         A.  I think it was a mutual decision.

12         Q.  And at any point in time, do you recall

13    telling Mr. Pinch that you felt that you should not be

14    terminating Ms. Howard at this time?

15         A.  Yes.

16         Q.  And when do you recall telling him that?

17         A.  Probably in or around this time.

18         Q.  Do you recall saying to him that -- do you

19    recall telling him that earlier in the fall when you

20    first learned about her procedure?

21         A.  Yeah.

22         Q.  Did he agree with you?

23         A.  Yes.

24         Q.  Initially?

25         A.  I don't recall.

PETER SCHWARTZ - February 27, 2013

1          MS. LAWLESS:

2          Q.   When you say "revenue was hurting on that

3     side," what do you mean by that?

4          A.   Revenue was down from the year previously.

5          Q.   And how much was it down, if you know?

6          A.   I don't know.  But looking at this, we were

7     looking at the direct business.  It was evaporating.  I

8     don't know -- I guess this is Valerie's.  "As we've

9     been drilling down on our billing and where we see it

10    evaporating."  I think it's confirmation of what I'm

11    saying.

12         Q.   If one wanted to look at any documents to

13    reflect that revenue was down at that time period,

14    where would you look?

15         A.   There's two places.  You can look in Stratus,

16    S-t-r-a-t-u-s.  It's the company's proprietary system

17    for tracking revenue.

18              You can also look at Miller Kaplan, which

19    were the reports that showed where your revenue was

20    versus previous year and how it compared to the market.

21         Q.   Anyplace else that you would look if you

22    wanted to get what you believed to be accurate

23    information?

24         A.   Stratus was -- you could pull up individuals.

25    You could look at the station as a whole.  I'd start

PETER SCHWARTZ - February 27, 2013

1      Q.  Were you at that time having weekly

2  expectation meetings with Valerie on how you wanted her

3  to team manage?

4      A.  I don't recall.

5      Q.  And when you wrote here, "Have communicated

6  expectations in writing," are you referring to the

7  e-mail you sent to her in subject re expectations?

8      A.  Yeah.  That's likely the case.

9      Q.  That's on or about May 13, 2010?

10     A.  That's likely the case.

11     Q.  Okay.  Now, Ms. Howard has testified that you

12  were not having weekly expectation meetings with her.

13  Do you disagree with that?

14     A.  I don't agree nor disagree with that.  I

15  don't recall it.

16         MS. LAWLESS:  I'm going to have the court

17  reporter mark as the next exhibit, Exhibit 28, a

18  two-page document, Bates stamped SQ 681 and 682.

19             (A document was marked as Exhibit 28 for

20  identification.)

21         THE WITNESS:  Okay.

22         MS. LAWLESS:

23     Q.  So it appears that on July 21st of 2010,

24  Mr. Pinch sent you an e-mail.  The subject was NSM.  He

25  wrote, "How is the search coming?  Need help?"

PETER SCHWARTZ - February 27, 2013

1        A.   Who sent this?

2        Q.   Jon Pinch.

3        A.   Okay.  Yeah.  He's asking me if I need help.

4        Q.   "The plan is to swap Val for NSM, save a

5   hundred grand, and have the NSM do all of the markets

6   on the West Coast plus our Colorado market."

7        A.   Okay.

8        Q.   You recall receiving that on or about July

9   21st of --

10       A.   I do.

11       Q.   And then you responded later in the evening.

12   You apologized for the delay.  I don't know who JD is.

13   Who is JD?

14       A.   John Dickey.

15       Q.   When you received this e-mail from Mr. Pinch

16   when he told you the plan was to swap Val for NSM and

17   save 100 grand, was that the first you had heard about

18   the plan to swap Valerie for the national sales

19   manager?

20       A.   I think probably confirming our next or a --

21   yeah.  I think at that time, it's probably the first or

22   it may have been a conversation that took place just

23   before it.  He's -- it looks like he's confirming what

24   he wants his plan to be.

25       Q.   To the best of your recollection, was it the

1    first time you had heard that he wanted to basically

2    swap her for a national sales manager and save 100

3    grand?

4         A.   Yeah.   I think "swap" is the word he uses.   I

5    think the idea is that it's the elimination of the

6    position and the hiring of an NSM.

7         Q.   But he did use the word "swap"?

8         A.   Yes.   Absolutely.

9         Q.   And at that point in time -- so I'm now

10   focusing on July of 2010 -- do you recall having any

11   conversations between the time -- with Mr. Pinch

12   between the time of February of 2010 when Valerie

13   physically returned to the office and July when he

14   sends this e-mail in which you talked about hiring a

15   national sales manager and eliminating her job?

16        A.   I don't recall the opportunity to hire a

17   national sales manager and eliminating her job.   There

18   was discussion of eliminating her job and then we

19   postponed it.   And then I think we were getting the

20   approval to hire a national sales manager.

21             So it became -- you know, we looked at it

22   probably strategically and said if the position of

23   general sales manager over KFOG and KSAN is eliminated,

24   then it will free up money, because it's all a zero

25   cents game.

93

PETER SCHWARTZ - February 27, 2013

1    chart is a by-product of when there was a lot more

2    revenue being generated, not necessarily the sales from

3    below, but the management structure.  I mean, this is

4    what the structure was in place when I arrived in '08.

5         Q.  And it hadn't changed until as of 8-9-2010?

6         A.  No.  The only thing missing from this was the

7    national sales manager's position, and then the

8    reorganization of the sales staff below.  But from a

9    managerial standpoint, everything is the same with the

10   exception of the elimination of the NSM role.

11        Q.  At the time after Omari left, did Ms. Haysler

12   talk to you about the potential of replacing Omari with

13   Ms. Howard?

14        A.  I don't recall that.  It's very possible.

15        Q.  Were you in a hurry at all to replace Omari?

16        A.  Absolutely, yeah.

17        Q.  Why were you in a hurry?

18        A.  Because you don't want to lose any type of

19   momentum that you may have with management.  You want

20   to be able to put somebody in that position.  You want

21   to be able to hopefully see that position pay for

22   itself and generate more revenue by working with the

23   sales staff.  It's like, you know, losing a rudder.

24        Q.  And did you -- at any point in time, did

25   Ms. Howard bring candidates to your attention?

100

PETER SCHWARTZ - February 27, 2013

1    thought were more qualified.

2         Q.  Had you worked at all with Ms. Donohue

3    before?

4         A.  No.

5         Q.  Did anyone that you know refer her to the

6    company, if you remember?

7         A.  I don't remember if she was referred by

8    anyone in particular.  I know that people spoke highly

9    of her.  But I don't remember anybody specifically

10   referring her.  I know that Valerie -- I think Valerie

11   brought her in as a candidate.

12        Q.  If you could go back to what's been marked as

13   Exhibit 27, and if you look at item one, it says, "KFOG

14   LSM candidate Maura Donohue will be in tomorrow.  Will

15   make her an offer."  And then, "Omari was at 225K with

16   his recent increase and offer will be 50K less than

17   that."  Are you referring to the fact that the offer to

18   Maura Donohue would be 50K less than that which was

19   offered to Omari?

20        A.  That's accurate.

21        Q.  Do you know why it was 50K less?

22        A.  Because we could hire somebody for less money

23   and save that money.

24        Q.  And so would it be fair to say, to the best

25   of your knowledge, based on this document that Maura

102

PETER SCHWARTZ - February 27, 2013

1       Donohue was hired in at 175K?

2           A.  I think she was hired in a little less than

3       that.

4           Q.  In that range?

5           A.  Maybe 165-, if I can remember.  That was just

6       more cost savings.

7           Q.  You say you were looking at the profit and

8       loss statements.  What profit and loss statements are

9       you referring to?

10          A.  The station's P and Ls.  You just look at

11      them as they pertain to your top line revenue less your

12      expenses, you know.  You have one for yourself, I'm

13      sure.  And it just identifies if we're reaching budget,

14      if we're able to keep our head, you know, at the level

15      where we needed to be.

16          Q.  Do you know how the station profit and loss

17      was doing in the 2010 time period?

18          A.  Less than budget.

19          Q.  Do you know how much?

20          A.  No.

21          Q.  You'd have to look at them?

22          A.  I'd have to.

23          Q.  And they're just called the station profit

24      and loss statements?

25          A.  I don't know what they're referred to.  I

1          MS. LAWLESS:

2      Q.   Looking at the bottom of Exhibit 31, it

3  appears that you have salaries listed for October 2010

4  compared to salaries for January 2010.  Do you see

5  that?

6      A.   Yes.

7      Q.   So at this point, the plan was that as of

8  October 2010, Ms. Howard would no longer be working at

9  the company; is that correct?

10     A.   That's accurate.  And the reason being -- do

11  you see the dates?

12     Q.   You showed me salaries of October 2010 and

13  salaries January 2010.  That's what I was looking at.

14     A.   The idea was that, you know, it was going to

15  occur -- there was going to be -- we were going to

16  terminate Valerie -- eliminate the position is what was

17  going to happen in quarter three.  That's why you see

18  January 2010 and then October 2010 as opposed to

19  September 2010.

20     Q.   At some point in time, did you have a

21  discussion with Mr. Pinch where you decided that as of

22  quarter three or quarter four that you wanted to not

23  have Valerie on the payroll?

24     A.   Yeah.  Quarter three.  Yeah.

25     Q.   And did he say why?

PETER SCHWARTZ - February 27, 2013

1      A.   It was an elimination of the position.   Our

2   revenue was down.   Our P and Ls were suffering.   We had

3   to make cost cuts.   It's the same thing that we did

4   back in '09.   It's much the same thing --

5      Q.   Did Mr. Pinch ever talk to you about the cost

6   of healthcare when he was referring to employees?   How

7   much it was costing the company.

8      A.   No.

9      Q.   Never did?

10     A.   Maybe in three and a half years.   But I can't

11   tell you ever that I can remember.

12     Q.   Did he ever tell you that the cost of the

13   health benefits was increasing substantially?

14     A.   I don't remember.

15          MS. LAWLESS:   I'll have the court reporter

16   mark Exhibit 32.

17              (A document was marked as Exhibit 32 for

18   identification.)

19          MS. LAWLESS:   While we're at it, let's just

20   do Exhibit 33.   Exhibit 32 is SQ 1182 through 1184.

21   Exhibit 33 will be 1748 to 1749.

22              (A document was marked as Exhibit 33 for

23   identification.)

24          MS. LAWLESS:

25     Q.   If you could first look at what's been marked

PETER SCHWARTZ - February 27, 2013

1      will be terminated?

2           A.   Yes.   If they were eliminating the position,

3      Valerie would be eliminated.

4           Q.   And Karen was Karen --

5           A.   Gooseff.  She was our business manager.

6           Q.   You talk about three months' severance?

7           A.   Yes.

8           Q.   You tell Mr. Pinch what her start date was?

9           A.   Yes.

10          Q.   And that she has no vacation left.  And then

11     you ask him how should we proceed?

12          A.   Right.

13          Q.   At this point in time -- correct me if I'm

14     wrong -- it was the plan that you were going to

15     eliminate Valerie's position within the next month,

16     week?

17          A.   Within the month of September.

18          Q.   And then he responds, "I think since it has

19     taken so long, I would revise the severance downward."

20     And then he talks about typically, you know, a week for

21     every year of employment.  "In this case 35 to 45 days

22     should be considered a lot."

23               Do you know what Mr. Pinch means when he

24     says, "I think since it has taken so long"?

25          A.   Yes.  Because I think it goes back to the

PETER SCHWARTZ - February 27, 2013

1    fact that we were looking to eliminate the position and

2    we started conversations with this back in July of

3    2009.

4        Q.  When you had the conversations back in 2009,

5    you were considering doing it, correct, but you hadn't

6    finalized her plan before her diagnosis?

7        A.  That was the beginning of the conversations.

8    But by September, prior to knowing what was going on or

9    she was taking leave, we had made the decision to

10   eliminate that position.  The question is whether we

11   were going to eliminate -- we were going to eliminate

12   it in September, but we hadn't chosen a specific date.

13   But we wanted to eliminate it in September of '09

14   because it correlated with the quarter and correlated

15   with our P and Ls.

16        But then Valerie went out on leave and

17   everything else -- my testimony identified that we held

18   off on it.  It wasn't the right time.  We discussed it

19   again in February.  We held off on it again.  And here

20   we are with a bigger plan.  The NSM job wasn't being

21   just given to me and to my staff.

22        If you've read the e-mails again -- I know

23   you've got so much paperwork in front of you.  It was

24   to be an NSM for not only San Francisco -- so I wasn't

25   get an NSM completely funded by the elimination of

119

PETER SCHWARTZ - February 27, 2013

1    Valerie's job.  It was Colorado, Oregon, everybody.  So

2    that was it.

3           It goes all the way back --

4    Q.  Let me ask you this.

5    A.  Let me finish.

6    Q.  I'm going to strike as nonresponsive, but go

7    ahead.

8           MS. MOSER:  I think he's just trying to

9    answer your question.

10          MS. LAWLESS:  He's going on and on.

11          THE WITNESS:  Go ahead.

12          MS. LAWLESS:

13   Q.  Are you done?

14   A.  Yeah.  Go ahead.

15   Q.  With respect to the severance that you were

16   discussing in September of 2010 shortly before her job

17   was eliminated, this is the question I have for you.

18   Do you recall writing any e-mails to anyone in the

19   summer of 2009 after the decision had allegedly been

20   made to eliminate Valerie Howard's position about

21   severance?

22   A.  I don't recall.

23   Q.  Do you know why there wouldn't be any such

24   e-mails if you were considering it a year ago?

25   A.  Discussions.  There's a lot of things --

120

1    well.  Correct?

2          A.   That's correct.

3          Q.   Joe is being hired and his first day will be

4    September 15; is that correct?

5          A.   That is correct.

6          Q.   Monday was September 13th.  Do you recall at

7    around this time that Ms. Howard came to your office

8    and told you that she had learned through an e-mail

9    that she was being terminated?

10         A.   Yes.  I do remember.  I don't remember it

11   being this same day, but if that's when it occurred.  I

12   do remember her walking into my office and saying she

13   learned that she was going to be terminated.

14         Q.   Ms. Howard has testified that you initially

15   said to her, "No.  That's not true," and then she said,

16   "I saw the e-mail."

17         A.   I don't believe I would have said that's not

18   true.  I would have asked her, "Why do you believe

19   that?"  And then she shows me the e-mail.

20         Q.   Do you deny saying that to her?

21         A.   I do.

22         Q.   When were you planning on telling Ms. Howard

23   that she was terminated?  Was that after the

24   announcement that Joe was being hired?

25         A.   Yeah.  But it's not directly related to

PETER SCHWARTZ - February 27, 2013

1    Joe's.  It could have been at the end of the week.  It

2    could have been at the end of the month.  But it would

3    have been post that date.  Yes.

4         Q.  Did you discuss with anyone in human

5    resources or in Atlanta or anywhere that you felt that

6    you should get someone hired in the NSM position prior

7    to informing Valerie Howard that her position was being

8    eliminated?

9         A.  I don't recall that.

10        Q.  What do you recall about the conversation

11   that you had with Ms. Howard when she came to your

12   office and told you that she had learned that she was

13   being terminated?

14        A.  I think from the point -- I remember Valerie

15   walking in, sitting in front of my desk.  And then we

16   stood up.  If I remember correctly -- I can't remember

17   if at that point she got up and walked out or we

18   walked -- we walked over.  At some point, there was a

19   conversation where we walked over and sat at the chairs

20   in my office away from my desk so we weren't like this

21   (indicating).  We were more side by side.

22             I just said, "It's an elimination of

23   position.  It's a cost cut."

24        Q.  What, if anything, did she say?

25        A.  I don't recall.

123

PETER SCHWARTZ - February 27, 2013

1      Q.  Do you recall anything else that was said in

2  that conversation other than what you've testified to?

3      A.  I'm searching, you know -- I'm searching my

4  mind, kind of remembering.  I think -- I think Valerie

5  at one point had said to me that, you know -- she asked

6  me if we were concerned if she was going to sue us over

7  this.  I don't remember if that was in the same

8  conversation or another conversation.

9          I have no answer for that other than it's an

10  elimination of position.  It's a -- we're not filling

11  that role.  We're not paying somebody that salary.

12  That's what it was.

13      Q.  Do you recall Ms. Howard in that conversation

14  when she told you that she had found out through an

15  e-mail that had been sent to her that she was being

16  terminated her asking you about Joe's position?

17      A.  She may have.  Yeah.  I have some

18  recollection to that.

19      Q.  Do you recall her asking you about why you

20  had allowed her to hire Maura?  Do you recall her

21  asking about that position?

22      A.  Maybe.  I don't absolutely recall it, but she

23  probably could have asked that question.  My answer --

24  my answer to all of it is it's a different position.

25  It's a different position.

PETER SCHWARTZ - February 27, 2013

1      And the other idea behind this is as we were

2  hiring -- you know, the hiring of Joe was because -- I

3  think you can read this in the e-mail.  "Joe has an

4  impeccable reputation as a national sales manager and

5  will provide immediate credibility."

6      That's what we were already looking for.  We

7  were looking for somebody who was already in the

8  position of national sales manager who has those

9  relationships current and immediately that would be

10 executed.

11     Q.  And it's your opinion that at the time,

12 Valerie did not have those?

13     A.  That's accurate.  Absolutely.

14     And then with Maura, it was the idea that I

15 still wanted to see if we can retain the full

16 complement of staff even while the conversation was

17 being had about eliminating that position, because I

18 still am a manager that believes that a full complement

19 of managers could be self-supporting and drive more

20 revenue.  But in the end, we couldn't save the

21 position, and it was the station performance was

22 unfortunately not as robust as it had been.

23     Q.  In the end, was it your decision to terminate

24 Ms. Howard?

25     A.  I think it was a mutual decision between Jon

PETER SCHWARTZ - February 27, 2013

```
 1    termination."  So I don't recall when the next

 2    conversation was, but I imagine we did.

 3         Q.  Did you subsequently have a conversation with

 4    her in which you officially terminated her?

 5         A.  I don't remember.  I don't remember if it was

 6    myself at that point or if it was just -- if it was

 7    Stacey or Stacey and I did it together in my office.

 8         Q.  And did you ever talk to the employee who

 9    sent the e-mail to her?

10         A.  Absolutely.

11         Q.  Who did you speak to?

12         A.  Karen Gooseff.

13         Q.  What did you say to Karen?

14         A.  Karen actually got to me almost before I got

15    to her.  She was mortified of the idea that she did

16    that.  It was a mistake.

17         Q.  Do you know if she was disciplined at any

18    time for doing that?

19         A.  No.

20         Q.  You don't know or she was not?

21         A.  I didn't discipline her.  And if she was to

22    be disciplined, it would have been by somebody else in

23    Atlanta.  A person in business in Atlanta or Jon.

24         Q.  Who did she report to at the time?

25         A.  I don't remember the gal's name.  I don't
```

127

1    job?

2         A.   Why is she less qualified?

3         Q.   Yes.  Well, it's kind of an agree-disagree.

4    For the record, you're now going to tell me why you

5    believe that she is less qualified than Joe; correct?

6         A.   Yes.

7         Q.   Thank you.

8         A.   Because Joe is currently in the position.  If

9    this was 15 years ago, as I recognized on her resume,

10   it may have been a different story, you know.  But Joe

11   at the time was deep into the national sales manager

12   role.  He had those relationships, and he was working

13   on current business.  That's why he was hired.

14        Q.   Any other reasons?

15        A.   No.

16        Q.   Were you ever present when John Dickey was

17   visiting the San Francisco office and he made a comment

18   about his sister having breast cancer and how it

19   changed her life?

20        A.   I recall something like that.  Yeah.  I don't

21   remember exactly what he said, but I remember he

22   referenced something like that.

23        Q.   Do you recall that Ms. Howard was present

24   during that -- when he made that comment?

25        A.   Was it in a -- in what environment was it?

140

1    know, with top-line revenue.

2         I'd say that Cumulus has been the most

3    cost-cutting focused company that I have absolutely

4    worked with.  It was consistent with the day I got

5    there.  So nothing, you know, was surprising to me as

6    we, you know, continually campaign to reduce cost.

7         Q.  Did you ever come to the conclusion that

8    Cumulus was a less-professional company to work for

9    than other companies that you've worked for?

10        A.  I liked working for CBS because I think they

11   understood some of the bigger market issues.  But

12   overall, it wasn't -- I didn't see them walking the

13   halls and being unprofessional.  I saw them walking the

14   halls and behaving the way they wanted to behave, which

15   was they had less pretense than other companies.  They

16   just operated the way they wanted to.

17        Q.  And did you ever have any employees complain

18   to you --

19        A.  Absolutely.

20        Q.  -- about Cumulus?

21        A.  Absolutely.

22        Q.  What were some of the comments they made to

23   you about the company?

24        A.  They're cheap.

25        Q.  Okay.  Heard that one.

PETER SCHWARTZ - February 27, 2013

1    include or exclude her from things?

2         A.   Neither.   Just to operate -- business as

3    usual.

4         Q.   Do you feel as if Valerie added value to the

5    company?

6         A.   Yes.

7         Q.   Why didn't you say anything to Jon Pinch

8    about keeping her because of that?

9         A.   I think Jon was on -- he definitely was

10   looking to cost cut.   I think one of the things I said

11   in my e-mail before was, you know -- I remember -- you

12   know, to say it was a love fest is an understatement.

13   Trying to, you know, create value more for Valerie.

14   Because I think he -- he was on a track to be able to

15   cut more cost and I was trying to be able to save more

16   management.

17        You know, Jon -- I would say that, you know,

18   I never communicated it specifically to Jon in e-mail,

19   but I could certainly say that I communicated verbally

20   over, you know, a phone conversation saying Valerie

21   does bring value to the company.   At some point, Jon is

22   going to be, like, it's $40,000.   The station revenue

23   does not justify us having three managers on that side.

24        That was it.   We had only two managers on the

25   KNBR side.   We were running with two radio stations,

PETER SCHWARTZ - February 27, 2013

1    far less billing than the others.  We also had the

2    Giants, the Golden State Warriors, the 49ers.

3            The spread was separating.  We were running

4    with two managers.  And that just became very clear and

5    evident to Atlanta.

6        Q.  Did you consider Valerie for the local sales

7    manager job at KNBR?

8        A.  No.

9        Q.  Why not?

10       A.  Did not have the current experience in

11   selling sports.  And to sell sports, you've got to be

12   really sports centric.  You've got to understand it.

13   You've got to be able to speak it.  You've got to be

14   able to talk to it.

15           Transactionally people will buy it.  But, you

16   know they do a ton of direct business.  And those

17   direct businesses buy it because of the Giants.  So you

18   got to know it.  That's why, you know, we hired David.

19       Q.  Did you ever consider simply reducing

20   Valerie's compensation?

21       A.  No.

22       Q.  Why not?

23       A.  Because we were going to eliminate the

24   position.  The position was going to be eliminated.  On

25   the other side we were running with two managers over

PETER SCHWARTZ - February 27, 2013

1    there for all of that, and we only had -- we had three

2    managers over here billing less money.

3         We had far more moving parts on this side.

4    Like I said, it just became evident it wasn't going to

5    be like, hey, can we reduce Valerie's salary by 30

6    grand and keep a third manager over there.

7         Q.  Well, why not terminate one of the local

8    sales managers and give Valerie that position?

9         A.  Because the conversations at that time would

10   suggest, "Valerie, I want you to take a 33 percent cut

11   in pay and I want you to take a reduction in bonus and

12   take a far less status position with less

13   responsibilities."  Wasn't going to do that.  I was

14   going to hire somebody else into the position fresh.

15        Q.  Is that different than your approach with any

16   other employee?

17        A.  No.  It's the same.  If the position was the

18   same across on the AMs and they said, "We want you to

19   eliminate Judy's position," and the question was

20   whether we're going to eliminate her or try to keep her

21   and reduce her salary by 80 grand, I'd eliminate the

22   position.

23        Q.  Are you aware of a practice at some companies

24   that when they have layoffs that they recall employees

25   as they have open positions?

PETER SCHWARTZ - February 27, 2013

1    and ambiguous.  The document speaks for itself.

2              THE WITNESS:  I don't have a recollection of

3    a lot of them, but I do have a recollection of a lot of

4    them, too.

5              MS. MOSER:

6         Q.  Do you have a recollection as to whether the

7    decision to terminate Valerie's employment in 2009 was

8    made before or after you learned about her medical

9    condition?

10        A.  It was before her medical condition.

11        Q.  Do you have any doubt?

12        A.  No doubt.

13        Q.  Why?  How are you so sure?

14        A.  Because the discussion was already taking

15   place.  We were getting towards the bifurcation -- that

16   great word again -- of the staffs, and we were looking

17   to make some cost-cutting moves to become more

18   efficient.

19             Unfortunately, Valerie's salary was the

20   highest in the building.  And that was it.  We were

21   operating with two sales managers on the AM side and we

22   were operating with three sales managers on the FM

23   side.

24        Q.  One of the documents you reviewed -- I

25   believe it was between you and Jon Pinch.  It said

153

PETER SCHWARTZ - February 27, 2013

```
 1          A.  Both.  But corporate had to be looped in on
 2     that.
 3          Q.  Would it be unusual that corporate legal
 4     would be looped in on that?
 5          A.  Sure.  Absolutely.
 6          Q.  Usual or unusual?
 7          A.  I think usual.  I don't recall anyone else
 8     having an extended leave.
 9          Q.  How about in terms of general HR issues; did
10     you speak with someone at corporate HR or corporate
11     legal when you had --
12          A.  General HR issues we dealt with locally.  If
13     it was -- if it had something to do with discrimination
14     or, you know, we sensed that there might be potential
15     litigation, you've got to bring in corporate.  But
16     anything that was general HR stuff was dealt with by
17     Stacey.
18          Q.  Didn't all terminations have to go through
19     legal?
20          A.  Yes.  That's accurate.
21               MS. LAWLESS:  Belated objection.  Leading.
22               MS. MOSER:
23          Q.  Why did you send Gene's e-mail to you to
24     Richard Dunning?
25          A.  I think that recalling Valerie's statement
```

PETER SCHWARTZ - February 27, 2013

1    that "I'm going to sue you" is that, you know, she

2    appeared to be litigious, so it was my responsibility

3    to sort of loop in general counsel.

4         Q.  At any point during Valerie's employment at

5    the company, did you -- strike that.

6             Did you feel as if you wanted to keep Valerie

7    at the company or not keep Valerie at the company

8    during Valerie's employment?

9         A.  I wanted to keep her at the company.

10        Q.  How long did you feel that way?

11        A.  Probably for the time that she was there up

12   until, you know, we had to make the decision and the

13   station revenue wasn't justifying it.  Even so, when we

14   had considered it a couple times beforehand, there was

15   still the even -- you know, even when we were hiring

16   Maura and Joe and, you know, moving positions around at

17   KNBR, I wanted to see if -- I always want to keep

18   people employed, whether it was Valerie or somebody

19   else.

20            You know, I always want to keep a head count.

21   I always believe that a head count can sustain the

22   revenue.  Unfortunately, it was proven then and it

23   continues to be proven now at the radio stations that

24   the revenue was just abysmal compared to what it once

25   was.

1          CERTIFICATE OF DEPOSITION OFFICER - FEDERAL COURT
2
3              I, WENDY L. VAN MEERBEKE, duly authorized to
    administer oaths, hereby certify that at the
4    commencement of the foregoing deposition, the witness
    stated, under penalty of perjury, that he or she would
5    testify the truth, the whole truth, and nothing but the
    truth, in the within-entitled cause; that said
6    deposition was taken at the time and place herein
    stated; that the testimony of said witness was reported
7    by me, to the best of my ability, a duly Certified
    Shorthand Reporter, and was thereafter transcribed by
8    me (or under my direction) into typewriting by
    computer; that the foregoing is a full, complete and
9    true record of such testimony; and that the deponent or
    a party requested review of the deposition prior to
10   completion of the deposition; and that the deponent was
    given an opportunity to review the deposition.
11
12             I FURTHER CERTIFY that I am not interested in
    the outcome of said action nor connected with nor
13   related to any of the parties in said action nor to
    their respective counsel.
14
15
16                 *Wendy L. Van Meerbeke*
17          ----------------------------
                   Deposition Officer
18
19
20          ----------------------------
21              Date of Certification
22
23
24
25

TOOKER & ANTZ COURT REPORTING & VIDEO SERVICES
(415) 392-0650

**From:**      Peter Schwartz
**Sent:**      Thursday, October 22, 2009 7:47 PM
**To:**        Jon Pinch
**Subject:**   Valerie

Here is what Stacey has learned. We called Richard yesterday to confirm the below but have yet to connect.

1. FMLA says we cannot require an employee to take more leave than is necessary.

2. If an employee can perform certain aspects of their job, the employer must allow the employee to do so. We can deem this to be part-time status if employee is not performing all of their duties of the job and pay employee accordingly. Part-time status strictly refers to the hours being worked as FMLA protects the employee's full-time status with the company.

3. With an employee (in this case Valerie), receiving a doctor's certification that she can return to work but must perform her work duties from home (based on her immune system being compromised by the chemo), it appears we then must identify what those duties are she can perform, determine what percentage those duties represent of her total job requirements. We then would allow her to work part-time from home and pay her accordingly.

Right now, she is currently doing the following.
- Dialing into the CSOS calls.
- Updating KFOG and KSAN one-sheets with new PPM data.
- Friday AE one-on-ones (via phone).
- Dialing-in on CSOS training.
- Discussing AE performance with Omari and Michael.

Most of the meat of the job is still left on the bone. We are waiting to speak with Richard. We will call him again tomorrow.

*Peter Schwartz*
*VP/ Director of Sales*
*Cumulus*
*KNBR/KFOG/KSAN (The BONE), Cumulusjobs.com*
*Giants, Niners, Warriors*
*55 Hawthorne Street - 10th Floor*
*San Francisco, CA 94105*
*p (415) 995-6814*
*peter.schwartz@cumulus.com*

*Ask me how Cumulus can help with your recruitment effort.*

 Please consider the environment before printing this e-mail.



1

Howard v. Cumulus Media Inc., et al.

**From:** Peter Schwartz
**Sent:** Thursday, February 04, 2010 1:22 PM
**To:** Karen Gooseff
**Subject:** FW: Sales Managers' Bonus Structures

See Jon's approval.

On Feb 4, 2010, at 7:04 AM, "Jon Pinch" <jon.pinch@cumulus.com> wrote:

I will approve this, however I am not real comfortable with KNBR being paid at 98% of budget.... Send the wrong signal.

Jon Pinch
COO\EVP Cumulus Media
3280 Peachtree Road NW
Suite 2300
Atlanta, GA 30305
(office) 404-949-0700
(cell) 404-964-8611

**From:** Peter Schwartz
**Sent:** Wednesday, February 03, 2010 8:09 PM
**To:** Jon Pinch
**Subject:** FW: Sales Managers' Bonus Structures

For our discussion tomorrow, below is my proposed Sales Manager Bonus plan.

Would also like to add an element that allows a manager to recoup a bonus they may have missed in month but was able to make it up in the quarter. Can make it up ONLY in the quarter and NOT at the end of the year.

**From:** Peter Schwartz
**Sent:** Friday, January 22, 2010 1:31 PM
**To:** Jon Pinch
**Subject:** Sales Managers' Bonus Structures

Here are my proposed bonus structures. When putting them together for Judi and Daniel, I took into consideration the bigger load they are carrying for the cluster. Their bonuses are based on ALL am revenue (KNBR, KTCT, Giants, Niners). When I set up each potential bonus pool using their bonus pool from 2009 but then adding in the element of a stretch goal to achieve additional bonus. Unless you require us to, we won't budget the stretch goal bonuses as they are essentially self-funding when we reach the stretch revenue goal. As for Omari, I set up a smaller bonus pool (compared to Michael and Daniel) as we rolled 75% of his interpolated earnings from 2009 into his base salary. Here is what I propose:



PLAINTIFF'S EXHIBIT

18

Schwartz

PENGAD 800-631-6989

Howard v. Cumulus Media Inc., et al.





Valerie Howard  $240k          $62k      $60k ($5,000/mth)
                                          $2,500: 100% of station total budget
                                          $1,500: 112% of station total budget
                                          $1,000: 100% of SF cluster total budget

b

*Peter Schwartz*
*VP/ Director of Sales*
*Cumulus Media Partners*
*KNBR/KFOG/KSAN (The BONE), Cumulusjobs.com*
*Giants, Niners, Warriors*
*55 Hawthorne Street - 10th Floor*
*San Francisco, CA 94105*
*p (415) 995-6814*
*peter.schwartz@cumulus.com*

*Ask me how Cumulus can help with your recruitment effort.*

image001.jpg» Please consider the environment before printing this e-mail.

Cumulus Media Email Policy
PLEASE NOTE  This message contains confidential information and is intended only for the individual(s) named  Employees of CMI and CMP and their subsidiaries) are prohibited from forwarding this email or otherwise disclosing the contents of this email, or any portion thereof, to any other party, including any non-employee of the respective companies. Failure of an employee to comply with this policy will result in disciplinary action up to and including immediate termination of employment

From:       Peter Schwartz
Sent:       Monday, May 17, 2010 12:01 AM
To:         Jon Pinch
Subject:    Update

Welcome back! Understand Daniel was on the hook for some of his recommendations.

A quick update for you below:

1. KFOG LSM candidate Maura Donahue will be in tomorrow. Will make her an offer (Omari was at $225k with his recent increase and offer will be $50k less than that - Michael is at $180 and Daniel is at $190k) 2. Pacing for June is strong led by KNBR and KSAN. Continue to move the rate on current and new advertisers as reflected in the local pacing for May and for both local and national for June and July.
3. Pacing increased this week for June, July, August , September.
4. May is pacing close to flat with last year but this is the week we reconcile Kaboom ticket sales against revenue. Slow ticket sales will hurt pacing.
5. National's strong pacing is a product of both rate increases on KSAN and KNBR coupled with national beginning to book sooner than local.
6. Having weekly expectations meetings with Valerie on how I want her team managed. Have communicated expectations in writing.
7. Still on pace to re-launch our half-off program with dedicated weekly offers from all three stations. Had a good week selling 250 tickets to a festival this weekend generating $3750. Intend on generating this revenue across all three stations for 52 consecutive weeks (re-launch of program with three dedicated offers is part of Path-To-Peek strategy).
8. As mentioned above, Kaboom tickets are slow. Will call you with Lee to discuss.
9. You received the weekly CSOS call out activity sheet.
10. Hired new seller to start Monday on KSAN. Close on a 2nd new hire.
11. Good deals for this week include:
         Mathew Wexler on KSAN closed $60k non-spot deal with Miller Beer.
         Cluster took big shares for Infinity for May booking $75k.
         Matt Allighieri (KFOG) and Jennifer Sagamund (KSAN) two of our new sellers both closed $3k net direct deals this week (it's not the size of the deal for these guys - yet). Both showing traction.
         Chris Yong (KNBR) expects to close $121k net direct for Carrier Air Conditioners on
Monday.


Cumulus Media Email Policy
PLEASE NOTE:  This message contains confidential information and is intended only for the individual(s) named.  Employees of CMI and CMP (and their subsidiaries) are prohibited from forwarding this email or otherwise disclosing the contents of this email, or any portion thereof, to any third party, including any non-employee of the respective companies.  Failure of an employee to comply with this policy will result in disciplinary action up to and including immediate termination of employment.



PLAINTIFF'S
EXHIBIT
27
Schwartz

PENGAD 800-631-6989

1



PLAINTIFF'S
EXHIBIT
28
Schwartz

**From:**      Peter Schwartz
**Sent:**      Thursday, July 22, 2010 12:24 PM
**To:**      Jon Pinch
**Subject:**      RE: NSM

Actually, it's still slightly under wraps. When I check with people for recommendations I premise it with, "We are thinking about it but nothing confirmed. If approved, maybe a Q4 start date." We could drop the ad with a "Top 4 California Market" which narrows it to LA, SF, SD, Sac.

**From:** Jon Pinch
**Sent:** Thursday, July 22, 2010 7:06 AM
**To:** Peter Schwartz
**Subject:** RE: NSM

We could attach a proportionate amount to the other stations, we'll see.  Why don't you put an ad in Inside Radio.  Since we're not doing this on the "sly", it would be a great way to see who's available across the country.  You could run one ad for both senior seller and NSM.

Jon Pinch
COO\EVP Cumulus Media
3280 Peachtree Road NW
Suite 2300
Atlanta, GA  30305
(office) 404-949-0700
(cell) 404-964-8611

**From:** Peter Schwartz
**Sent:** Wednesday, July 21, 2010 9:19 PM
**To:** Jon Pinch
**Subject:** RE: NSM

Sorry for the delayed response. Catch up from having JD in town. We had good KFOG meetings.

I have four potential candidates of which three of them were previously NSMs in SF. Sarantos is coming back to me with a few more ideas. Reaching out to my contacts in SD and Sacramento to see if they would like to see any of their competitors leave town. Locally, we are hunting for the right replacements for the TWINS. We've found that some good sellers from LA are afraid of the Sports element on KNBR. Judi has a meeting tomorrow with a strong candidate and has another in the pipeline. Trying to avoid re-treads. If you have other suggestions for the NSM position, please send them my way.

Q: Will a small (tiny) portion of the NSM salary be absorbed by Oxnard/Ventura and Colorado?

**From:** Jon Pinch
**Sent:** Wednesday, July 21, 2010 8:26 AM
**To:** Peter Schwartz
**Subject:** NSM

How's the search coming?  Need help?  The plan is to swap Val for NSM, save a hundred grand, and have the NSM do all of the markets on the west coast plus our Colorado market.

SQ000681                                                 Howard v. Cumulus Media Inc., et al.

Jon Pinch
COO\EVP Cumulus Media
3280 Peachtree Road NW
Suite 2300
Atlanta, GA  30305
(office) 404-949-0700
(cell) 404-964-8611

---

Cumulus Media Email Policy
PLEASE NOTE: This message contains confidential information and is intended only for the individual(s) named. Employees of CMI and CMP (and their subsidiaries) are prohibited from forwarding this email or otherwise disclosing the contents of this email, or any portion thereof, to any third party, including any non-employee of the respective companies. Failure of an employee to comply with this policy will result in disciplinary action up to and including immediate termination of employment.

SQ000682                                                          Howard v. Cumulus Media Inc., et al.