# EXHIBIT D

1              UNITED STATES DISTRICT COURT

2        IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                        --oOo--

4

5    VALERIE HOWARD

6              Plaintiff,

7         vs.                           No. C 12-4880 CRB

8    CUMULUS MEDIA INC.,

     SUSQUEHANNA RADIO CORP. and

9    DOES ONE through FIFTY, inclusive,

10             Defendants.

     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _/

11

12

13             DEPOSITION OF STACEY HAYSLER

14                    VOLUME I

                  (Pages 1 to 50)

15

               Wednesday, February 27, 2013

16

                San Francisco, California

17

18

19   Reported by:

     CHERYL WILDER, CSR #7805

20

21

22

                    TOOKER & ANTZ

23        COURT REPORTING AND VIDEO SERVICES

             350 SANSOME STREET, SUITE 700

24        SAN FRANCISCO, CALIFORNIA 94104

        Phone (415) 392-0650  Fax (415) 392-3897

25

STACEY HAYSLER, VOLUME I - February 27, 2013

1    part of our FCC licensure and then in accordance with

2    California law, we also did harassment prevention

3    training for all supervisors.

4         Q.   And how often was the harassment training, do

5    you know?

6         A.   Alternate years, odd number years for

7    California.

8         Q.   That was generally sexual harassment?

9         A.   Sexual harassment was the main focus but it

10   did cover all types of discrimination.

11        Q.   And in your role as the HR coordinator, did

12   you keep records as to which employees attended the

13   discrimination training?

14        A.   Yes.

15        Q.   And do you have any knowledge, for example, as

16   to whether or not Valerie Howard ever attended any of

17   that training when she was there?

18        A.   Yes, she did.

19        Q.   Do you have any knowledge as to whether or not

20   Mr. Schwartz attended any of the training?

21        A.   Yes, he did.

22        Q.   Where were those records kept, do you recall?

23        A.   At the end of the training, the program

24   generated a certificate that the employee had to print

25   sign and date and give to me and it was placed in their

1    personnel file.

2         Q.   Do you know if the records regarding the

3    people who attended the training were kept anywhere else

4    other than their personnel files, to your knowledge?

5         A.   No.  They were filed in their personnel file.

6         Q.   All right.  And in your role as an HR

7    coordinator, were you the designated individual in

8    San Francisco that was responsible for handling

9    complaints of discrimination, to your knowledge?

10        A.   Under the company policy, if someone had a

11   harassment or discrimination complaint, they could bring

12   it to me as the HR coordinator or any member of

13   management staff.  The company also had an anonymous

14   reporting hotline by phone, by email and also a web

15   form.  So if somebody wasn't comfortable coming to me or

16   to their manager, they had alternate ways to report it

17   that the company could still be notified and take

18   action.

19        Q.   When you were studying at the University of

20   Phoenix obtaining your HR certification, did you study

21   California anti-discrimination law?

22        A.   Yes.

23        Q.   And when you were at the University of

24   Phoenix, did you study the California Family Rights Act?

25        A.   Yes.

```
1        A.    With Karen Gooseff and Peter Schwartz.

2        Q.    And how did you do that?

3        A.    In a conversation.

4        Q.    The same day?

5        A.    Yes.

6        Q.    And did you meet together, the three of you?

7        A.    I spoke with Peter first.

8        Q.    And why did you go to Peter and meet with him?

9        A.    Before Ms. Howard came to see me, Peter had

10   come to my office to speak with me.

11       Q.    That day?

12       A.    Yes.

13       Q.    Okay.  On September 8th?

14       A.    Correct.

15             To let me know that as part of the company's

16   budget management that we were going to do for the

17   position eliminations and that Ms. Howard's position was

18   one of the ones that had been selected for elimination

19   and that her employment would be terminated that Friday.

20       Q.    So looking at our calendar, just so you have

21   it in front of you, so Peter came to you on September

22   8th and told you that Ms. Howard's position would be --

23   she would be eliminated or terminated as of September

24   11th; is that correct?

25       A.    Correct.
```

1      Q.   Is that the first time you had heard that from

2   Mr. Howard -- excuse me, from Mr. Schwartz?

3           Sorry about that.

4      A.   Yes.

5      Q.   And had Mr. Schwartz previously told you that

6   they were considering doing that?

7      A.   We had discussed that there would be further

8   layoffs.  He had not mentioned specific positions.

9      Q.   Further layoffs.  Are you talking about around

10  this time period there was testimony from Mr. Schwartz

11  that there had been a whole restructuring of account

12  executives on a national level?  Do you recall that, at

13  around 2009?

14          MS. MOSER:  The KAMs.

15          THE WITNESS:  The key account managers, yes.

16  That there was a designation for sort of the senior

17  seller group were designated as key account managers.

18     Q.   BY MS. LAWLESS:  And had there been -- was

19  there some restructuring that was taking place at that

20  time?

21     A.   Just in terms of who was designated a KAM and

22  it was my understanding they were given additional

23  responsibilities in those roles.

24     Q.   And when was it that Mr. Schwartz had talked

25  about the fact that there might be some additional

                                                          36

1    layoffs?  When had you had that conversation with him?

2          A.   It was an ongoing conversation throughout

3    2009.

4          Q.   And what layoffs had occurred in 2009 that you

5    recall?

6          A.   In July 2009, Tony Salvadore, the market

7    manager.  And in March we let go five or six people all

8    in one day.

9          Q.   Do you know if any of those were managers?

10         A.   I would have to look at the list of who was

11   let go.

12         Q.   Do you have a memory as to any of the

13   individuals that were let go in March of 2009?

14         A.   One was an IT staff, two people from traffic,

15   someone from accounting.  In May we let go one of the

16   track managers.

17         Q.   Who was that?

18         A.   Raquel, R-a-q-u-e-l, Lomeli, L-o-m-e-l-i.

19         Q.   And had there been any additional layoffs at

20   that time period?

21         A.   Unfortunately, in 2009 there were a number of

22   layoffs.  I would have to actually go back and look at

23   the records to see who else was let go.

24         Q.   These are the best that can you recall right

25   now?

STACEY HAYSLER, VOLUME I - February 27, 2013

1      A.   Off the top of my head, yes.

2      Q.   So just so I understand, September 8th

3  Ms. Howard comes to you, she tells you -- you've

4  testified about it, I'm not trying to -- but she

5  basically informs you that she had breast cancer and

6  then at that point you went and spoke with Karen and

7  Peter?

8      A.   I spoke with Peter first.

9      Q.   On that morning, that day?

10      A.   Yes.

11      Q.   He had come to you that morning?

12      A.   Correct.

13      Q.   And he had told you that he was planing on

14  eliminating her job and she would be terminated Friday?

15      A.   Correct.

16      Q.   And then Ms. Howard -- anything else you

17  recall Peter telling you in that conversation other than

18  what you testified to?

19      A.   No.

20      Q.   Then Ms. Howard came to you, same day, and

21  said, "I've got breast cancer," and then you told her

22  the information that you've already testified to about

23  her right to take family leave; right?

24      A.   Correct.

25      Q.   You finished your conversation with her.  Then

STACEY HAYSLER, VOLUME I - February 27, 2013

1    who do you go talk to first, Peter or Karen?

2         A.    Peter.

3         Q.    And where do you meet with Peter?

4         A.    His office.

5         Q.    Okay.  And by the way, did you take notes of

6    your conversation that morning with Peter when he

7    informed you about the job elimination?

8         A.    I may have written it down on my to-do list.

9         Q.    To-do list meaning?

10        A.    I kept a paper to-do list of things out of the

11   ordinary.

12        Q.    Do you still have that to-do list?

13        A.    Those were all company documents.  I left them

14   at the company when I terminated my employment.

15        Q.    Was that a handwritten document?

16        A.    Yes.  Just a pad, a legal pad like that.  Just

17   write notes.

18        Q.    All right.  So then you went to Peter's

19   office?

20        A.    Uh-huh.

21        Q.    And you went in and what did you say to Peter?

22        A.    I said, "Peter, we need to talk about the

23   plans for Friday."  And I said, "I think that we need to

24   delay the layoff.  Valerie informed me of a need to take

25   a medical leave and I don't think it's appropriate to

1    lay someone off the same week they've told us they need

2    a medical leave."

3         Q.   Why did you think that wasn't appropriate?

4         A.   When someone is dealing with a major medical

5    condition, that's really enough to occupy their

6    emotional and mental energy and resources.  And also

7    once somebody is laid off, their medical benefits and

8    everything terminates at the end of the calendar month.

9    And if she's going to need treatment for cancer, this is

10   not a good time to terminate medical benefits.

11        Q.   And what did Peter -- did you describe to

12   Peter what treatment she was needing?

13        A.   No.

14        Q.   What did you say specifically?

15        A.   I said, "She needs to take medical leave."

16        Q.   And did you tell him how long you anticipated

17   that medical leave would be?

18        A.   At that point I don't think I had a time

19   estimate.  If I did, I would have shared that with him,

20   but I don't think I had one at that time.

21        Q.   What did Peter say?

22        A.   Peter said, "Yeah, that's not a good thing to

23   do."  So we had to speak with corporate about it.

24   Because once corporate says, "You need to make these

25   cuts," if we have a compelling reason, say -- so --

STACEY HAYSLER, VOLUME 1 - February 27, 2013

1      Q.   So did you contact corporate then?

2      A.   Yes.

3      Q.   And who do you consider when you refer to

4    corporate to be?

5      A.   This particular time I believe we called Jon

6    Pinch, who's the regional vice-president for this

7    section of Cumulus.

8      Q.   Did you do that that day, on September 8th,

9    when you were in the office?

10     A.   Yes, we called.

11     Q.   You put him on speaker phone?

12     A.   Yes.

13     Q.   And who spoke to Mr. Pinch?

14     A.   Well, Peter started the conversation, but then

15   let me give the information I had, which is Valerie had

16   come to me requesting medical leave, she required a

17   medical procedure on Thursday, the 10th, and I didn't

18   think that terminating her employment through layoff on

19   Friday, the 11th, would be appropriate.

20     Q.   And what did Mr. Pinch say?

21     A.   He agreed.

22     Q.   And did he make a decision as to when she

23   might be terminated then?

24     A.   No.

25     Q.   Do you recall anything else being said in that

1          CERTIFICATE OF DEPOSITION OFFICER

2      I, CHERYL WILDER, CSR #7805, duly authorized to

3  administer oaths, hereby certify that at the

4  commencement of the foregoing deposition the witness

5  stated, under penalty of perjury, that he or she would

6  testify the truth, the whole truth, and nothing but the

7  truth in the within-entitled cause; that said deposition

8  was taken at the time and place therein stated; that the

9  testimony of said witness was reported by me and was

10  thereafter transcribed by me (or under my direction)

11  into typewriting by computer; that the foregoing is a

12  full, complete and true record of such testimony; and

13  that the deponent or a party did request review of the

14  deposition prior to completion of the deposition; and

15  that the deponent was given an opportunity to review the

16  deposition.

17      I further certify that I am not of counsel or attorney

18  for either or any of the parties in the foregoing

19  deposition and caption named, nor in any way interested

20  in the outcome of the cause named in said caption.

21

            _Cheryl Wilder_____

22                  DEPOSITION OFFICER

23

24         _____

               DATE Of CERTIFICATION

25

STACEY HAYSLER, VOLUME II - March 27, 2013

1                 UNITED STATES DISTRICT COURT

2          IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                         --oOo--

4

5     VALERIE HOWARD,

6                  Plaintiff,

7           vs.                          No. C 12-4880 CRB

8     CUMULUS MEDIA INC.,

      SUSQUEHANNA RADIO CORP. and

9     DOES ONE through FIFTY, inclusive,

10                 Defendants.

      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _/

11

12

13                 DEPOSITION OF STACEY HAYSLER

14                      VOLUME II

                   (Pages 51 to 198)

15

                   Wednesday, March 27, 2013

16

                   San Francisco, California

17

18

19    Reported by:

      CHERYL WILDER, CSR #7805

20

21

22

                        TOOKER & ANTZ

23          COURT REPORTING AND VIDEO SERVICES

             350 SANSOME STREET, SUITE 700

24          SAN FRANCISCO, CALIFORNIA 94104

         Phone (415) 392-0650  Fax (415) 392-3897

25

                                                          51

1    let's look at an exit.

2         Q.   And did he tell you that he wanted to

3    terminate her position or what did he say about the

4    exit?

5         A.   The position had been selected for

6    elimination, but then we found out about her medical

7    leave so the decision was put off pending Valerie's

8    return.  And now that we had a return date, Peter raised

9    the topic again.

10        Q.   Do you recall earlier any discussions with

11   Mr. Schwartz or anyone in the company in which you

12   discussed the decision was going to be put off until her

13   return or the job elimination would be put off until her

14   return?

15        A.   I'm sorry?

16        Q.   So I'm just wondering if earlier had there

17   been discussions once you found out about the medical

18   leave that the decision to eliminate the position was

19   being put off or the job elimination was being put off

20   until her return?

21        A.   The decision had been made but the actual

22   taking the step of terminating the position was put off.

23        Q.   And so when Peter learned, correct me if I'm

24   wrong, when Peter learned that she was coming back, he

25   came to you and asked about going forward with the

94

STACEY HAYSLER, VOLUME II - March 27, 2013

1    actual process of eliminating the job?

2         A.    Correct.

3              MS. MOSER:  Objection to the speculation as to

4    what Peter knew and wanted.

5         Q.   BY MS. LAWLESS:  And then you -- what did you

6    say in your conversation with him prior to sending this

7    email?

8         A.    We talked about timing.

9         Q.    What did you talk about with respect to

10   timing?

11        A.    Well, my main concern was for her COBRA

12   benefits.  Because, obviously, it's a big issue.  And

13   that, you know, putting it off a week would not have a

14   significant impact to the company but would make a

15   difference for her.

16        Q.    And what, if anything, did Peter say in

17   response?

18        A.    I don't remember specifically.  He understood

19   what I was saying and he understood my concern.

20        Q.    Did you express any concerns to him about the

21   appearance that the action may be considered

22   discriminatory if she were to be terminated as soon as

23   she returns from a leave?

24        A.    I don't recall specifically.

25        Q.    But do you think you did?

STACEY HAYSLER, VOLUME II - March 27, 2013

1    position elimination and the date would be Friday.

2        Q.   Do you recall that Monday was September 13th,

3    2010?

4            I can show you some --

5        A.   If I could have a calendar to see the dates.

6        Q.   I think I have a 2009 calendar, not a 2010.

7            But I have got some emails that have some

8    dates on them and my email says Monday was September

9    13th.

10           MS. MOSER:  I have the one that has

11   Valerie's --

12           THE WITNESS:  Oh, there's 2010.  Yea.

13           MS. MOSER:  If you don't mind looking.

14       Q.   BY MS. LAWLESS:  That's fine.

15       A.   Monday the 13th sounds right.

16       Q.   So when Peter came and told you, he told you

17   that the plan was to terminate her on the 18th; correct,

18   the Friday?

19       A.   Yes.

20       Q.   And what, if anything, did you say to Peter

21   when he told you this?

22       A.   I remember I told him that Friday wasn't my

23   usual day and I could either flex my schedule to come in

24   Friday or we could move it to Thursday.  And I don't

25   remember which it was going to end up being.

1        Q.    And why was it necessary for you to be there?

2        A.    As the HR representative, the involuntary

3    termination is always done with the HR and the

4    employee's manager.

5        Q.    And why is that?

6        A.    So that -- I'm there to answer questions or if

7    the employee has -- most employees just go into shock,

8    but if they start crying or something, I can give them a

9    tissue, I can help them pull themselves together and

10   deal with their exit.

11       Q.    And had you previously been in such

12   termination meetings?

13       A.    Yes.

14       Q.    And is it your normal practice in these

15   termination meetings to take notes of what is said?

16       A.    Not during the meeting itself, no.

17       Q.    Do you do it usually right afterwards?

18       A.    I'll take notes of something unusual.

19       Q.    And what would be something unusual?

20       A.    Employee becoming verbally aggressive or

21   abusive or physically aggressive.  Those are the unusual

22   circumstances.

23       Q.    So did you and Mr. Schwartz make a plan as to

24   whether you would come in on your usual day or move the

25   termination?

1          A.   Yes.

2          Q.   What did you agree to?

3          A.   I don't remember.

4          Q.   Okay.  And then after you learned this

5     information from Mr. Schwartz, you then went to see

6     Karen; is that correct?

7          A.   Yes.

8          Q.   And did you go see her in person?

9          A.   Yes.

10          Q.   And what did you tell Karen?

11          A.   That Valerie's position was being eliminated

12     and requested that she please prepare the final check

13     request to send to corporate payroll.

14          Q.   And what, if anything, did Karen say?

15          A.   Karen was upset.  She and Valerie had worked

16     together at another company and had known each other a

17     long time.  But she assembled all the paperwork and took

18     care of all the approvals and because her not preparing

19     the final check would not have changed anything.

20          Q.   Anything else that you said when Karen

21     expressed that she was upset?  Did you say anything to

22     Karen about the termination?

23          A.   In terms of?  Just sort of communicating the

24     fact to her and then trying to console her.  She and I

25     had a very good working relationship.  And when one's

1          A.    Given that Peter made this announcement,

2    because it's in the Allstaff to inform everybody, so he

3    had to inform HR, financial and IT ahead of these kinds

4    of things, and sometimes, particularly with management

5    announcements, the person would accept the offer but the

6    announcement wouldn't be made until right before their

7    start date because they needed to square away their

8    prior employer.  So it's possible that I knew about Joe

9    being hired prior to this email because of our hiring

10   process.

11         Q.    Sure.

12         A.    But short of looking at my emails, I really

13   couldn't tell you.

14         Q.    Do you recall having any conversations with

15   Karen about the fact that the same week that Valerie was

16   being terminated they were hiring Joe Cariffe?

17         A.    Specifically, no.

18         Q.    Do you recall having any conversations with

19   any employees about the fact that the same week that

20   Valerie Howard was being terminated they were hiring a

21   new national sales manager, Joe Cariffe?

22         A.    Not specifically.

23         Q.    Did Mr. Schwartz ever tell you at any point in

24   time the reason or rationale behind the elimination of

25   Valerie Howard's position?

121

STACEY HAYSLER, VOLUME II - March 27, 2013

1        A.    That the sales management structure was top

2    heavy and just looking at the budget versus

3    responsibilities that the FM general sales manager made

4    the most sense as the position to eliminate.

5        Q.    Did you have an understanding as to what

6    Ms. Howard's salary was at the time she was terminated?

7        A.    I don't know specifically what it was.  If

8    someone had needed that information, it could be found,

9    but I don't know off the top of my head.

10        Q.    Were you involved at all in the -- any

11    communications with Mr. Cariffe in which his salary

12    was -- his oncoming salary was discussed?

13        A.    No.

14        Q.    Did you have any knowledge as to what the

15    company was paying Joe Cariffe when he was hired in

16    September of 2010?

17        A.    It would have been part of his new hire

18    information that I needed to set him up as an employee,

19    but it would simply be presented to me as here is his

20    title, here is his start date, here is his salary.

21        Q.    Do have you any knowledge as to whether or not

22    Valerie Howard had previously worked as a national sales

23    manager?

24        A.    I don't.

25        Q.    Do you have any knowledge as to whether or not

STACEY HAYSLER, VOLUME II - March 27, 2013

1    2:35 California time, you couldn't respond to her at

2    1:48 p.m.?

3         A.   No.

4         Q.   So at 1:48, I guess, you responded to her

5    email, which we're assuming was sent at 11:35 a.m., and

6    you said that you were free starting at 3:00; correct?

7         A.   Correct.

8         Q.   And then she came to see you?

9         A.   Yes.

10        Q.   And tell me about that meeting.

11        A.   So Valerie came to see me and she was visibly

12   agitated.  And I put up my do not disturb sign and

13   closed the door and we sat down.  And she said something

14   like, "I know," or "I've learned I'm going to be

15   terminated on Friday."  I don't remember exactly how she

16   phrased it, but something like that.  Which was a shock

17   to me because nobody should have known except me, Peter,

18   Karen Gooseff and corporate.

19             And so I asked her, "Well, what makes you

20   think that?"  Because, of course, this is extremely

21   awkward.

22             And she said, "I got an email," or something

23   like that.

24             I said, "Okay."

25             And she asked something like, "What do you

STACEY HAYSLER, VOLUME II - March 27, 2013

1    know about it?"

2            And I said, you know, "I was informed this

3    morning that the position is being eliminated."

4            And she said, "I'm going to go talk to

5    Peter --" or no, maybe -- she maybe asked a question or

6    made a statement.  I don't remember exactly.

7            And then she said, "I'm going to go talk to

8    Peter," and stood up and left my office to go talk to

9    Peter.

10       Q.   Do you recall anything else that was said in

11   this conversation other than what you've testified to?

12       A.   I don't remember anything specific.

13       Q.   How long did the conversation last?

14       A.   Less than five minutes.

15       Q.   And did she tell you who the email had been

16   sent by?

17       A.   No.

18       Q.   Did she -- then she left and, to your

19   knowledge, did she go and speak with Peter?

20       A.   Yes.

21       Q.   Did you pick up the phone and call anyone and

22   let them know what had just happened?

23       A.   I went to see Karen so we could call Peter,

24   because Karen's office is just a few steps from mine.

25   We called Peter and he didn't answer.

1        Q.   And what did you tell Karen when you went to

2    see her?

3        A.   I said, "Karen, Valerie just came to me and

4    said she knows she's going to be terminated Friday.  Do

5    you know anything?"

6             And Karen was just as flabbergasted as I was.

7    And then she paused and she got this really horrified

8    look on her face and she went into her email and she

9    found out that she had misaddressed the final paycheck

10   request.

11       Q.   And what did she say when she found that out?

12       A.   She started crying.

13            MS. MOSER:  Let's go off the record for a

14   second.

15            (The deposition was at recess.)

16       Q.   BY MS. LAWLESS:  So I take it that you

17   consoled Karen?

18       A.   Yes.

19       Q.   And then what did you do next?

20       A.   Went back to my office, tried calling Peter

21   again, didn't get him because he was on his way down to

22   see me.

23       Q.   Okay.  And was Karen still with you?

24       A.   No.  She was in her office.

25       Q.   And did Peter come in to see you then?

128

1          A.    Tuesday was not my usual day to be at Cumulus,

2    but there may have been phone calls.  I could log in and

3    check my email remotely to try to stay on top of things.

4    So there may be some emails from that day.  I couldn't

5    tell you exactly who or what was said.

6          Q.    And then were you back at work on Wednesday?

7          A.    Yes.

8          Q.    And did you have any conversations with anyone

9    on Wednesday regarding Ms. Howard?

10          A.    Probably Peter, Karen Gooseff, maybe Richard

11   or Nicole.

12          Q.    And what do you recall discussing with Peter

13   Schwartz regarding Valerie Howard on that day?

14          MS. MOSER:  As long as Denning or Nicole

15   weren't on the phone or anything like that.  So no legal

16   counsel present.

17          THE WITNESS:  I don't remember what the

18   combinations and permutations of who was on what

19   conversation.  Wow.

20          MS. MOSER:  It wouldn't be privileged which

21   actual execution you walked out of those meetings with,

22   but what the company decided to actually do, just the

23   content if there was any legal counsel present in the

24   meeting itself.

25          THE WITNESS:  The one thing Peter informed me

1    that we were going to extend her exit date and that her

2    days off for her medical procedure would be sick days.

3         Q.   BY MS. LAWLESS:   And they extended the

4    termination date until the following week; correct?

5         A.   Yes.

6         Q.   And do you recall any conversations that you

7    had with Karen Gooseff on that Wednesday regarding

8    Ms. Howard?

9         A.   Yes.

10        Q.   What do you --

11        A.   I had to inform her about the sick days, the

12   correction to the final paycheck.  The final paycheck

13   had already -- had been processed, so we were going to

14   do an additional check for the actual final check

15   because we couldn't -- because the first check had

16   already been processed and it was easier just to do an

17   additional check than to cancel the first one and start

18   the process over.  So she had to make all the

19   arrangements and the calculations for that.

20        Q.   Did you have any conversations with

21   Mr. Schwartz about shutting down her email access or

22   anything like that?

23        A.   When an employee leaves, certain things we

24   have to do for IT, which is to let them know, how does

25   the email get handled, how does their voice mail get

                                                          133

1    between Monday, when she left the office, and Wednesday

2    that this was going to occur?

3         A.   I don't know.

4         Q.   Looking at what's been marked as Exhibit 26,

5    this is an email from yourself to Stacey Haysler dated

6    Friday, September 17th -- excuse me, it's from yourself

7    to Karen Gooseff dated Friday, September 17th in which

8    you're informing her that Valerie's employment was

9    extended through September 21st; right?

10        A.   Correct.

11        Q.   And then you advise her that since the final

12   check had already been sent, you're going to send her

13   the additional money?

14        A.   Correct.

15        Q.   Is that, in fact, what happened?

16        A.   Yes.

17        Q.   And then it looks like you -- that she was

18   going to be getting one month's severance starting from

19   the date of September 21st?

20        A.   Correct.

21        Q.   Did you learn at some point in time that

22   Ms. Howard's husband sent an email to Mr. Schwartz about

23   the termination?

24        A.   At some point?

25        Q.   Yes.  When you were -- at that point in time

1  the next -- I'm going to have her mark a few exhibits

2  here so we can kind of plow through this material here.

3          We are going to have the next exhibit in

4  order, which I believe is 28, is SQ291.  And SQ499, will

5  be the next exhibit, which is 29.  SQ270 to 271 will be

6  30.  SQ276 will be 31.  SQ716 will be 32.  SQ520 will be

7  33.  And SQ268 will be 34.

8          (Deposition Exhibit Nos. 28 through 34 were

9  marked for identification.)

10          MS. MOSER:  What order should we --

11          MS. LAWLESS:  Let's start with 28.

12          MS. MOSER:  You're such a logical thinker,

13  Therese.

14          MS. LAWLESS:  I don't know about logical, but

15  one way of keeping my brain organized.

16      Q.   BY MS. LAWLESS:  Ms. Haysler, could you, for

17  the record, tell us what Exhibit 28 is, please.

18      A.   It is the CMP Susquehanna Corp. Notice To

19  Employee Of Change In Relationship.  I will go into

20  detail.  Tell me when.

21      Q.   And tell me, did you fill out this document?

22      A.   Yes, I did.

23      Q.   And what was the purpose of filling out the

24  document?

25      A.   In California, when an employee is separated

1    from their employment, whether it's voluntary or

2    involuntary termination, you need to give them a notice

3    in this or a substantially similar form, along with the

4    DE2320 pamphlet which is called For Your Benefit.  It

5    informs the employee about unemployment, how the process

6    works, how to apply.  And it's a very simple form.  You

7    put the employee's name, their Social Security number

8    for security reasons, because in the case of

9    face-to-face exit meetings, this packet is handed to the

10   employee, we don't put their full Social Security on it

11   because if they drop it walking to their car or BART or

12   something, it could compromise their identity.

13          You tick the appropriate box for the reason

14   for the separation of employment, the effective date and

15   that's the form.

16      Q.   And is it true that Ms. Howard's employment

17   was effective September 21st, 2010?

18      A.   I would need to refer back to the email from

19   Richard Denning.

20      Q.   Well, see where you mark "Layoff effective"

21   and it says a date?

22      A.   I'm trying to see if that was an original date

23   or revised date.

24      Q.   That is the revised date.

25      A.   Then that is the correct date.

141

 1    back on a very part-time consulting basis.

 2           Q.   When was that?

 3           A.   September 2011.

 4           September is a really busy month.  And so I

 5    helped them through the transition and that was my last

 6    involvement with them.  And they did not replace the HR

 7    function that Heather had been performing.

 8           Q.   And when you were hired back as a consultant,

 9    you weren't an employee, you were just working as a

10    consultant; is that correct?

11           A.   Just kind of on an as-needed hours,

12    here-and-there basis.

13           Q.   Do you know why Heather left?

14           A.   She went back to the credit union she had

15    worked at before.  She had left there because her -- the

16    small credit union she worked at had been acquired by a

17    larger one and she had been told that her position would

18    be eliminated, so she started a job hunt and found a job

19    because she didn't want to go through a period of

20    unemployment.  And it turned out the acquiring company

21    decided that losing her was a mistake, so they made an

22    offer for her to go back and she did.

23           Q.   Earlier we had talked about some of the

24    internal job postings.

25           A.   Yes.

STACEY HAYSLER, VOLUME II - March 27, 2013

1      A.    Initially performance reviews were tied to

2  compensation adjustments.  So when I first started, that

3  system wasn't in place, I created it, so I remind

4  people, "You've got an anniversary coming up.  Do

5  something with this person."

6          And I created -- I have what I call the

7  four-question performance review that is really simple,

8  easy for the manager, easy for the employee, quick, gets

9  to the heart of the matter and isn't one of those

10  endless ten-page forms, "On the scale of one to 23 what

11  is this person --" because those aren't effective, those

12  aren't helpful and nobody is going to fill them out

13  accurately.

14          But then once the company stopped doing

15  compensation adjustments in 2008, there wasn't the

16  pressure to do them because there was no way to reward

17  employees for improving their performance.  So a lot of

18  managers didn't continue doing it.  And it wasn't a

19  matter of company policy that they had to be done.

20      Q.    And do you know why the company stopped doing

21  compensation adjustments in 2008?

22      A.    The global economy went into the tank and

23  revenues went down and they were looking to cut

24  expenses, so the company did layoffs and imposed a

25  salary freeze.

STACEY HAYSLER, VOLUME II - March 27, 2013

1       A.   Raquel was laid off in 2000 --

2       Q.   Nine, I believe.

3       A.   Nine.  Okay.

4       Q.   Around June.

5       A.   Okay.  So that would have been with Tony

6  Salvadore because he was still market manager at the

7  time.

8       Q.   I believe that Mr. Salvador was terminated

9  later than June of 2009.  I could be wrong.

10      A.   That's what I said, it was with Tony because

11 he was still there.  He was terminated in July.

12      Q.   Okay.  He was the market manager?

13      A.   Yes.

14      Q.   So you had the discussions with Tony?

15      A.   Yes.

16      Q.   I'm sorry, I misunderstood you.  Excuse me.

17      A.   That's all right.

18      Q.   What were the discussions regarding

19 terminating Raquel's job?

20      A.   Well, background to Raquel's exit.  In March

21 of 2009, the company decided that further layoffs were

22 necessary due to a continued decline in revenue, and one

23 of the employees selected was Michele Mercer, who was a

24 traffic manager, M-e-r-c-e-r.  And so, start the

25 process.  And then at the time the traffic department

1    sat right outside my office.  And I was working with my

2    door open and I heard Michele burst into tears, so I

3    pulled her into my office, along with her supervisor,

4    and she had just gotten off the phone with her doctor

5    who informed her that she had breast cancer, so we

6    soothed her and got her out to go see her doctor.

7              And I went up to see Tony and said, "I don't

8    think we should lay her off next week.  She just

9    received news of a medical problem and she needs to take

10   some time to deal with that.  And I don't think it's

11   appropriate to terminate her employment while she's out

12   on medical leave."

13        Q.    And did Tony agree with you?

14        A.    Absolutely.

15        Q.    And at some point she returned from her

16   medical leave?

17        A.    Yes.

18        Q.    And Tony was still employed when she returned;

19   correct?

20        A.    Yes.

21        Q.    And so how does that relate to Raquel?

22        A.    Part 2.  The choice is between laying off

23   Michele or laying off Raquel, and Michele was chosen

24   because she was a more highly compensated employee.

25   Since this was a budget matter, the most expensive

1    employee in the department is the one who is laid off.

2         Q.   I will just ask you a little bit about that.

3    It was my understanding that was not always the case

4    when it came to terminations.

5         A.   For the traffic department that was how we

6    made the determination.

7         Q.   That was for the traffic department in 2009?

8         A.   Yes.

9         Q.   So they basically went for the highest paid

10   employee?

11        A.   Yes.

12             And also with those March separations, it was

13   the highest paid employee, highest paid nonmanager

14   employee in IT, and one other person in traffic.

15   Because we had two people doing continuity at the time

16   and, again, highest paid one was the one let go.

17        Q.   So Raquel Lomeli was the most highly

18   compensated?

19        A.   No, Michele Mercer.

20        Q.   Oh, Michele was?

21        A.   This is why Michele was originally selected to

22   be laid off.

23        Q.   Then she went out on leave?

24        A.   Yes.  And while she was out on leave, the

25   remaining traffic staff were all supposed to pitch in

                                                         178

1    and help.  Raquel did not display the teamwork one might

2    have wished.  She was very vocal in her complaints about

3    the additional work.  She did not shoulder the expected

4    additional work, which created -- which pushed more work

5    onto the other two people in the department, which isn't

6    fair.

7              When Michele came back from leave, Karynann,

8    K-a-r-y-n-a-n-n, Blasi, B-l-a-s-i, who was the manager

9    of the traffic department, came to see me and said, "We

10   know we were going to let Michele go, but Raquel really

11   didn't step up."  And at that point we knew Raquel was

12   going out on medical leave, so we were going to retain

13   Michele while Raquel was out.

14        Q.   Why was Raquel going out on medical leave, do

15   you know?

16        A.   I don't remember.

17        Q.   Okay.

18        A.   It wasn't breast cancer.

19             And so while Raquel was out, Michele was

20   amazing.  She stepped up, she took on things, she took

21   on extra things without being asked.  She really made a

22   lot of difference in making sure the work got done and

23   things happened like they were supposed to.

24             So Karynann came to me and said, "You know, I

25   think we're going to make a mistake here.  I think it's

STACEY HAYSLER, VOLUME II - March 27, 2013

1    better that we retain Michele even though she's more

2    expensive.  She's more of a team player and she's better

3    at her work."

4              So we go to see Tony and say, "Hey, Tony, here

5    is this kind of interesting thing.  And we know that

6    this is solely a budget decision, but can you talk to

7    corporate and see what they say?  It's not a huge amount

8    of money, but it's noticeable, but the difference in the

9    work is really significant and measurable."

10        Q.   And that's the information that you were

11   receiving from Karyn?

12        A.   Karynann, yes.

13        Q.   Sorry.

14        A.   So Tony I think emailed or called Pinch and

15   explained the situation.  And Jon was like, "Well, yeah,

16   let's keep Michele even though she's a higher salary."

17        Q.   And Tony was in agreement with that, to your

18   knowledge?

19        A.   Yes.

20        Q.   Do you have any knowledge as to how long

21   Raquel was out on her medical leave?

22        A.   I don't remember.

23        Q.   Do you have any knowledge as to how long

24   Michele was out on her medical leave?

25        A.   I think around three months, but I don't

 1   file drawer but each had their own file.

 2        Q.   Got you.  Understood.

 3        A.   How to give an HR person nightmares.

 4             MS. MOSER:  That's true.

 5        Q.   BY MS. LAWLESS:  Do you know if Raquel Lomeli

 6   received a severance agreement?

 7        A.   Yes, she did.

 8        Q.   Did you receive a severance agreement at all

 9   when you finally left the company?

10        A.   No.

11        Q.   Do you have any agreements with the company at

12   all in writing or orally?

13        A.   No.

14             MS. LAWLESS:  Let's take a little break.

15             Actually, I think I'm done for now.

16             THE WITNESS:  Thank you.

17

18                  EXAMINATION BY MS. MOSER

19        Q.   I have a couple questions.  I won't say one

20   because that's always the kiss of death.

21             Have you handled employment termination

22   meetings for Cumulus?

23        A.   Oh, yes.

24        Q.   Have you handled those type meetings for job

25   eliminations?

STACEY HAYSLER, VOLUME II - March 27, 2013

1    A.   Yes.

2    Q.   Can you estimate how many of those you've

3  done?

4    A.   Let's see.  Fall of 2008, there were at least

5  three.  March of 2009, probably four or five.  Raquel

6  was in 2009.  Tony, I wasn't in the meeting, but I did

7  all the process.  Later in 2009 there was another batch

8  of layoffs.  We also terminated employees for poor

9  performance, behavioral policy violation things.  And

10  the involuntary term's, particularly for sales

11  executives who couldn't meet their sales goals, kind of

12  a regular occurrence, sadly.  When the company did its

13  acquisition of Citadel, one of the things I did for them

14  was assist with the two group layoffs at KGO.  So sadly

15  it was a regular occurrence during my time there.

16    Q.   In your personal experience for these job

17  eliminations you've been a part of, are you aware of any

18  employee who was told before they were actually

19  terminated that they would have their job eliminated in

20  the future?

21    A.   Oh, no.

22    Q.   Why wouldn't that happen?

23    A.   It's never -- it's not constructive, because

24  the employee either immediately starts stressing about

25  the fact that, oh my God, I'm not going to have a job

1    and then in the future there may be a position available

2    and Cumulus would could go and affirmatively ask that

3    laid off employee if they would like to apply for the

4    job?

5         A.   Not that I'm aware of.

6         Q.   Have you ever heard of it happening?

7         A.   Not while I was doing the HR work.

8         Q.   Are you aware of any policy or practice at

9    Cumulus in this layoff situation to demote an employee,

10   instead of terminate the employment, instead of

11   eliminate the job?

12        A.   No.

13        Q.   Have you ever heard of that happening?

14        A.   Not at Cumulus.  Other companies I have dealt

15   with have done that, but not at Cumulus.

16        Q.   Are you aware of any policy or practice at

17   Cumulus to reduce an employee's salary instead of

18   eliminating that position?

19        A.   I've never known them to do that.

20        Q.   So you never heard of it happening?

21        A.   No.

22        Q.   Were you surprised when Joe Cariffe started at

23   the company as a national sales manager around when

24   Valerie Howard had her job eliminated?

25        A.   The timing looks awkward, but the fact is we

STACEY HAYSLER, VOLUME II - March 27, 2013

1    had been recruiting for the position for rather a while.

2    I don't see the two items as related.

3         Q.   So what is that based on?  Is there a

4    difference in the type of jobs?  They are both sales

5    manager jobs; right?

6         A.   But saying they are both sales manager jobs is

7    like saying, you know, the benefits manager is the same

8    as the payroll manager.  They both have manager, but

9    they have different functions, different

10   responsibilities, different requirements.  And because

11   somebody can do one job that is a manager doesn't mean

12   they are right for the other job that is a manager.

13        Q.   You testified earlier, and I don't want to put

14   words in your mouth, so what was the order between when

15   you learned that Valerie's job was going to be

16   eliminated and when you found out that she needed to

17   take medical leave?

18        A.   So Peter Schwartz informed me that her

19   position was going to be eliminated.  Later that day she

20   came to me and said, "I need to take medical leave,"

21   which was sort of like a deja vu with Michele Mercer's

22   situation.  And so then I went to talk to Peter about,

23   "I think we need to revisit this plan."

24        Q.   Did you look for any documentation that would

25   reflect that timing, the order of those two things?  Did

186

1    Q.    Did you do that with the Valerie Howard

2    situation at all ever?

3    A.    When they initially made the decision to

4    eliminate her position --

5    Q.    Uh-huh.

6    A.    -- and then she came to me and told me about

7    her need for medical leave, I went back to Peter and

8    said, "We can't do this," very similar with the Michele

9    Mercer situation of we can't lay somebody off when they

10   are out on medical leave, it's just not the right thing

11   to do, it's not fair to the employee, it's not the kind

12   of company that Cumulus wants to be and, you know, other

13   circumstances like that.

14   Q.    Were there any other circumstances with

15   Valerie or Michele that you had that type of

16   conversation or just the ones you just mentioned?

17   A.    Well, there was a discussion with Peter when

18   Valerie was initially coming back about if we're going

19   to terminate her on her return, let's time it in such a

20   way so that we're not jeopardizing her health care

21   because, again, I think it's very important to consider

22   the human side of the equation.  Yes, from corporate's

23   point of view, it's about making the budgets work,

24   expenses versus revenue, but you're still dealing with

25   the human being and you have to factor those things in.

1          CERTIFICATE OF DEPOSITION OFFICER

2      I, CHERYL WILDER, CSR #7805, duly authorized to

3    administer oaths, hereby certify that at the

4    commencement of the foregoing deposition the witness

5    stated, under penalty of perjury, that he or she would

6    testify the truth, the whole truth, and nothing but the

7    truth in the within-entitled cause; that said deposition

8    was taken at the time and place therein stated; that the

9    testimony of said witness was reported by me and was

10   thereafter transcribed by me (or under my direction)

11   into typewriting by computer; that the foregoing is a

12   full, complete and true record of such testimony; and

13   that the deponent or a party requested review of the

14   deposition prior to completion of the deposition; and

15   that the deponent was given an opportunity to review the

16   deposition.

17      I further certify that I am not of counsel or attorney

18   for either or any of the parties in the foregoing

19   deposition and caption named, nor in any way interested

20   in the outcome of the cause named in said caption.

21          _Cheryl Wilder_

22              DEPOSITION OFFICER

23

24          _____

                DATE Of CERTIFICATION

25

**Karen Gooseff**

From:          Stacey Haysler
Sent:          Friday, September 17, 2010 12:54 PM
To:            Karen Gooseff
Subject:       FW: Valerie - Privileged Communications - Attorney Work Product


Karen - Valerie's employment has been extended through September 21, per Richard Denning's email below.  Please prepare an actual final check to include the additional days. Since we have already sent her what was to have been the final check and retrieving it would cause unnecessary stress for Valerie, she will cash that one as her pay through today, and we will send her an additional check for her time through Sept. 21.


Stacey

From: Richard Denning
Sent: Friday, September 17, 2010 9:46 AM
To: Stacey Haysler
Cc: Jon Pinch; Peter Schwartz
Subject: FW: Valerie - Privileged Communications - Attorney Work Product

Stacey:  See below.  We will consider her last day the 21st.  Her one month severance will start from that date.

Please call if you have any questions.

Richard S. Denning
Vice President, General Counsel & Secretary Cumulus Media, Inc.
3280 Peachtree Road, NW
Suite 2300
Atlanta, GA  30305
Ph:  404-260-6677
Fax: 404-260-6877

Cumulus Media Email Policy
PLEASE NOTE:  This message contains confidential information and is intended only for the individual(s) named.  Employees of CMI and CMP (and their subsidiaries) are prohibited from forwarding this email or otherwise disclosing the contents of this email, or any portion thereof, to any third party, including any non-employee of the respective companies.  Failure of an employee to comply with this policy will result in disciplinary action up to and including immediate termination of employment.

EXHIBIT NO. 26
HAYSLER
CHERYL WILDER, CSR 3-27-13

1