# EXHIBIT F

```
 1                UNITED STATES DISTRICT COURT
 2         IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                          --o0o--
 4
 5  VALERIE HOWARD,                    )
                                       )
 6              Plaintiff,             )
                                       )
 7     vs.                             )    No. C 12-4880 CRB
                                       )
 8  CUMULUS MEDIA INC., SUSQUEHANNA    )
    RADIO CORP, and DOES ONE through   )
 9  FIFTY, inclusive,                  )
                                       )
10              Defendants.            )
    _____)
11
12
13                      Deposition of
14                   KAREN MARIE GOOSEFF
15                     June 27, 2013
16
17
18
19  Reported by:
20  James Matthews, CSR 7916
21
22                      TOOKER & ANTZ
                COURT REPORTING & VIDEO SERVICES
23                350 SANSOME STREET, SUITE 700
                 SAN FRANCISCO, CALIFORNIA 94104
24                      (415) 392-0650
25
```

                                                                1

```
 1        Q.   Okay.  And what was the worksheet called?
 2        A.   It's called the payroll worksheet.
 3        Q.   Okay.  And this was a note basically informing
 4   headquarters that she was going out on disability?
 5        A.   That she was out.  Why the payroll was a different
 6   rate than it would normally be.
 7        Q.   Okay.  And to your understanding was this note made
 8   after she actually physically went out on disability?
 9        A.   I would assume yes because I wouldn't have
10   submitted the payroll unless I knew that she was out on
11   disability.
12        Q.   When you were looking for records or notes
13   regarding the date did you find any other records or notes?
14        A.   No, that's what I was looking for.
15        Q.   And why were you looking for that?
16        A.   Because I knew in '09 -- in September of '09 that
17   they had asked me to prepare a final check for Valerie as
18   they were eliminating her position.
19        Q.   And did you see any notations relating to the fact
20   that you had been asked to prepare a final paycheck for
21   Valerie Howard?
22        A.   No.  I was told to prepare that by Stacey Haysler
23   our HR manager at the time.
24        Q.   And did you see any communications between you and
25   headquarters or anyone informing them that that was going to
```

```
 1       A.   I don't recall.
 2       Q.   Can you give me a best estimate in the five-year
 3  range?
 4       A.   I'd say probably maybe 15 years ago.
 5       Q.   Okay.
 6       A.   Strictly an estimate.
 7       Q.   So you think around 2000?
 8       A.   Could have been.  I honestly don't remember.
 9       Q.   You don't remember?
10       A.   Um-um.
11       Q.   Okay.  And where did you work when you commenced
12  employment up here?
13       A.   I worked at Bonneville for KDFC.
14       Q.   And what years did you work at Bonneville?
15       A.   I worked for Bonneville for six -- six and a half
16  years, I think.  And that was right before I came here.  To
17  Cumulus.
18       Q.   Were you working at Bonneville when Ms. Howard was
19  working there?
20       A.   Yes.
21       Q.   Did have you any interaction with her at
22  Bonneville?
23       A.   Yes.
24       Q.   And what was your interaction?
25       A.   Originally when I started Valerie was my boss.
```

26

1      A.   I don't recall.
2      Q.   -- physically?  Okay.  Did Mr. Schwartz ever talk
3  to you at all about Valerie Howard in the 2009 time period?
4      A.   I don't recall.  You mean relating to this kind of
5  stuff?
6      Q.   Or anything.
7      A.   I don't remember.
8      Q.   Okay.  Did Mr. Schwartz ever tell you that he was
9  dissatisfied with Ms. Howard's performance at all?
10     A.   No.
11     Q.   Did Mr. Schwartz ever tell you that he was planning
12 on eliminating Ms. Howard's job?
13     A.   No.
14     Q.   And as of the end of December -- excuse me -- as of
15 the end of the year 2009 did you have -- ever have any
16 conversations with Valerie Howard in which you told her that
17 you learned that her job was going to be eliminated?
18     A.   In 2009?
19     Q.   Yeah.
20     A.   I don't -- no, I don't think so.
21     Q.   Okay.  And in the 2009 time period did anyone tell
22 you that they were going to eliminate Ms. Howard's job?
23     A.   Yes.
24     Q.   Okay.  And who told you that?
25     A.   Stacey.

72

1  Q.  And what did Stacey say?
2  A.  She asked me to prepare her final check.
3  Q.  Okay.  And did you do that?
4  A.  I was in the process, and then I was told to stop.
5  It had been -- it wasn't going to happen.
6  Q.  Okay.  And is there any written communication
7  related to that?
8  A.  No.  Stacey personally told me this.
9  Q.  And when did Stacey tell you that?
10  A.  I don't know the exact date.  It was in September
11  of '09 but I don't recall the date.
12  Q.  Okay.  Do you know if it was before September 8th,
13  2009?
14  A.  I don't know the exact date.
15  Q.  And when Stacey told you to prepare the final
16  paycheck where were you when she told you that?
17  A.  In my office.
18  Q.  Okay.  And how long did you have a conversation
19  about you preparing the final paycheck?
20  A.  I don't recall.
21  Q.  Okay.  And did she tell you why you should prepare
22  a final paycheck for Valerie Howard?
23  A.  I don't recall.
24  Q.  Okay.  And did she tell you when Ms. Howard would
25  be informed of this?

73

1   stopped doing whatever you were doing?
2       A.   No.  There isn't -- I don't have anything.  I
3   deleted anything that I would have started.
4       Q.   Okay.  And when you delete things at the company to
5   the best of your knowledge are they deleted permanently?
6       A.   I don't know.
7       Q.   Okay.  And --
8       A.   It was not e-mail.  It was an Excel document is
9   where I do all the manual pay -- pay information.  To do a
10  check is on Excel.
11      Q.   Okay.
12      A.   So I don't know if that would be kept at all.
13      Q.   All right.  But in fact you don't even know if you
14  actually physically started doing that process?
15      A.   I started the process, I do remember that.  But I
16  don't know how far I got into it before it was stopped.
17      Q.   And when you say you started the process what do
18  you mean by that?
19      A.   I started calculating vacation, you know, going
20  through how much vacation I owed Valerie, and that kind of
21  stuff, and what dollars I would need and that kind of stuff.
22      Q.   And when you did that did you keep -- did you hand
23  write that at all?  Often times when I'm doing calculations
24  --
25      A.   No, I did everything on the computer.

76

TOOKER & ANTZ COURT REPORTING & VIDEO SERVICES
(415) 392-0650

1    Q.   Okay.  And what do you recall about -- in terms of
2  doing that?
3    A.   Of doing the check?
4    Q.   Yeah.
5    A.   I sent the e-mail to Valerie by mistake instead of
6  Jon Pinch.  I was horrified when I found out.
7    Q.   And we'll get to that.  But I'm just wondering as
8  of September 8th, 2010 when he or Peter Schwartz is
9  indicating that you and Stacey are in the loop do you know
10 whether or not you had started processing the --
11   A.   I'm not sure of the date.  I'm not real sure of the
12 date.
13   Q.   Okay.
14   A.   I don't remember.
15   Q.   All right.  And as of the date when you learned
16 that she -- her job would be eliminated --
17   A.   Um-hum.
18   Q.   -- did you have an understanding that she in fact
19 would be offered a severance of some type?
20   A.   I have no idea.  My whole role is just to process
21 the paycheck.
22   Q.   All right.  So let's now go to the e-mail that you
23 just discussed, okay?
24   A.   Um-hum.
25   Q.   I know.  Probably been waiting all day.  It is

97

```
 1        A.    Um-hum.
 2        Q.    That is where you were trying to get the final
 3   paycheck done; is that right?
 4        A.    Yes.
 5        Q.    Okay.  And then you had to have that approved by
 6   Mr. Pinch?
 7        A.    Yes.
 8        Q.    And why did it have to be approved by Mr. Pinch?
 9        A.    We didn't have a market manager.
10        Q.    Okay.  And Mr. Schwartz was reporting to Mr. Pinch
11   at that time, correct?
12        A.    Correct.
13        Q.    Now, after you sent this e-mail, whatever time you
14   sent this, how did you learn that you had sent it to Ms.
15   Howard in error?
16        A.    I learned because Stacey came in and said that
17   Valerie found out she was being terminated.  And I'm like I
18   don't understand how she could find out.  So I'm like all of
19   a sudden I thought the only thing that I've done is send an
20   e-mail to John and then I looked and that's how I found it.
21        Q.    So you didn't intend to send it to Ms. Howard?
22        A.    No.
23        Q.    You intended to send it to Mr. Pinch?
24        A.    Yes.  It's even addressed to him down here, Jon.
25        Q.    And when Stacey --
```

100

```
 1      A.   Yeah.
 2      Q.   Do you recall was it on September the 13th --
 3      A.   Yes.
 4      Q.   -- when Stacey came to you?
 5      A.   Yes.
 6      Q.   Okay.  Do you recall what time of day it was?
 7      A.   It was the end of the day.  End of the workday.
 8      Q.   Okay.  And did you look at the e-mail while Stacey
 9   was still in the room with you?
10      A.   No, I discovered it myself after she told me.  I
11   was trying to think there's no way.  I mean -- how could --
12   there was only three of us in the market that knew.  Peter,
13   Stacey and myself.
14      Q.   And Jon Pinch also knew?
15      A.   Well, I meant in the market.
16      Q.   When say in the market?
17      A.   San Francisco.  Our market.
18      Q.   Okay.  And so then what did you do to check?
19      A.   I just started thinking and I went back and looked
20   at my sent e-mail and that's where I saw it.
21      Q.   And when you discovered that you had erroneously
22   sent it to Ms. Howard what did you do?
23      A.   I went to Stacey immediately and told her.
24      Q.   And what did Stacey say?
25      A.   She -- we called Peter and had Peter come down so I
```

101

```
 1  that begins traffic department?
 2       A.   Yes.
 3       Q.   And that paragraph states that Michele Mercer will
 4  be let go, right?
 5       A.   Correct.
 6            MS. LAWLESS:  I'm going to object,
 7  mischaracterizing the evidence.
 8            MR. SOLLEY:  Q. You understood that Michele Mercer
 9  was going to be laid off, right?
10       A.   Yes.
11       Q.   Was she laid off?
12       A.   No.
13       Q.   Does she still work at Cumulus?
14       A.   Yes.
15       Q.   Do you know why she was not laid off?
16       A.   I do per the e-mail.  It talks about her health
17  issue.
18       Q.   I'm going to show you one more e-mail which will be
19  Defendant's Exhibit B.
20  (Whereupon Defendant's Exhibit B was marked for
21            identification.)
22            MR. SOLLEY:  Q. Let me know when you've had a
23  chance to review that.
24            (Pause.)
25       A.   Okay.
```

159

```
 1      Q.   And you testified that she was the GM of KDFC?
 2      A.   Yes.
 3      Q.   Do I have that right?
 4      A.   Yes.
 5      Q.   And at some point she became a sales manager?
 6      A.   I think general sales manager.  Actually.
 7      Q.   Because she went from general manager to general
 8   sales manager?
 9      A.   Um-hum.  To the best of my recollection, yes.
10      Q.   And would that be considered a promotion or a
11   demotion?
12      A.   A demotion.
13      Q.   Who owned Bonneville, if you know?
14      A.   It's the Mormon Church.
15           MS. LAWLESS:  I didn't know.
16           THE WITNESS:  Yeah, Bonneville, or anything
17   Bonneville.
18           MS. LAWLESS:  Yeah, right.
19           MR. SOLLEY:  Q. In your opinion does Bonneville
20   have a different approach than Cumulus to how they run their
21   business?
22           MS. LAWLESS:  Objection, vague and ambiguous.
23   Lacks -- calls for speculation.
24           THE WITNESS:  I would not have a clue.
25           MR. SOLLEY:  Q. Okay.  You testified earlier that
```

```
 1    in 2009 you recall being asked to prepare a final paycheck
 2    for Valerie, right?
 3         A.   Yes.
 4         Q.   And you also recall being asked in 2009 to not
 5    carry through with that final paycheck?
 6         A.   Yes, that's correct.
 7         Q.   Was that unusual?
 8         A.   Yes.
 9         Q.   Normally when you're asked to prepare a final
10    paycheck it's because the decision is final, correct?
11         A.   Correct.
12         Q.   Hence the final paycheck name?
13         A.   Yes.
14         Q.   And you said that Stacey didn't explain why she was
15    asking you not to prepare the final paycheck?
16         A.   She really can't.  And Stacey won't.
17         Q.   Because she's maintaining confidentiality?
18         A.   Yes.  Exactly.
19         Q.   So all you knew was that there had been a change of
20    course?
21         A.   Yes.
22         Q.   Which occurred based on general practice after what
23    had been a final decision to eliminate Valerie's job?
24              MS. LAWLESS:  Objection, lacks foundation, calls
25    for speculation.
```

162

```
 1            MR. SOLLEY:  Q.  You can answer.
 2       A.   Yes.
 3       Q.   And you testified about the Excel Spreadsheet that
 4  you use when you would record manual payroll changes?
 5       A.   Yes.
 6       Q.   And you believe that you had started in 2009
 7  entering Valerie Howard's information into that spreadsheet?
 8       A.   Yes.  I know I started the process of preparing the
 9  final check.  I don't recall how far I got.  Into the
10  process.  But I know I started it.
11       Q.   And would that information be reflected in the
12  Excel Spreadsheet now?
13       A.   No.  I deleted it when it wasn't completed.
14       Q.   Because when the decision was made not to eliminate
15  the position you had no need to have what would then be
16  inaccurate information?
17       A.   Correct.
18       Q.   On the spreadsheet, right?
19       A.   Correct.
20            MR. SOLLEY:  Okay, that's all I have.
21               FURTHER EXAMINATION BY MS. LAWLESS
22            MS. LAWLESS:  Q.  Okay.  If you can look at what was
23  marked as Defendant's B.
24       A.   Um-hum.
25       Q.   Ms. Gooseff.  And looking at page 2 of Defendant's
```

163

1      CERTIFICATE OF DEPOSITION OFFICER--FEDERAL COURT
2
3         I, JAMES MATTHEWS, CSR No. 7916, duly authorized to
4      administer oaths, hereby certify that at the commencement of
5      the foregoing deposition the witness stated under penalty of
6      perjury that he or she would testify the truth, the whole
7      truth, and nothing but the truth in the within-entitled
8      cause; that said deposition was taken at the time and place
9      therein stated; that the testimony of said witness was
10     reported by me and thereafter transcribed by me or under my
11     direction into typewriting by computer; that the foregoing is
12     a full, complete, and true record of said testimony; and that
13     the deponent or a party requested review of the deposition
14     prior to completion of the deposition; and that the deponent
15     was given an opportunity to review the deposition.
16        I FURTHER CERTIFY that I am not of counsel nor attorney
17     for either or any of the parties in the foregoing deposition
18     and caption named, or in any way interested in the outcome of
19     the cause named in said caption.
20                           _____
                                   DEPOSITION OFFICER
21
22     I hereby certify this copy is a
       true and exact copy of the
23     original      [signature]
24     _____
       DEPOSITION OFFICER
25

TOOKER & ANTZ COURT REPORTING & VIDEO SERVICES
(415) 392-0650